1    [Attorneys On Next Page]

2

3

4

5

6

7

8    UNITED STATES DISTRICT COURT

9    CENTRAL DISTRICT OF CALIFORNIA

10    WESTERN DIVISION

11

| | |
|---|---|
| GIGANEWS, INC., a Texas corporation; and LIVEWIRE SERVICES, INC., a Nevada corporation, | Case No.: 2:17-cv-05075-AB (JPR) |
| | **DISCOVERY MATTER** |
| Plaintiffs, | ***Before Hon. Jean P. Rosenbluth*** |
| v. | **JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND FOR PROTECTIVE ORDER (LOCAL RULE 37-2)** |
| PERFECT 10, INC., a California corporation; NORMAN ZADA, an individual; and DOES 1-50, inclusive, | |
| Defendants. | Date:      July 19, 2018<br>Time:      10:00 a.m.<br>Courtroom: 690, 255 E. Temple St., Los Angeles, CA 90012 |
| | Discovery Cut-off:  July 27, 2018<br>Trial Date:      January 15, 2019 |

1 | ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
2 | JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
3 | TODD R. GREGORIAN (CSB No. 236096)
tgregorian@fenwick.com
4 | FENWICK & WEST LLP
555 California Street, 12th Floor
5 | San Francisco, CA 94104
Telephone: 415.875.2300
6 | Facsimile: 415.281.1350

7 | RONALD P. SLATES, SBN: 43712
rslates2@rslateslaw.com
8 | KONRAD L. TROPE, SBN: 133214
ktrope@rslateslaw.com
9 | RONALD P. SLATES, P.C.
500 South Grand Avenue, Suite 2010
10 | Los Angeles, CA 90071
Telephone: 213.624.1515
11 | Facsimile: 213.624.7536

12 | Attorneys for Plaintiffs/Judgment Creditors,
GIGANEWS, INC. and LIVEWIRE SERVICES, INC.
13 |

14 |
MATTHEW C. MICKELSON (S.B.N. 203867)
15 | matthew@mickelsonlegal.com
LAW OFFICES OF MATTHEW C. MICKELSON
16 | 16055 Ventura Boulevard, Suite 1230
Encino, CA 94136
17 | Telephone: 818.382.3360
Facsimile: 818.382.3364
18 |
Attorneys for Defendants
19 | PERFECT 10, INC. and NORMAN ZADA

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

JOINT STIPULATION RE PLAINTIFFS' MOTION
TO COMPEL PRODUCTION OF DOCUMENTS AND          CASE NO.: 2:17-cv-05075-AB (JPR)
FOR PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

   A.   Plaintiffs' Preliminary Statement ............................................. 1

   B.   Defendants' Preliminary Statement ......................................... 4

II.   PLAINTIFFS' MOTION TO COMPEL DOCUMENTS ............................ 7

   A.   Giganews's First Set of Requests for Production of Documents ......... 7

   Request for Production No. 6 ..................................................... 7

   Response to Request for Production No. 6 (Perfect 10) ...................... 7

      Giganews's Position ................................................ 10

      Perfect 10's Position ............................................... 13

III.   PLAINTIFFS' MOTION FOR PROTECTIVE ORDER ........................... 19

   A.   The Court should not allow Defendants to Harass an Apex Officer with No Knowledge Relevant to the Claims in This Action. ............. 19

      Giganews and Livewire's Position ........................... 20

      Defendants' Position ................................................ 22

   B.   Perfect 10's 410 Requests for Admissions are Harassing, Irrelevant and Disproportionate to the Needs of the Case .................................. 23

      Giganews and Livewire's Position ........................... 23

      Perfect 10's Position ............................................... 25

   C.   The Majority of the Requests are Irrelevant and not in Proportion to the Needs of the Case. .......................................... 26

      1.   Requests Regarding Plaintiffs' Servers and Business ............. 26

      Giganews and Livewire's Position ........................... 29

      Perfect 10's Position ............................................... 30

      2.   Requests Regarding Child Pornography .................. 32

      Giganews and Livewire's Position ........................... 32

      Perfect 10's Position ............................................... 33

      3.   Requests Regarding Copyright Infringement Allegations ....... 34

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

Giganews and Livewire's Position ...........................................42

Perfect 10's Position ................................................................43

4.  Requests Regarding Perfect 10's Reason for Filing Suit ........43

Giganews and Livewire's Position ...........................................44

Perfect 10's Position ................................................................45

5.  Requests Regarding Ineffective DMCA Notifications of Claimed Infringement................................................................45

Giganews and Livewire's Position ...........................................47

Perfect 10's Position ................................................................47

6.  Requests Regarding the Mimo Newsreader ...........................48

Giganews and Livewire's Position ...........................................48

Perfect 10's Position ................................................................49

7.  Requests Regarding Litigation Other than the Underlying Action.....................................................................................49

Giganews and Livewire's Position ...........................................55

Perfect 10's Position ................................................................56

8.  Requests Regarding Criminal Investigations .........................56

Giganews and Livewire's Position ...........................................57

Perfect 10's Position ................................................................58

9.  Requests Regarding Usenet .....................................................58

Giganews and Livewire's Position ...........................................58

Perfect 10's Position ................................................................59

10.  Requests Regarding Megaupload ...........................................59

Giganews and Livewire's Position ...........................................60

Perfect 10's Position ................................................................61

**TABLE OF CONTENTS
(CONTINUED)**

**Page**

11.   Requests Regarding Movies, Television Shows, and Music ...............................................................................61

        Giganews and Livewire's Position ...........................................69

        Perfect 10's Position ................................................................70

12.   Requests Regarding Amicus Briefs in the Underlying Case ...............................................................................70

        Giganews and Livewire's Position ...........................................75

        Perfect 10's Position ................................................................75

13.   Requests Regarding Hypotheticals Regarding the Concept of Theft .........................................................................76

        Giganews and Livewire's Position ...........................................76

        Perfect 10's Position ................................................................77

14.   Requests Regarding Message-IDs ...........................................77

        Giganews and Livewire's Position ...........................................82

        Perfect 10's Position ................................................................83

15.   Requests Regarding Giganews Deposition Responses ...........83

        Giganews and Livewire's Position ...........................................89

        Perfect 10's Position ................................................................89

IV.   CONCLUSIONS ................................................................................90

        Giganews and Livewire's Conclusion.....................................90

        Perfect 10's Conclusion...........................................................90

# TABLE OF AUTHORITIES

Page(s)

CASES

*A. Farber & Partners v. Garber*,
234 F.R.D. 186 (C.D. Cal. 2006) ........................................................ 13

*Affinity Labs of Tex. v. Apple, Inc.*,
No. C 09-4436, 2011 WL 1753982 (N.D. Cal. May 9, 2011) .................... 20, 21

*Asarco LLC v. Union Pac. R.R. Co.*,
No. 2:12-cv-00283-EJL-REB, 2016 WL 1755241 (D. Idaho May 2, 2016) ............................................................................................... 24

*Ashmore v. Dodds*,
No. 8:15-cv-00561-JMC, 2015 WL 6445985 (D.S.C. Oct. 23, 2015) .......... 12, 18

*Baine v. Gen. Motors Corp.*,
141 F.R.D. 332 (M.D. Ala. 1991) ...................................................... 20

*Barrous v. BP P.L.C.*,
No. C 10-2944 LHK PSG, 2011 WL 1431826 (N.D. Cal. Apr. 14, 2011) ................................................................................................ 12, 18

*Buchanan v. Chi. Transit Auth.*,
No. 16-cv-4577, 2016 WL 7116591 (N.D. Ill. Dec. 7, 2016) ..................... 76

*Busche v. URS Energy & Constr., Inc.*,
No. CV-13-5016-EFS, 2013 WL 5652154 (E.D. Wash. Oct. 15, 2010) ................................................................................................ 33

*Cory v. George Carden Int'l Circus, Inc.*,
No. 4-13-CV-760, 2015 WL 11072152 (E.D. Tex. Dec. 18, 2015) .................. 12

*Damian v. A-Mark Precious Metals, Inc.*,
No. CV 16-7198 FMO, 2017 WL 6940515 (C.D. Cal. Aug. 28, 2017) ................................................................................................ 24

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) *cert. denied*, 555 U.S. 1047 (2008) ................... 24

*E.E.O.C. v. Braun Elec. Co.*,
No. 1:12-cv-1592-LJO-JLT, 2014 WL 356998 (E.D. Cal. Jan. 24, 2014) ................................................................................................ 12

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ............................................................ 59

*Evans v. DSW Inc.*,
No. CV 16-3791-JGB, 2017 WL 9480800 (C.D. Cal. Aug. 24, 2017) ................................................................................................ 11

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Hill v. National Collegiate Athletic Assn.*,
  7 Cal. 4th 1 (1994) ................................................................................ 12

*In re Heller Ehrman LLP*,
  Bankr. No. 08-32514DM, 2013 WL 951706 (N.D. Cal. Mar. 11,
  2013) ................................................................................................... 30

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, MLD No. 1827, 2011 U.S. Dist. LEXIS 85608
  (N.D. Cal. Aug. 1, 2011) ................................................................. 20, 21

*Jadwin v. Cnty. of Kern*,
  No. 1:07-cv-0026-OWW-TAG, 2008 WL 3820288 (E.D. Cal. Aug.
  8, 2008) ................................................................................................ 24

*Johnson v. Runnels*,
  No. CIV S-04-0776 LKK EFB P, 2008 WL 5046064 (E.D. Cal.
  Nov. 21, 2008) ...................................................................................... 25

*K.C.R. v. Cnty. of L.A.*,
  No. CV 13-3806 PSG, 2014 WL 3434257 (C.D. Cal. Jul. 11, 2014) ............... 20

*Knapp v. Cate*,
  No. 1:08-cv-01779-AWI-BAM PC, 2012 WL 2912254 (E.D. Cal.
  Jul. 16, 2012) ....................................................................................... 43

*Oakes v. Halvorsen Marine, Ltd.*,
  179 F.R.D. 281 (C.D. Cal. 1998) ..................................................... 11, 12

*Perez v. Miami-Dade Cnty.*,
  297 F.3d 1255 (11th Cir. 2002) ............................................................. 33

*Stokes v. Interline Brands, Inc.*,
  No. C-12-05527 JSW (DMR), 2013 WL 6056886 (N.D. Cal. Nov.
  14, 2013) ........................................................................................ 24, 33

*Tatung Co. v. Hsu*,
  No. SA CV 13-1734-DOC, 2015 WL 11116906 (C.D. Cal. Feb. 11,
  2015) ............................................................................................. 11, 17

*Taylor v. Great Lakes Waste Servs.*,
  No. 06-CV-12312-DT, 2007 WL 422036 (E.D. Mich. Feb. 2, 2007) .......... 24, 25

**STATUTES**

Cal. Civ. Code
  § 3439.04(2)(B) ..................................................................................... 24
  § 3439.04(a)(1) ...................................................................................... 30
  § 3440 ................................................................................................... 24

Civ. L. R. 37-2 ............................................................................................. 1

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(b)(1) ................................................................................................33

Fed. R. Civ. P. 26(c)(1)......................................................................................48, 55, 57

Fed. R. Civ. P. 36(a)(1)................................................................................................42

Fed. R. Evid. 501 ................................................................................................11

## I.     INTRODUCTION

The parties submit this joint stipulation on Plaintiffs Giganews and Livewire Service's motion for protective order.  Civ. L. R. 37-2.  The parties conducted conferences of counsel by telephone on April 25 and May 29, 2018.  As Local Rule 37-2.1 requires, Plaintiffs attach a copy of the Court's scheduling order as Exhibit A to the Declaration of Todd Gregorian ("Gregorian Decl."), which accompanies this joint stipulation.

Fact discovery closes on July 27, 2018 and expert discovery closes on September 14, 2018.

### A.     Plaintiffs' Preliminary Statement

Plaintiffs seek to recover cash and assets that Perfect 10's CEO Norman Zada transferred from Perfect 10 to himself to avoid paying the Court's $5+ million[1] fee award in *Perfect 10 v. Giganews*, C.D. Cal. No. CV 11-7098 ("Related Case").  Zada took $850,000 out of Perfect 10's bank account immediately after the District Court granted summary judgment.  *See* Related Case, Dkt. 802 at 3.  He "bought" Perfect 10's physical assets, nominally paying in cash, but then he continued to transfer that cash indiscriminately between Perfect 10 and his personal accounts.  Zada testified that he did so to avoid enforcement of the Court's judgment and resulting "interference" with Perfect 10's business.  These are classic fraudulent transfers to hinder a creditor's collection against Perfect 10.

Perfect 10's discovery abuse that Mr. Zada orchestrated in the original case was extreme.  The Court compelled discovery numerous times and Perfect 10 violated nearly every order.  *See* Related Case, Dkts. 223, 254, 311, 312, 320, 322, 326, 342 and 676.  Perfect 10 and Zada provided false declarations, searched insufficiently, deleted email accounts, discarded computers, withheld responsive

---

[1] The District Court awarded approximately $5.6 million; with an award of appellate fees by the Ninth Circuit, the award has climbed to approximately $6.5 million.

non-privileged documents, and delayed large (yet incomplete) productions to impede depositions. *See generally*, Related Case, Dkt. 676.[2] They also sought to impose unreasonable burdens in discovery requests to Giganews and Livewire. *See* Related Case, Dkts. 216, 295, 316, & 412.

Perfect 10 and Zada follow the same pattern in this case; in addition, their discovery efforts wildly chase facts and issues that are not relevant to this case or even to the earlier case. This case is narrow. It concerns Zada's manipulation of Perfect 10's finances to dodge the fee award against Perfect 10 that actually occurred, and the sanctions award that Zada and Perfect 10's counsel manifestly expected, in the earlier case.

Giganews and Livewire seek the Court's assistance with three disputes:

**1.    *Ordering production of Perfect 10's and Mr. Zada's financial information.*** This is a fraudulent transfer action. Perfect 10's *and* Mr. Zada's financial records are therefore relevant for a host of reasons:

- They will identify the transfers between Perfect 10 and Zada and, if necessary, help trace the transferred funds and assets.
- They will show the transfers left Perfect 10 insolvent. A transfer is fraudulent if the source of the transfer can no longer pay its reasonably foreseeable expenses. Mr. Zada often took money out of Perfect 10 and paid its expenses from his own accounts. Discovery of *Zada's* financial records is necessary to identify *Perfect 10's* reasonable expenses.
- They will show Mr. Zada's wrongful intent and the falsity of his representations to the Court. Zada offered to settle the $5+ million judgment against Perfect 10 for $2 million plus future contingent rights to foreclose on real estate. He claims that the offer evidenced his innocent

---

[2] The Magistrate Judge ultimately vacated his sanctions order against Perfect 10, but only on the grounds that the District Court's fee award had mooted Plaintiffs' request for monetary sanctions.

1       intent, because, as he represented to this Court, he lacked "available"

2       additional funds to offer more.  Zada has also recently claimed, contrary

3       to his sworn testimony, that he moved Perfect 10's cash into his own

4       accounts to earn a better rate of return.  Discovery of both Perfect 10's

5       and Zada's records is necessary to show the falsity of these claims.

6           Defendants have refused to provide documents regarding funds and assets

7 that are *nominally* Zada's.  They want to cherry-pick records to disclose in order to

8 present a misleading picture.  The particular dispute here concerns documents

9 regarding liabilities of Perfect 10 and Zada.  Perfect 10 invokes its production in the

10 original case to avoid a proper production now.  That production is incomplete, up

11 to four years old.  Zada has refused to produce his complete records even though

12 they admittedly reflect debts he incurred for Perfect 10.  These documents are both

13 relevant and proportional:  Plaintiffs and the Court have no way to assess Perfect

14 10's "reasonable expenses" if those expenses are "off the books," in Zada's

15 "personal" records that he will not disclose.  The Court should not allow Perfect 10

16 and Zada to play a shell game hiding unfavorable evidence behind a self-serving

17 claim that the evidence relates to Zada and not Perfect 10.

18         **2.**    ***Preventing Mr. Zada's harassment of Giganews co-CEO Ronald***

19 ***Yokubaitis.***  Although fact discovery closes shortly, Defendants have noticed only

20 one deposition, of Giganews co-CEO Ronald Yokubaitis.  Mr. Yokubaitis has no

21 personal knowledge about the fraudulent transfers at issue here.  Plaintiffs have not

22 disclosed him as a witness.  Defendants have provided no reason for deposing him

23 beyond saying that Yokubaitis has made "various central decisions" in this case.

24 (Gregorian Decl. Ex. B)  But before taking an "apex" deposition, a party must

25 show the deponent has unique relevant *information* and that it has no less intrusive

26 means of discovering that information.  Defendants have not identified information

27 unique to Mr. Yokubaitis and they have not attempted any other means (such as a

28

1   30(b)(6) deposition) to obtain it.  The Court should therefore protect Mr. Yokubaitis

2   from having to sit for a deposition.

3         **3.**     ***Limiting Perfect 10's excessive and irrelevant admission requests.***

4   Perfect 10 served 410 requests for admission on topics ranging from child

5   pornography to European criminal investigations to a car-stealing robot.  Plaintiffs

6   offered to admit or deny 78 relevant requests (with objection to certain others) if

7   Defendants withdrew the remainder.  But Defendants refused a reasonable

8   compromise.  The Court should therefore issue a protective order limiting

9   Defendants to requests for admission Nos. 128 to 206 (which Plaintiffs offered to

10  answer), and precluding further requests for admission including the irrelevant

11  requests identified below.

12        **B.**    **Defendants' Preliminary Statement**

13        Defendants object to Plaintiffs' obvious attempts to smear Dr. Zada rather

14  than dealing with the issues.  Dr. Zada is a former Stanford, UCLA, and Columbia

15  University professor who is not the demon they make him out to be.  Plaintiffs

16  employed the same smear campaign tactics in the related case to obtain a shocking

17  ruling that has been severely criticized by the Recording Industry Association of

18  America ("RIAA").  The RIAA has described Plaintiffs as "**shady companies**"

19  engaging in "**blatant copyright infringement**."  See Declaration of Dr. Norman

20  Zada, ("Zada Decl.") ¶9, Exh. 3.)

21        In the Related Case, the truth is that Perfect 10 produced more than 30 times

22  as many documents as did Plaintiffs, along with a multi-colored, six page

23  production log.  Perfect 10 produced its tax returns, bank records, detailed financial

24  statements which detail every check and to which person, going back in most cases

25  to 1996.  It produced its server logs, copyright certificates, model releases,

26  assignments of rights, settlement agreements, and a raft of other things, while

27  Plaintiffs produced next to nothing.  (Zada Decl. ¶3, Exh. 1.)

28

1    Plaintiff's claim that "Perfect 10's discovery abuse that Mr. Zada orchestrated

2    in the original case was extreme."  In fact, there is no such finding in the record, as

3    the interim finding to which Plaintiffs refer, Dkt. 676, was **vacated**.  (*See* Dkt.

4    685.)[3] Plaintiffs claim that "Perfect 10 and Zada provided false declarations," again

5    citing to Dkt. 676.  **There is no such finding in 676.**  In fact, the term "false" only

6    appears once in the entire document (and not in respect to Dr. Zada or P10).

7    Moreover, Plaintiffs improperly attempt to litigate the merits in their Motion.

8    They make the tired allegation that that "Zada testified that he did so [transferred

9    funds] to avoid enforcement of the Court's judgment…"  No cite is given because

10    no cite exists.  That is a complete and utter mischaracterization of Dr. Zada's

11    testimony in the Related Action.  Plaintiffs should end their obvious smear

12    campaign and just deal with the facts.

13    Dr. Zada has agreed to produce on July 2 any missing Perfect 10 financial

14    information, his personal 2014-2016 tax returns, his credit card statements from

15    January 2014 to January 2017, his personal bank statements from December 2012

16    to March 2015, documents relating to his 2015 home loan, and even copies of his

17    brokerage and bank statements at the end of 2014 to show that he did not have the

18    $5.8 million in cash to pay off the judgment.  ( Zada Decl. ¶4.)

19    In other words, Plaintiffs are being given everything they need.  In contrast,

20    Plaintiffs have produced **no documents whatsoever**, have refused to answer most

21    interrogatories, and **have refused to answer even a single Request for**

22    **Admission**.

23    It is Perfect 10's contention that Plaintiffs won the prior case primarily by a)

24    manufacturing discovery disputes that did not exist, and in the process, so

25

---

[3] Defendants contend that the vacated discovery order in the Related Case was

26    incorrect.  It consisted of a 56 page proposed order drafted by Plaintiffs that was
adopted wholesale by the previous magistrate judge (Hillman).  Had the sanction

27    order been entered, Defendants would have appealed it; but because it was vacated,
Defendants had no opportunity to appeal. (Zada Decl.  ¶6.) Plaintiffs cannot rely

28    upon a vacated discovery order to hurl mud at Defendants in this litigation.

poisoning the Court against Perfect 10 that it was possible to persuade the District Court judge to make a decision that was legally and factually incorrect.  After the entry of the judgment, the RIAA and MPAA filed Amicus briefs in support of Perfect 10's appeal to the Ninth Circuit, which argued that the District Court got the case wrong.  Plaintiffs evidently intend to continue that strategy here.  The Court should not indulge them.

Plaintiffs' Motion should be denied in its entirety, for the following reasons:  First, RFP No. 6 solely asks for Defendants' liabilities, not their assets.  So Plaintiffs' request that the Court to order "production of Perfect 10's and Mr. Zada's financial information," is beyond what RFP No. 6 seeks.  The Motion should be denied on this ground alone.  Dr. Zada and Perfect 10 have already completely enumerated their liabilities.  (See Amended response to RFP 6).  There is nothing left to disclose.  The simple fact is that Plaintiffs are wasting the court's time with this Motion, because they already know Perfect 10's and Dr. Zada's liabilities, and will be receiving a raft of other financial documents on July 2.

With regard to the Yokubaitis deposition, that individual was deposed in the Related Case, and there is no reason to disallow his deposition now.  Mr. Yokubaitis is the CEO of a relatively small private company that subsists entirely on the unauthorized sale of other people's copyrighted works.  He was responsible for the filing of the present lawsuit and Perfect 10 and Dr. Zada have every right to depose him to determine the basis for the suit.

Finally, given that Plaintiffs have produced no documents, and refused to answer most interrogatories, it is imperative that the Court order them to respond to each of the RFAs which were designed to establish facts that would allow Defendants to rapidly make their case.  A major issue in this case is whether Perfect 10 believed it would win the Related Case.  If it expected to win, then it would not have expected there to be any creditors, and none of the allegedly unlawful

transfers could be unlawful.  For that reason, it is imperative that Plaintiffs be ordered to admit or deny that a) the RIAA and the MPAA both submitted Amicus briefs in support of Perfect 10's appeal before the Ninth Circuit, urging reversal, the Justice Department filed an Amicus brief in the DC appeals court which supported Perfect 10 argument for direct infringement liability, Perfect 10 had won a previous similar case against Usenet Operator GUBA in 2002, no Usenet Operator had previously won, Usenet Operators have been arrested in Europe, and a slew of other RFAs which will establish why Perfect 10 believed it would win.

## II.    PLAINTIFFS' MOTION TO COMPEL DOCUMENTS

### A.    Giganews's First Set of Requests for Production of Documents

### Request for Production No. 6[4]

All documents identifying liabilities of Norman Zada, Perfect 10, or any other nonpublic entity or business in which Norman Zada has a voting, management, ownership, or other financial interest, including potential or contingent liabilities.

### Response to Request for Request for Production No. 6 (Perfect 10)

Perfect 10 incorporates the General Objections as set forth above herein.

Perfect 10 objects to his request on the grounds that it is compound, and also vague and ambiguous.  Perfect 10 objects to this request on the grounds that it is burdensome, oppressive and vastly overbroad.  Perfect 10 objects to this request on the basis that it does not specify the documents sought with particularity.  Perfect 10 further objects to this request as it seeks the disclosure of information protected from discovery by the attorney-client privilege and the attorney work product doctrine.  Perfect 10 further objects to this request on the grounds that it seeks information not relevant to the subject matter of the action, and not reasonably calculated to lead to the discovery of admissible evidence.

---

[4] Giganews served identical requests on Perfect 10 and Mr. Zada, and Perfect 10 and Mr. Zada served substantively identical responses.

1    Subject to the above specific objections and Perfect 10's general objections,

2  Perfect 10 responds as follows:

3    Following the entry of a suitable protective order, Perfect 10 will produce

4  responsive non-privileged documents that it can locate upon a reasonable search,

5  that have not already been produced, with respect to its debt to Dr. Zada.  Dr. Zada

6  will produce documents sufficient to establish that he borrowed approximately $3.5

7  million in late April of 2015 on his home at 11803 Norfield Ct.

8    **Amended Response to Request for Production No. 6 (Zada)**

9    Dr. Zada incorporates the General Objections as set forth above herein.

10   Dr. Zada 10 objects to this request on the grounds that it is compound, and

11  also vague and ambiguous. Dr. Zada objects to this request on the grounds that it is

12  burdensome, wildly oppressive and vastly overbroad, as it is unlimited as to Dr.

13  Zada objects to this request on the basis that it does not specify the documents

14  sought with particularity. Dr. Zada further objects to this request as it seeks the

15  disclosure of information protected from discovery by the attorney-client privilege

16  and the attorney work product doctrine. Dr. Zada further objects to this request on

17  the grounds that it seeks information not relevant to the subject matter of the action,

18  and not reasonably calculated to lead to the discovery of admissible evidence. Dr.

19  Zada further objects to this request to the extent it violates Dr. Zada's privacy rights.

20   Subject to the above specific objections and Perfect 10's general objections,

21  Dr. Zada responds as follows:

22   Perfect 10 has already produced its tax returns going back to 1996, as well as

23  detailed financial reports, quick books statements, and bank statements. Those

24  reports identify any minimal, temporary debts that Perfect 10 may have had, such as

25  legal bills, etc.  They, along with Perfect 10's bank statements, show that such bills

26  were promptly paid, so that, with the exception of a large debt to Dr. Zada, Perfect

27  10 had no other meaningful debts prior to the $5.63 million fee award which was

28

entered around March 24, 2015.  Following entry of a suitable protective order, to the extent that there are any similar documents, i.e., more recent Perfect 10 tax returns, bank statements, etc., that have not already been produced, they will be produced.  With respect to its debt to Dr. Zada, Perfect 10 will produce any responsive non-privileged documents that it can locate upon a reasonable search, that have not already been produced.

Dr. Zada objects to this request as it relates to his debts, because it is unlimited as to time. He does not recall having any meaningful debts other than an occasional mortgage.  Plaintiffs have alleged that Dr. Zada and Perfect 10's offer of $5.819 million ($2 million in cash plus a $3.819 million first trust deed on Dr. Zada's home) to end further motion practice days after the award was entered, was fraudulent because Dr. Zada actually had that amount in cash.  To refute those claims, Dr. Zada will be producing his 2014, 2015, and 2016 tax returns, along with bank and brokerage statements, which show that he had slightly over $4.1 million in cash and cash equivalents around the time when the $5.63 million fee award was entered. In other words, he didn't have that amount in cash.  He has already produced the first page of his 2007, 2008, 2009, 2010, 2011, 2012 and 2013 tax returns, which show that he had very little interest or dividend income over that period, along with a tax loss carry-forward of -$8.581 million.

Dr. Zada does not believe that the details of the home loan he took out in late April of 2015 are relevant.  Nevertheless, to minimize motion practice, he will produce non-privileged documents that he can locate upon a reasonable search relating to that loan.  He will also produce the following credit card statements: the main card he uses, Amex, from January 2014 to January 2017, the last date when a credit card payment was made from the Perfect 10 bank account, and any other credit card statements that correspond to payments made from the Perfect 10 bank account from January 2014 onwards.

**Giganews's Position**

Perfect 10 and Zada have refused to produce responsive documents related to their debts and liabilities that are squarely at issue, and which Giganews is entitled to discover.

Zada has admitted to intermingling his funds with Perfect 10's, using his own personal funds and accounts to pay Perfect 10 expenses. *See* Dkt. 26-8 at 16–19. The requested documents are therefore essential in several respects. A full accounting of Perfect 10's and Zada's liabilities is necessary to unwind their separate finances and identify the transfers between them. Additionally, Perfect 10's ability to pay its reasonably foreseeable debts is an essential element of the constructive fraudulent transfer claim. This requires a full accounting of the expenses of the business. But Zada intermingled his funds with Perfect 10's and used his personal accounts to pay Perfect 10's debts and liabilities. Production of only Perfect 10's records will necessarily omit the full scope of its liabilities and disguise its insolvency.

For these reasons, Perfect 10 and Zada must produce to the full scope of the request and not withhold documents related to their liabilities. Perfect 10 has offered to update its production of bank statements and summary financial records. It has not made that production despite months to do so. Regardless, Plaintiffs are entitled to review the underlying records of Perfect 10's liabilities and do not have to accept Perfect 10's summaries in its unaudited financials. (Perfect 10's summaries are in fact likely to be inaccurate. After Zada's fraudulent transfers, Perfect 10 could no longer employ Ms. Poblete, its paralegal and bookkeeper. Perfect 10's production of Quickbooks records for 2016 reflects that Ms. Poblete stopped updating those files regularly.) Mr. Zada has offered to produce only a selection of his tax returns and credit card statements, neither of which reflect the full extent of his liabilities including those he took on for the benefit of Perfect 10.

Zada claims that his settlement offer of $2 million plus additional contingent rights proves that he did not take Perfect 10's cash to hinder creditors.[5]  As part of his explanation for why this partial payment proves his good faith, he has represented to the Court that he lacked the ability to pay the full amount of the judgment.  *See* Dkt. 19 at 6; Dkt. 37 at 1.  Plaintiffs are entitled to discovery to test the truth or falsity of this claim, and to show that Zada actually had sufficient cash and assets to pay the judgment in full.  Again, Zada proposes to pick and choose some financial records to show a partial picture that favors him.  He has made *no representation* to the Court that these records disclose *all* of his cash and assets.[6]

Mr. Zada has objected to producing additional records because the request is not limited by time and on privacy grounds.  Plaintiffs agree to limit the request to debts and liabilities existing as of January 1, 2011 or accruing thereafter.  The right to privacy, however, is not an "absolute bar to discovery" and "may be subject to invasion."  *Evans v. DSW Inc.*, No. CV 16-3791-JGB (SPx), 2017 WL 9480800, at *5 (C.D. Cal. Aug. 24, 2017) (quoting *E.E.O.C v. Cal. Psych. Transitions*, 258 F.R.D. 391, 395 (E.D. Cal. 2009).[7]  Specifically, the law does not allow a bad actor to shield his malfeasance by claiming a "privacy right" in financial records.  Where the party invoking the objection is accused of fraudulent transfers, and the information is directly relevant to those transfers, it is discoverable.  *Tatung Co. v. Hsu*, No. SA CV 13-1734-DOC (ANx), 2015 WL 11116906, at *3 (C.D. Cal. Feb. 11, 2015) (denying motion to amend special master decision compelling defendants' bank records in a fraudulent transfer action); *Ashmore v. Dodds*, No.

---

[5] It does not: by transferring Perfect 10's cash and assets to himself, Zada could offer to pay less than the full judgment and impose additional settlement conditions. If it were not for Zada's fraud, Plaintiffs could have simply enforced the judgment.

[6] Zada has also just recently offered an entirely new theory for why he made the transfers: he could earn a higher rate of return by moving the money into his personal accounts.  Discovery into those accounts is necessary to test this assertion.

[7] In a diversity jurisdiction case such as this one, state law governs matters of privilege.  *See Oakes v. Halvorsen Marine, Ltd.*, 179 F.R.D. 281, 284 (C.D. Cal. 1998); Fed. R. Evid. 501.

8:15-cv-00561-JMC, 2015 WL 6445985, at *4 (D.S.C. Oct. 23, 2015) (overruling privacy objection in fraudulent transfer case where information was necessary to "determine whether Defendant [was] in possession of monies or proceeds traceable to [a Ponzi scheme, or] evidence regarding Defendant's earnings and/or assets during the period of time at issue").

Here, Zada directed large transfers to himself so that Perfect 10 could avoid paying the millions of dollars it owes. This is therefore a case where "the gravamen of the lawsuit is inconsistent with the application of [any privacy] privilege because the documents sought may verify or contradict [Defendants'] claims." *Barrous v. BP P.L.C.*, No. C 10-2944 LHK PSG, 2011 WL 1431826, at *4 (N.D. Cal. Apr. 14, 2011) (granting motion to compel "tax, financial and accounting records, and income, disbursement, expenses, revenues and sales statements"); *Cory v. George Carden Int'l Circus, Inc.*, No. 4-13-CV-760, 2015 WL 11072152, at *1–2 (E.D. Tex. Dec. 18, 2015) (requests seeking "credit card and checking account statements" were relevant and discoverable).[8]

Perfect 10 and Zada's offer to provide summaries and selections of their records is insufficient for the additional reason that Zada has a decade-long record of litigation misconduct, including multiple violations of this Court's orders in the original copyright case. *See* Related Case, Dkts. 676, 684. For example, the Court in that case found that Perfect 10 failed to comply with numerous discovery orders, responded to discovery with outright false testimony and doctored declarations, conducted insufficient searches, deleted email accounts, discarded laptops before searching them, refused to produce documents, and made large, yet still incomplete

---

[8] The cases are clear that any true privacy concern can be addressed via a protective order. *E.E.O.C. v. Braun Elec. Co.*, No. 1:12-cv-1592-LJO-JLT, 2014 WL 356998, at *5–6 (E.D. Cal. Jan. 24, 2014) (holding that right to privacy did not preclude disclosure of financial information); *see also Oakes*, 179 F.R.D. at 284; *Hill*, 7 Cal. 4th at 38 (1994) (privacy concerns "are assuaged if . . . confidential information is carefully shielded from disclosure except to those who have a legitimate need to know").

1   productions—of documents they claimed not to have at depositions—far too late

2   for Giganews and Livewire to use them at deposition or to move to compel. *See*

3   *generally*, Related Case, Dkt. 676.  In this case, Giganews and Livewire accuse

4   Zada of financial fraud.  Given his history of abuses, the Court should not force

5   Giganews and Livewire to accept Zada's self-serving characterizations of the debts

6   and finances he chooses to divulge in place of actual and complete financial

7   records.

8       Ultimately, "[P]laintiff's need for defendant [Zada's] financial documents

9   outweighs [his] claim of privacy, especially when the 'impact' of the disclosure of

10  the information can be protected by a 'carefully drafted' protective order. *A.*

11  *Farber & Partners v. Garber*, 234 F.R.D. 186, 191 (C.D. Cal. 2006).  The records

12  are in Zada's exclusive control.  The Court should compel discovery to reach the

13  truth of these transfers.

14      **Perfect 10's Position**

15      Plaintiffs' motion to compel is both premature and overreaching, as well as

16  intentionally inflammatory, as it contains a number of demonstrably false

17  statements included solely to smear Dr. Zada.

18      First, the Request for Production that Plaintiffs seek to compel – No. 6

19  simply asks for "All documents identifying liabilities" of Perfect 10 and Mr. Zada.

20  A review of Defendants amended response to RFP 6 shows that **Defendants have**

21  **already answered that request.**  Specifically, the amended response states,

22  "Perfect 10 has already produced its tax returns going back to 1996, as well as

23  detailed financial reports, quick books statements, and bank statements. Those

24  reports identify any minimal, temporary debts that Perfect 10 may have had, such as

25  legal bills, etc.  They, along with Perfect 10's bank statements, show that such bills

26  were promptly paid, so that, with the exception of a large debt to Dr. Zada, Perfect

27  10 had no other meaningful debts prior to the $5.63 million fee award which was

28

1   entered around March 24, 2015.  Dr. Zada states that does not recall having any

2   meaningful debts other than an occasional mortgage.  So that's it.  And Dr. Zada

3   also stated that he will be providing documents regarding his current $3.5 million

4   loan on his home.  Because RFP No. 6 only asks for *liabilities,* not *assets*, all of

5   Plaintiffs' Motion asking for documents regarding Defendants' assets must, as a

6   matter of course, be denied.

7       Moreover, even if it were the case that RFP No. 6 asked for assets as well as

8   liabilities, there are good reasons to deny such requests based upon the conduct of

9   Plaintiffs' Chief Executive Officer.  Ron Yokubaitis, the CEO of Giganews, has a

10  video on his Facebook page where he discusses Perfect 10's confidential

11  settlements, and smears Dr. Zada in the process.   He made those comments at a

12  public i2coalition event with Senator Goodlatt present.  Those settlement

13  agreements were produced as Highly Confidential – Attorneys Eyes Only and are

14  extraordinarily sensitive.  (Zada Decl. ¶11.)  Mr. Yokubaitis has no business

15  broadcasting Perfect 10's highly confidential settlement agreements to the world.

16  On that basis alone, Defendants should not be ordered to produce confidential

17  documents other than those that are absolutely essential to the case, which they

18  already have or will have on July 2.

19      Despite having already received everything they could possibly need,

20  Plaintiffs start off by making the outrageous claim that "Perfect 10 and Zada have

21  refused to produce responsive documents related to their debts and liabilities."

22  They never say what those documents are, because there are none.  Perfect 10 owes

23  approximately $52 million to Dr. Zada, based on financials in Plaintiffs possession,

24  and whatever the court has awarded to Plaintiffs.  That's it.  Dr. Zada owes

25  approximately $3.5 on his home.  Plaintiffs already know that too. There is nothing

26  else to produce.

27      Next, Plaintiffs next make the completely unsupported claim that they are

28

entitled to know "the full extent" of the liabilities Dr. Zada "took on for the benefit

of Perfect 10." Dr. Zada has already answered that question. He didn't take on any

liabilities for the benefit of Perfect 10. Once again, there is nothing to produce.

Plaintiffs use their motion to compel RFP 6, which they should have never

filed, as Perfect 10 and Dr. Zada have completely answered that RFP, to engage in

a smear job on Dr. Zada. For example, they claim that "Zada has a decade-long

record of litigation misconduct." They cite to Dkt. 676, which was vacated, and

Dkt. 684, the attorney's fees order. The term "misconduct" does not appear in Dkt.

684. Prior to the instant case, Perfect 10 won its previous case against search

engine Yandex in 2013, in Northern California on summary judgment. Prior to this

case, neither Perfect 10 nor Dr. Zada had ever been sanctioned or ordered to pay

attorney's fees. In other words, Plaintiffs are just making things up.

Next, in footnote 6, Plaintiffs falsely contend that Dr. Zada transferred all of

Perfect 10's cash and assets to himself. In fact, Dr. Zada left all of Perfect 10's

primary assets, its copyrights and trademarks, which cost $53 million to create,

with Perfect 10. (Zada Decl. ¶10.) For that reason alone, it would have made no

sense for Dr. Zada to not pay Plaintiffs $850,000, and there by lose $53 million in

copyrights and trademarks.

Plaintiffs continue by falsely claiming that the Court found that Perfect 10

provided "false testimony and doctored declarations…" citing to the vacated Dkt.

676. As incorrect as that interim finding was, because Plaintiffs wrote it and

Magistrate Judge Hillman just signed it verbatim, even that document does not

support Plaintiffs 'fantastical claims here. Plaintiffs copied and sold Perfect 10's

content without permission. Perfect 10 didn't need to "doctor declarations" to win

the Related Case.

Plaintiffs make numerous other untruthful statements designed solely to

smear Dr. Zada. Defendants will not waste any more of the Court's time dealing

1   with them, except to say that they are all patently false.

2       To recap, because Plaintiff's motion deals solely with RFP 6, and it has been

3   completely answered, Plaintiffs motion should be denied.  However, if the Court

4   wishes to entertain Plaintiff's proposed order, which goes way beyond RFP 6, a

5   number of points need to be made.

6       First, Defendants have already agreed to produce whatever they have not

7   already produced with respect to item 1, parts (a), (c), (d), (e), and (f) in the

8   proposed order, as well as (g) with respect to Perfect 10, and there was no need

9   whatsoever for Plaintiffs to burden this Court unnecessarily to obtain an order that

10  was already agreed to. (Zada Decl. ¶2.)  However, quite a few of the requested

11  materials in the proposed order don't exist, and Plaintiffs should know that.  For

12  example, no Bank of America statements exist for January 2011 to March 2012,

13  because the account was opened in October 2012.  (Zada Decl. ¶7.)  Plaintiffs know

14  that because those statements were produced in 2016 in response to debtor

15  examination discovery and they could see when that account was opened.

16  Similarly, no Wells Fargo statements exist after November 2012, because the

17  account was essentially closed around the end of October 2012 and moved to Bank

18  of America.  (Zada Decl. ¶7.)  Plaintiffs should know that as well, as they have

19  previously received Wells Fargo statements which show that the account was

20  closed near the end of October 2012.  Plaintiffs also ask the Court to order

21  documents that have already been produced.  For example, they ask the Court to

22  order production of Wells Fargo statements for June through September 2012.

23  Those were produced as P-FIN006394-P-FIN006498.   They ask the Court to order

24  production of April 2012 Wells Fargo statements.  Those were already produced as

25  P-FIN006370-P-FIN006392. (Zada Decl. ¶8.)  Finally, Plaintiffs know that all

26  Perfect 10 financial statements have been produced and that statements were not

27  done monthly but rather quarterly, so what they are asking for in proposed order (f)

28

1    does not exist.  (Zada Decl. ¶8.)

2         With respect to proposed order b), g) for Dr. Zada, and h), none of these

3    requests are covered by RFP6, so they are improper.   But, going further, why do

4    Plaintiffs need all of this private information regarding Dr. Zada?  With this

5    information, Plaintiffs will be able to see every payment made by Dr. Zada going

6    back to 2011, before this case even started, and Mr. Yokubaitis will be able to put

7    another video on his Facebook page mentioning all of this confidential information

8    and smearing Dr. Zada in the process.  Dr. Zada has already agreed to produce his

9    2014, 2015, and 2016 tax returns, to demonstrate that he currently does not have

10   outstanding debts.   (Zada Decl. ¶2.)  Any interest payments to creditors would

11   appear there.  Dr. Zada has also agreed to produce his credit card statements from

12   January 2014 through January 2017, the last date when a credit card payment was

13   made from the Perfect 10 bank account, so Plaintiffs can see what all the payments

14   were for.  Finally, Perfect 10 has produced most of its cancelled checks but will

15   supplement that production to make it current, so Plaintiffs can see what all of the

16   payments were for.  That should be enough for Plaintiffs to examine every

17   conceivable transfer and payment from the Perfect 10 account during the pendency

18   of this case.  That is all they need.

19        Plaintiffs are simply not entitled to the most sensitive documents they seek –

20   Mr. Zada's personal financial records, bank statements, and brokerage statements.

21   The alleged fraud involved transfers from the Perfect 10 bank account to Dr. Zada's

22   bank account.  Perfect 10's bank records and detailed financial statements show all

23   that.  What Dr. Zada had in his various accounts is irrelevant.  Particularly

24   irrelevant is what Dr. Zada had in his personal accounts after the alleged transfers

25   occurred, which ended in November 2014.  These are completely immaterial to any

26   of the issues in this lawsuit, and Plaintiffs have articulated no basis showing

27   otherwise. *Tatung Co. v. Hsu*, No. SA CV 13-1734-DOC (ANx), 2015 WL

28

1    11116906, at *3 (C.D. Cal. Feb. 11, 2015) is inapposite, since that case concerned

2    discovery into a fraud scheme in which the source of funds directed to various

3    entities was crucial to determining liability; there is no such need for information

4    here, because Dr. Zada's current financial status is absolutely irrelevant to whether

5    or not he was the recipient of fraudulently-transferred funds from Perfect 10.

6    Similarly not on point is *Barrous v. BP P.L.C.*, No. C 10-2944 LHK PSG, 2011 WL

7    1431826, at *4 (N.D. Cal. Apr. 14, 2011), because in that case the party resisting

8    discovery had put into issue all of their financial affairs by claiming the defendants'

9    conduct had injured their profits and livelihood.[9]  *Ashmore v. Dodds*, No. 8:15-cv-

10   00561-JMC, 2015 WL 6445985, at *4 (D.S.C. Oct. 23, 2015) concerned discovery

11   to determine the recipients of monies from a Ponzi scheme – again, not relevant,

12   since here the defendant, Dr. Zada, is already known.

13          Simply put, Dr. Zada's current financial records have absolutely no

14   connection or relevance to Plaintiffs' fraudulent transfer claims. They are therefore

15   shielded from production on privacy grounds.

16          Plaintiffs' contention that "It [Perfect 10] has not made that production

17   **despite months to do so**," is pure pedantry.  Plaintiffs second set of requests,

18   which actually ask for asset information, were made on May 21.  Defendants have

19   agreed to produce documents with respect to these requests very rapidly (by July 2),

20   long before a hearing on this Motion will be heard.  Plaintiffs' complaint about a

21   months-long delay is riddled with chutzpah – Plaintiffs themselves have produced

22   nothing at all since they were served with document requests and requests for

23   admissions in **March**, and have relied upon the entry of a protective order which

24   _____

25   [9] Plaintiffs assert that a protective order can take care of all of Dr. Zada's privacy concerns (see footnote 7.) First of all, no such order has been entered as of the date of this stipulation, because Plaintiffs have insisted on several revisions of any such

26   Order (see Mickelson Decl. ¶ 3_, Exh. "2.")  More importantly, Mr. Yokubaitis apparently has no respect for protective orders, as he is broadcasting information

27   regarding Perfect 10's ultra sensitive confidential settlements on his Facebook page. Zada Decl. ¶11.  There is simply no need for Dr. Zada to turn over private

28   documents when they have absolutely no relevance to this case.

1   they dragged their feet in drafting.  (See Declaration of Matthew C. Mickelson
2   Decl. ¶ 3, Exh. "2.")

3       Plaintiffs' discussion regarding Dr. Zada's contention that he did not have the
4   cash to pay the $5.819 is simply not properly related to RFP 6.  However, in an
5   effort to avoid motion practice on this issue (an effort spurned by Plaintiffs), Dr.
6   Zada offered to provide, and will provide by July 2, documents sufficient to prove
7   that he did not have sufficient cash to pay off the entire judgment when he made the
8   last offer to settle the related case in early April 2014.  (Zada Decl. ¶4; see
9   Mickelson Decl. Exh. "1.")[10]

10       To summarize, Defendants have already answered RFP6, so Plaintiffs motion
11   to compel should be denied.  Perfect 10 owes Dr. Zada around $52 million, and
12   owes Plaintiffs whatever the Court awarded.  Dr. Zada owes $3.5 million on his
13   home.  There is nothing more to add.  The Court should not grant the proposed
14   order because it goes way beyond RFP6.  However, if it contemplates doing so,
15   Defendants have already agreed to provide responsive documents to every request,
16   except requests dealing with Dr. Zada's personal assets which are irrelevant as to
17   whether fraudulent transfers took place, and are protected by privacy concerns.

18   **III.   PLAINTIFFS' MOTION FOR PROTECTIVE ORDER**

19       **A.   The Court should not allow Defendants to Harass an Apex Officer**
20            **with No Knowledge Relevant to the Claims in This Action.**

21

22   _____

23   [10] Furthermore, whether or not Dr. Zada had sufficient cash to pay off the judgment
24   in full is completely irrelevant.  The only possible relevance of the requested
     financial documents is to show he had the cash to make the offer that was, in fact,
25   actually made – and the documents indeed show that is the truth.  Dr. Zada made an
     offer of full payment of the judgment ($2 million in cash plus a first trust deed on
26   his home), and Plaintiffs turned the offer down without making a counter-offer.
27   People who offer to pay millions more than they are required to do (the award was
     against Perfect 10, not Dr. Zada), are simply not fraudsters as Plaintiffs claim.
28

**Giganews and Livewire's Position**

Perfect 10 and Mr. Zada have failed to identify any grounds to allow them to depose Giganews's CEO, Ron Yokubaitis, and the Court should issue a protective order preventing the deposition.

"Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Affinity Labs of Tex. v. Apple, Inc.*, No. C 09-4436, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011) (quoting *Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C05–04374 MMC (JL), 2007 WL 205067, at *3 (N.D. Cal., Jan. 25, 2007)); *see also K.C.R. v. Cnty. of L.A.*, No. CV 13-3806 PSG (SSx), 2014 WL 3434257, at *7 (C.D. Cal. Jul. 11, 2014). A court should issue a protective order barring the deposition of a party's "apex" officers unless the party seeking the deposition demonstrates that:

> (1) The officer or director has "unique personal knowledge" relevant to the case; and

> (2) There are no other less intrusive means of discovery available, including written discovery and depositions of other employees.

*See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, MLD No. 1827, 2011 U.S. Dist. LEXIS 85608, at *18 (N.D. Cal. Aug. 1, 2011); *Affinity Labs*, 2011 WL 1753982, at *15; *Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 334-36 (M.D. Ala. 1991) (denying depositions of VP).

Here, Perfect 10 and Mr. Zada bear the burden to show that a deposition of Giganews's CEO is necessary and cannot meet it.

First, Defendants failed to identify any relevant facts uniquely in Mr. Yokubaitis's possession. The key issues in this case concern Zada's removal of cash and assets from Perfect 10: whether Zada did so with the intent to hinder, delay or defraud; whether he left Perfect 10 unable to pay its reasonably foreseeable

1  debts; and whether he provided any reasonably equivalent value for the cash and

2  property he received.  Mr. Yokubaitis has no direct knowledge of these facts.

3      When pressed on this point, Defendants' counsel could not identify any

4  relevant facts or subjects for the deposition.  Instead, he made the claim that Mr.

5  Yokubaitis "has made various central decisions" in the litigation.  A 7-hour

6  deposition that asks the CEO what he has discussed with the company's attorneys

7  in privileged conversations is an exercise in harassment, and is precisely what the

8  "apex" deposition rule seeks to prevent.  The Court can and should issue a

9  protective order for this reason.  *See Affinity Labs*, 2011 WL 1753982, at \*16

10  ("[h]ere, Affinity cannot meet its burden to show that Mr. Jobs has 'unique' and

11  'non-repetitive' knowledge regarding any relevant topic"); *In re TFT-LCD*, 2011

12  U.S. Dist. LEXIS 85608, at \*18.

13      Second, Defendants cannot make the required showing that they have

14  engaged in less burdensome methods of discovery.  Defendants have taken no

15  depositions in the case.  In fact, they have noticed *no other depositions* at all.

16  Accordingly, they cannot show that the information they seek from Giganews's

17  CEO is unavailable through other means, for example through a 30(b)(6) deposition

18  of Giganews.

19      Defendants point only to the fact that Giganews has made legitimate

20  objections to harassing and irrelevant discovery requests.  (Gregorian Decl. Ex. B.)

21  Giganews responded in detail to interrogatories that bore on the facts of the case.

22  (*Id.* Ex. C.)  The remaining requests cover wholly irrelevant topics such as child

23  pornography, requests for Giganews to conduct legal research, European criminal

24  investigations, copyright litigation not involving any of the parties to this case, and

25  movies, television shows, and music to which Perfect 10 never claimed any

26  ownership rights, to name just a few objectionable categories.  (*See generally*, *id.*

27  Ex. D.)  Defendants have not sought to compel further responses to these requests,

28

1  despite months to do so.  More importantly, a deposition in which Mr. Zada's

2  counsel asks the Giganews CEO offensive and irrelevant questions on these topics

3  is not one the Court should countenance.

4      Perfect 10 and Zada failed to identify any relevant, unique knowledge of Mr.

5  Yokubaitis that they could not discover despite attempting other means.  The Court

6  should issue the protective order against the deposition.

7      **Defendants' Position**

8      The key to Plaintiff's case, is alleged in paragraphs 38 and 40 of their FAC,

9  namely, that Dr. Zada realized early on that Perfect 10 would lose the Related Case

10  and be hit with a large judgment.  In fact, such an assertion defies logic and

11  common sense.  Litigation is expensive, unpleasant, and a waste of time and

12  energy.  No copyright plaintiff continues to litigate a case it expects to lose.

13      So far, Plaintiffs have not produced a single document, or answered a single

14  RFA.  They have been asked to identify all cases where a Usenet Operator

15  previously won (there are none), all cases where Perfect 10 was ordered to pay the

16  other sides attorney's fees (there are none), all cases where a copyright plaintiff was

17  ordered to pay fees that exceeded 1/10 of their yearly sales (there are none), all

18  cases where a party who copied and sold other people's content without permission

19  was awarded fees (there are none) and other similarly important interrogatories.

20  They have refused to answer all of them.  The only person left to answer those

21  questions is Mr. Yokubaitis, who is responsible for filing the present lawsuit, and

22  needs to explain the basis for it.  Furthermore, a deposition of Mr. Yokubaitis is

23  absolutely essential to justify Giganews's RFA responses, which in the past were

24  completely unintelligible and non-responsive.  Giganews is not an Apple or a

25  General Motors.  It is not a public company and has a relatively small number of

26  employees.  Perfect 10 has deposed Mr. Yokubaitis before.   He is not an 'apex'

27

28

1  deponent in any sense of the word.[11]

2       Perfect 10 should not be required to state at this point, any of its proposed

3  questions, to give an advantage to Plaintiffs.  However, one of the key questions to

4  Mr. Yokubaitis, will be why he believes that parties who file copyright

5  infringement lawsuits should expect to lose and be bankrupted, and why he believes

6  that his company is justified in not paying copyright holders for the use of their

7  works.  Defendants would also like to ask why his companies policy of selling

8  access to copyrighted works for which he has no licenses, is any different from the

9  policy of Usenet Operators who have recently been arrested.   Defendants are only

10  seeking to depose one person on their side, and that person is Mr. Yokubaitis.  He

11  runs Giganews, is responsible for not accepting Defendants offer of full payment,

12  and is responsible for all key decisions made in this case.  He cannot be sheltered

13  from asking questions about the lawsuit he himself launched.

14       **B.      Perfect 10's 410 Requests for Admissions are Harassing,**

15            **Irrelevant and Disproportionate to the Needs of the Case.**

16       **Giganews and Livewire's Position**

17       This is not a complicated case.  It involves three claims with similar

18  elements, all based on a circumscribed number of fraudulent transfers made to

19  hinder creditors.  Perfect 10's 410 requests for admission are unduly burdensome

20  and excessive.  They seek admissions on such irrelevant and inflammatory topics

21  such as child pornography and criminal copyright liability of nonparties in the

22  European Union.  Giganews and Livewire respectfully ask the Court for an order

23  limiting Defendants to 78 requests (Nos. 128 to 206), and barring additional

---

25       [11] In a previous case, Perfect 10 deposed Susan Wojcicki of Google, who is
26  now president of YouTube.  Google, a large public company, made the same
   "apex" arguments as Plaintiffs do here, but lost.   Mr. Yokubaitis is no Susan
27  Wojcicki.

28

1  requests.

2      The Federal Rules do not expressly limit the number of requests for

3  admission a party may serve, but "[h]undreds of requests . . . almost raise a

4  presumption of burdensome discovery." *Asarco LLC v. Union Pac. R.R. Co.*, No.

5  2:12-cv-00283-EJL-REB, 2016 WL 1755241, at *12 (D. Idaho May 2, 2016); *see*

6  *also Taylor v. Great Lakes Waste Servs.*, No. 06-CV-12312-DT, 2007 WL 422036,

7  at *2 (E.D. Mich. Feb. 2, 2007) (denying motion to compel responses to 297

8  requests for admission as "oppressive" and unduly burdensome).

9      This case "is not the type of complex lawsuit that warrants voluminous

10  discovery of the type [Perfect 10] propound[s]." *Stokes v. Interline Brands, Inc.*,

11  No. C-12-05527 JSW (DMR), 2013 WL 6056886 at *2 (N.D. Cal. Nov. 14, 2013)

12  (limiting propounding party to 25 requests); *see also Taylor*, 2007 WL 422036, at

13  *5–6; *Jadwin v. Cnty. of Kern*, No. 1:07-cv-0026-OWW-TAG, 2008 WL 3820288,

14  at *2 (E.D. Cal. Aug. 8, 2008) (finding an interrogatory incorporating 290 requests

15  for admission by reference was "not narrowed or tailored in any way so as to avoid

16  being oppressive or unduly burdensome"). Giganews and Livewire allege that

17  between 2014 and the present, Perfect 10 made a series of transfers to Zada for the

18  purpose of shielding assets from the judgment. *See* Dkt. 26 ¶¶ 20, 24–25; Cal. Civ.

19  Code. § 3439.04(a)(1) & (2)(B); Cal. Civ. Code § 3440. The key issues in the case

20  are whether Zada intended to hinder Perfect 10's creditors, and whether he should

21  have reasonably believed the transfers would leave Perfect 10 with insufficient

22  funds to pay its reasonably foreseeable expenses.[12]

23  _____

24  [12] *See Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) *cert. denied*, 555 U.S.
1047 (2008). An actual fraudulent transfer is one made with "'actual intent to

25  hinder, delay or defraud any creditor of the debtor.' Constructive fraud . . . requires
a showing that the debtor did not receive 'reasonably equivalent' value for the

26  transfer, and the transfer was made when the debtor . . . '[i]ntended to incur, or
believed or reasonably should have believed that [it] would incur, debts beyond [its]

27  ability to pay as they became due.'" *Damian v. A-Mark Precious Metals, Inc.*, No.
CV 16-7198 FMO (SSx), 2017 WL 6940515, at *5 (C.D. Cal. Aug. 28, 2017)

28  (quoting *Optional Capital Inc. v. Das Corp.*, 222 Cal. App. 4th 1388, 1401-02
(2014).

1    This case does not involve claims like those in the original copyright case
2    between the same parties.  The original case sought a potential $9 billion in
3    statutory damages based on tens of thousands of discrete alleged copyright
4    violations.  *See, e.g.*, Related Case, Dkt. 1.  In "an uncomplicated case such as this
5    one," Perfect 10 does not need over 400 requests for admission to defend itself.  *See*
6    *Taylor*, 2007 WL 422036, at *2.  The Court should find "that [responding] would
7    be unduly burdensome in light of the unfocused and largely irrelevant nature of
8    [Perfect 10's] requests" and issue a protective order.  *Johnson v. Runnels*, No. CIV
9    S-04-0776 LKK EFB P, 2008 WL 5046064, at *2 (E.D. Cal. Nov. 21, 2008).

10   **Perfect 10's Position**

11   Once again, Plaintiffs attempt to inflame and mislead.  There has never been
12   a copyright case with damages anywhere close to $9 billion.  Plaintiffs know full
13   well that Defendants would have settled the related case for several million dollars.
14   In the related case, Giganews asked 362 RFAs, and Perfect 10 answered every one
15   of them.  (Zada Decl. ¶13.)  Second, the central issue in this case is whether Perfect
16   10 could have reasonably expected to lose early on.  If Perfect 10 did not anticipate
17   a loss prior to the entry of the summary judgment orders, then the $900,000 that
18   was transferred before the entry of such orders could not have been fraudulent,
19   since Perfect 10 could not have reasonably anticipated that Giganews would be a
20   future creditor.

21   Perfect 10 carefully selected its RFAs to establish, in a streamlined fashion,
22   why it expected to win.   All of the RFAs work together to tell a story.   One cannot
23   tell that story by cutting out most of RFAs.  As just a few examples, requests which
24   ask Giganews to admit that a) no Usenet Operator had previously won, b) Perfect
25   10 had won a prior case against Usenet Operator GUBA, c) Perfect 10 had never
26   previously been sanctioned or ordered to pay attorney's fees, and d) the RIAA
27   described Plaintiffs as "shady companies" engaged in "blatant copyright

28

infringement," are all relevant to establishing that Perfect 10 reasonably expected to win.

### C.    The Majority of the Requests are Irrelevant and not in Proportion to the Needs of the Case.

#### 1.    Requests Regarding Plaintiffs' Servers and Business

- **No. 1:** Admit that paragraph 24 of Perfect 10's first amended complaint ("FAC"), Dkt. 105 in Perfect 10, Inc. v. Giganews, Inc. et al., U.S. District Court for Central District of California, Case No. 2:11-cv07098-AB-JPR (hereinafter "the Related Case"), alleged that "Giganews sells access to at least 9,000,000,000,000,000 bytes (9,000 trillion bytes) of stolen movies, songs, computer software, and images, and other materials to its customers, virtually every major popular movie, popular song, popular software program, and image ever created, for anywhere from $4.99 per month up to $34.99 per month."

- **No. 2:** Admit that on 8/27/2014, giganews.com contained the following text: "we store an estimated 25 petabytes of Usenet messages." (See Related Case Dkt. 508-1 Exh. 3, Pg. 4.)

- **No. 3:** Admit that 25 petabytes is roughly 25,000 terabytes.

- **No. 4:** Admit that in the Related Case, Giganews failed to provide a single example of a message stored on its servers that contained a copyrighted work that Giganews had a license to copy or distribute.

- **No. 5:** Admit that paragraph 24 of Perfect 10's FAC in the Related Case also alleged that "Giganews' $34.99 'diamond' membership' also includes a newsreader which Giganews created called 'Mimo,' and a Giganews 'VyprVPN' service which allows users to conceal their infringing activities."

- **No. 6:** Admit that on 3/20/2011 giganews.com displayed the following text: "Without VyprVPN, your online data is insecure and can be inspected by

your ISP … With VyprVPN, all of your internet traffic… is fully encrypted to our VPN servers, and your IP address is hidden." (See Related Case Dkt. 508-1, Exh. 3, Pg. 7.)

- **No. 7:** Admit that on 3/20/2011, giganews.com displayed the following text: "Giganews does not track the specific articles you download." (See Related Case Dkt. 508-1, Exh. 3, Pg. 8.)

- **No. 8:** Admit that paragraph 26 of Perfect 10's FAC in the Related Case alleged that "Giganews writes its own server code, builds its own network, and deploys servers in Europe, North America, and Asia to copy, display, and distribute its infringing content."

- **No. 9:** Admit that on August 27, 2014, giganews.com displayed the following text: "Unlike most Usenet providers who use third-party software, Giganews writes 100% of its server software." (See Related Case Dkt. 508-1 Exh. 3 p. 1.)

- **No. 10:** Admit that on August 27, 2014, giganews.com displayed the following text: "Own the servers," "Write the code," "Build the network."

- **No. 11:** Admit that on August 27, 2014, giganews.com displayed the following text: "2213 days binary retention."

- **No. 12:** Admit that "2213 days binary retention" meant that Giganews stored messages on its servers that contained binary content such as movies, songs, and images, for at least 2213 days.

- **No. 15:** Admit that the following text appeared on galacticgroups.com, a Livewire website, on February 16, 2007: "Galactic Groups offers access to over 100,000 newsgroups, including all of your favorite hierarchies . . . ." (See Related Case Dkt. 508-1 Exh 3. Pg 21.)

- **No. 16:** Admit that listed among those favorite hierarchies, were alt.binararies.movies, alt.binaries.music, and alt.binaries.images. (See Related Case Dkt. 508-1, Exh. 3, Pg 21.)
- **No. 17:** Admit that the newsgroup alt.binaries.movies has contained messages that contained movies.
- **No. 109:** Admit that Giganews's business does not revolve around the sale of access to copyrighted works that it has created.
- **No. 110:** Admit that Giganews's business revolves around the sale of access to copyrighted works for which it has no licenses to copy or distribute.
- **No. 315:** Admit that pages 1-2 of Related Case Dkt. 536 states, "Third, Giganews has no real explanation as to why legitimate companies such as Netflix and Apple pay copyright holders for their content, but Giganews need not."
- **No. 316:** Admit that Netflix pays for the content that it offers to its subscribers, but Giganews does not.
- **No. 317:** Admit that Amazon pays for the content that it offers to its subscribers, but Giganews does not.
- **No. 318:** Admit that Hulu pays for the content that it offers to its subscribers, but Giganews does not.
- **No. 319**: Admit that the total revenue of GIGANEWS, between 2009 and 2012, exceeded $200,000,000.
- **No. 320:** Admit that subscribers pay money to Giganews to gain access to movies, songs, adult images, and other copyrighted works.
- **No. 321:** Admit that GIGANEWS has no licenses to copy or distribute the copyrighted works stored on Giganews's servers.

- **No. 322:** Admit that GIGANEWS does not have any written agreements that would allow GIGANEWS to make copies of, distribute, or sell access to, any audio recordings and songs owned by Universal Music Group.

- **No. 323:** Admit that members of giganews.com are able to obtain copies of audio recordings and songs owned by Universal Music Group via giganews.com.

- **No. 324:** Admit that GIGANEWS has not offered to pay any movie studio for the right to make copies of that studios movies and provide those copies to requesting GIGANEWS subscribers.

- **No. 325:** Admit that GIGANEWS stores movies on its servers without the consent of the copyright holders of those movies.

- **No. 326:** Admit that GIGANEWS has not offered to pay any recording studio for the use of that recording studio's works.

- **No. 327:** Admit that GIGANEWS stores audio recordings and songs on its servers without the consent of the copyright holders of those songs.

- **No. 328:** Admit that GIGANEWS does not have an agreement with any movie studios to make copies of any movie stored on GIGANEWS' servers.

- **No. 329:** Admit that GIGANEWS does not have an agreement with any recording studios to make copies of any audio recordings or songs.

**Giganews and Livewire's Position**

These requests seek admissions regarding Giganews and Livewire's servers, systems, and business activities, all of which are irrelevant and thus not proportional to the needs of the case. How Giganews and Livewire conduct their business has no connection to the transfers at issue. Neither do these requests relate to whether Defendants made the transfers with the intent to "hinder, delay, or defraud."

Perfect 10 and Zada intend to suggest either that the Court erred in granting

summary judgment against them in the original case, or that Zada personally believed Giganews and Livewire were copyright infringers, and therefore he could not have foreseen an eventual judgment against Perfect 10. However, Zada's subjective beliefs about the copyright litigation are irrelevant. Actual fraud requires only that Defendants made a transfer to "hinder, delay, or defraud" a creditor. Cal. Civ. Code § 3439.04(a)(1). Zada's beliefs about the strength of his case are irrelevant to the question of whether, as he admitted at his debtor's examination, he tried to delay collection of the judgment.

Constructive fraud has an "objective" standard, meaning that Zada's subjective beliefs do not bear on the intent element of the claim at all. *See In re Heller Ehrman LLP*, Bankr. No. 08-32514DM, 2013 WL 951706, at *10 (N.D. Cal. Mar. 11, 2013) (objective test applies to determine whether a debtor made a transfer when it "'reasonably should have believed' that it would incur debts beyond its ability to pay."). Perfect 10's "categories" further demonstrate their requests are aimed at bolstering Zada's irrelevant subjective beliefs: "Why Zada believed Giganews was engaged in criminal copyright infringement, and would therefore certainly lose" (Gregorian Decl. Ex. D at p. 9); "Why Zada was certain that Giganews was directly liable for copyright infringement" (*Id.* at p. 13); "Why Perfect 10 did not expect to pay Giganews's attorneys [sic] fees" (*Id.* at p. 16); "Other reasons Perfect 10 expected to win" (*Id.* at p. 27); "Why Dr. Zada believed that Giganews would be held contributorily liable" (*Id.* at p. 45) (bold in original). The Court should issue a protective order as to these requests.

**Perfect 10's Position**

Plaintiffs misstate the law as well as their own allegations. Prior to the entry of the attorney's fees award, Plaintiffs were not creditors. In order for there to be a possibility of a fraudulent transfer, Dr. Zada would have had to expect Plaintiffs to become creditors. That is why his subjective beliefs are critical, not irrelevant as

1   Plaintiffs erroneously claim.  In fact, Plaintiffs make clear that Dr. Zada's

2   subjective beliefs are critical in their FAC.  In paragraph 38 of their FAC, they

3   allege, "Beginning in early 2014, Perfect 10, through Zada and in conspiracy with

4   him, began unlawfully transferring Perfect 10's corporate assets to Zada as it

5   became reasonably apparent that Perfect 10 would be ultimately be held liable for

6   Plaintiff's attorney's fees and costs in defeating Perfect 10's unmeritorious suit."

7   Paragraph 40 of their FAC alleges, "(3) the transfers happened when it became

8   reasonably apparent that a large judgment would be entered against Perfect 10 as a

9   result of its unmeritorious and unsuccessful suit for copyright infringement."

10  Defendants have the right to propound RFAs which, if admitted, destroy those key

11  allegations made in the FAC.  The above RFAs do just that.

12      RFAs 1-4 establish that Giganews offered for sale, 25,000 **terabytes** of

13  movies, songs, and other copyrighted works which were stored on its servers, and

14  failed to provide a single example of a license for any of those works.  RFAs 5-7

15  establish that Giganews offered a VPN service that allowed its subscribers to hide

16  their downloading activities, and advertised that it would not track its subscriber's

17  downloads.  This type of assistance in hiding illegal activity has been found in other

18  cases to constitute contributory infringement by inducement.   RFAs 8-10 support

19  Perfect 10's belief that Giganews materially contributed to the infringement.  RFA

20  12 established that Giganews's storage was not "temporary," a key mistake in both

21  the District Court and Ninth Circuit's rulings.  RFAs 16-17 help establish that

22  Giganews was willfully making unlicensed copies of movies and songs for

23  commercial purposes, and thereby satisfying the basic requirements for criminal

24  copyright infringement.  RFAs 109-110 establish that Giganews was not a

25  copyright creator, and therefore, based on established precedent, unlikely to be

26  eligible for any fee award.  RFAs 315-319 establish that Giganews cannot explain

27  why legitimate companies like Netflix, Amazon, and Hulu, pay for the works they

28

offer, but Giganews does not.  RFA 319 established that Giganews is making at least $50,000,000 a year by not paying copyright holders for the use of their works, a factor which should have been considered in determining the size of any fee award.  In other words, no significant award should have been made because it didn't make that much difference to Giganews but destroyed Perfect 10, who had sales of less than $40,000 a year.  RFA 320 establishes the reason why subscribers pay Giganews.  RFAs 321-329 establish that Giganews has no licenses to copy or distribute the movies or songs on its servers, a key reason why Perfect 10 believed it would win, as well as a basis for other criminal prosecutions of Usenet Operators and the Operators of the website megaupload.com, who did essentially the same thing.

### 2. Requests Regarding Child Pornography

- **No. 13:** Admit that Giganews was investigated by New York State Attorney General Cuomo in or about 2008 for having child pornographic images on its servers.  (See Related Case Dkt. 508-1 Exh. 3 pp.16-19.)
- **No. 14:** Admit that Exhibit 20 to Dr. Zada's expert report in the Related Case showed messages available from Giganews's servers in July 2014 with the following text in the subject field; "Sixteen yo. Lolita."

**Giganews and Livewire's Position**

Perfect 10's requests bear no connection to Defendants' fraudulent transfers, and they are thus irrelevant and disproportionate to the needs of the case.  More importantly, they are an improper and offensive attempt to tar Plaintiffs with a false association to child pornography.  This is a tactic Mr. Zada has previously used against Perfect 10's litigation opponents.  In the original case, two different former employees testified that Mr. Zada made them search for child pornography on the Internet to bolster his attacks on Google, causing the employees personal distress.  (Gregorian Decl. Ex. E at 59:1-62:25 & F at 60:10-61:2.)  Mr. Zada maintained a

1  printed file of child pornography that he originally claimed was for use against

2  "culprits" and later sought to use against Google and its executives. (*See id.*)  The

3  tactic has no place in this case.

4         Parties may engage in discovery to seek relevant, non-privileged information

5  proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  The Court,

6  however, may grant a protective order to protect a party from "annoyance,

7  embarrassment, oppression, or undue burden or expense."  *See Stokes*, 2013 WL

8  6056886, at *1 (citing Fed. R. Civ. P. 26(c)(1)).  Written discovery requests should

9  not represent "an effort to harass the other side or in the hope that a party's

10  adversary will simply concede essential elements."  *Id.* at *2.  When a party serves

11  requests, "as in this case, with the wild-eyed hope that the other side will fail to

12  answer and therefore admit essential elements  . . . , the rule's time-saving function

13  ceases; the rule instead becomes a weapon, dragging out the litigation and wasting

14  valuable resources."  *Perez v. Miami-Dade Cnty.*, 297 F.3d 1255, 1268 (11th Cir.

15  2002); *see also Busche v. URS Energy & Constr., Inc*., No. CV-13-5016-EFS, 2013

16  WL 5652154, at *1–2 (E.D. Wash. Oct. 15, 2010) (granting protective order on just

17  four RFAs served to harass, oppress, and embarrass responding party).

18         The Court should protect Giganews and Livewire from having to respond to

19  these requests.

20  **Perfect 10's Position**

21         Once again, Plaintiffs attempt to smear Dr. Zada with false allegations.  First,

22  Mr. Yokubaitis posted on his own website, a discussion of what happened when his

23  company was investigated by the New York Attorney General's office for child

24  pornography, which is a strict liability offense.  Perfect 10 was never able to get a

25  copy of the consent decree which might have had some language regarding

26  copyright infringement as well.  The simple fact is that such images are still

27  available as we speak.   It is not unreasonable for Dr. Zada to have believed that the

28

Court would not award bankrupting level fees to a party who not only infringes movies and songs en masse, but also distributes child pornography around the world for commercial purposes.  Plaintiffs could very easily remove such materials but choose not to.

Plaintiffs attempt to tar Dr. Zada with the fact that he asked two former employees to verify that Google at one time offered pictures of scantily clad little girls.  The purpose of that was to notify the authorities, which is what Dr. Zada did, as any law abiding citizen would do.  Notifying authorities that a major search engine is distributing child pornography un masse, is vastly different from being the party doing the distribution, which is what Giganews is doing as we speak. Furthermore, Giganews knows that one of those "employees," Rebekah Chaney, was a pathological liar who uses phony driver's licenses and was being sued at that time for defrauding Dr. Zada (who had been a great friend by funding her award winning short film and providing the monies to bury her father).

### 3.    Requests Regarding Copyright Infringement Allegations

- **No. 18:** Admit that paragraph 34 of Perfect 10's FAC in the Related Case states, "Giganews has directly infringed Perfect 10 copyrighted works by reproduction in at least four different ways. First, Giganews itself (not its customers) has copied tens of thousands of Perfect 10 Copyrighted Works including works bearing Perfect 10 copyright notices from various Internet locations and placed those images on Giganews servers."

- **No. 19:** Admit that paragraph 35 of Perfect 10's FAC in the Related Case states, "When Giganews goes to various Internet locations and makes copies of thousands of Perfect 10 images, it is not at the direction of third parties. Giganews itself elects to make such copies without permission of rights holders."

- **No. 20:** Admit that paragraph 36 of Perfect 10's FAC in the Related Case states, "Second, when a Giganews customer makes a request for a copy of a Perfect 10 image from Giganews' servers, Giganews makes a copy of that image and sends it over the Internet to that user."

- **No. 21:** Admit that paragraph 39 of Perfect 10's FAC in the Related Case states, "When users actually upload a Perfect 10 image to Giganews' servers, it is not stored at the direction of a third party because Giganews keeps that material as long as it desires, currently 1677 days, independent of the user's wishes."

- **No. 22:** Admit that paragraph 44 of Perfect 10's FAC in the Related Case states, "When a user requests a Perfect 10 image from Giganews's servers, Giganews must make a copy of that image and then send it via the Internet to the user.  In the process Giganews directly infringes Perfect 10's distribution right."

- **No. 28:** Admit that paragraph 54 of Perfect 10's FAC in the Related Case states, "Giganews has knowledge, when it elects to make copies of fake images of celebrities from 'newsgroups' such as alt.binaries.celeb.fake and alt.binaries.pictures.nude. celebrities.fake, that it is copying and distributing obviously unauthorized images. Hundreds of images from those groups use a Perfect 10 image for the purported body of the celebrity and infringe Perfect 10's copyrights.  See Exhibit 7."

- **No. 29:** Admit that paragraph 70 of Perfect 10's FAC in the Related Case states, "Defendants have copied, reproduced, distributed, adapted, and/or publicly displayed the Perfect 10 Copyrighted Works without the consent or authority of Perfect 10, thereby directly infringing Perfect 10's copyrights. An example of Giganews' direct infringement of Perfect 10's copyrighted works by display is shown in Exhibit 5."

- **No. 31:** Admit that Giganews has provided unlicensed copies of Perfect 10 copyrighted images to its subscribers upon request.

- **No. 32:** Admit that Giganews has displayed unlicensed copies of Perfect 10 copyrighted images to its subscribers upon request.

- **No. 33:** Admit that GIGANEWS has stored Perfect 10 copyrighted works on GIGANEWS's servers without Perfect 10's permission.

- **No. 34:** Admit that GIGANEWS has copied messages containing Perfect 10 copyrighted works from other Usenet Operators and stored those messages on GIGANEWS's servers.

- **No. 35:** Admit that GIGANEWS has distributed Perfect 10 images to other Usenet Operators.

- **No. 36:** Admit that Exhibit 1 to Dr. Zada's declaration (See Related Case Dkt. 506) contained a video which showed how Giganews subscribers could download full-size Perfect 10 images from Giganews's servers.

- **No. 38:** Admit the GIGANEWS has not offered to pay Perfect 10 for the use of Perfect 10's copyrighted works.

- **No. 39:** Admit that Giganews did not pay Perfect 10 for the use of Perfect 10's works.

- **No. 52:** Admit that Giganews reproduces copyrighted movies and music without authorization.

- **No. 53:** Admit that Giganews distributes copies of copyrighted movies and music without authorization.

- **No. 67:** Admit that in his declaration (Related Case Dkt. 506), Dr Zada included a section on page 13 entitled "Obviously Infringing Movies And Other Copyrighted Works Offered By Defendants."

- **No. 82:** Admit that page 1 of Dkt. 436 in the Related Case states, "First, Defendants are not innocent providers of Usenet access. Giganews has

copied approximately 25,000 trillion bytes of unauthorized copyrighted works onto its servers, including movies, television episodes, songs, and thousands of copyrighted images of Plaintiff Perfect 10, Inc. ('Perfect 10.'). Both Defendants commercially exploit that content without authorization from copyright holders. Defendants offer more than 240 times as many full-length movies as the website megaupload.com, whose operators are facing 25 years in prison for criminal copyright infringement."

- **No. 83:** Admit that page 2 of Dkt. 436 in the Related Case states, "First, Defendants have failed to cite, and cannot cite, to a single case holding that a defendant that copies and sells access to infringing material is not liable for direct infringement. On the contrary, the Supreme Court's decision in New York Times Co. v. Tasini, 533 U.S. 483 (2001) ('Tasini'), and multiple cases involving Usenet operators similar to Giganews, all found defendants liable for direct copyright infringement."

- **No. 86:** Admit that in his declaration (See Related Case Dkt. 506), Dr. Zada included a section on page 11, entitled, "How Giganews Copies Perfect 10 Images From The Usenet"

- **No. 87:** Admit that section referred to in RFA No. 86 contains the statement, "Attached as Exhibit 8 are true and correct copies of documents I created which illustrate how Giganews copies Perfect 10 images from non-Giganews Usenet servers onto its own Usenet servers."

- **No. 88:** Admit that in his declaration (See Related Case Dkt. 506), Dr. Zada included a section on page 12 entitled "How Other Usenet Providers Get Perfect 10 Images From Giganews"

- **No. 89:** Admit that section referred to in RFA No. 88 contains the statement, "Attached as Exhibit 9 are true and correct copies of documents I created

1   which provide evidence that Giganews has distributed Perfect 10 images to

2   other Usenet providers."

3   • **No. 90:** Admit that Dkt. 506, Exhibit 17, page 4 of the Related Case contains

4   the following text: "Is it illegal to download copyrighted files from binary

5   newsgroups? … It's illegal….Of course it's [sic] illegal."

6   • **No. 91:** Admit that Dkt. 506, Exhibit 17, page 5 of the Related Case, contains

7   the following text: "Of course easynews, supernews, giganews, etc. all say

8   that they don't retain usage logs anyway. This is a huge selling point because

9   essentially all of their subscribers are pirates."

10   • **No. 92:** Admit that Dkt. 506, Exhibit 17, page 6 of the Related Case, contains

11   the following text: "Easynews has terabytes of pirated software, movies,

12   games, TV shows, and porno on their hard drives, available for download at

13   speeds maxing out your cable modem for $11.95/month. They're going

14   down. It's just a matter of time."

15   • **No. 93:** Admit that Dkt. 506, Exhibit 17, page 10 of the Related Case

16   contains the following text: "Now Giganews seems to be attacking uploaders,

17   while maintaining 200 days of retained material, 99.9999% of which is

18   copyright infringing content.  As I said, something is very wrong."

19   • **No. 94:** Admit that Dkt. 506, Exhibit 18, page 1 of the Related Case, contains

20   the following text: "I wanted to rescind or delete any other possible P10

21   copyright posts that I many have posted between 5 April 2009 and your first

22   warning e-mail dated 24 October 2011…. I'm requesting you rescind or

23   delete all my post to alt.binaries.amp and alt.binaries.images.andmore up to

24   24 October 2011…. You know as well as I do that 90-95% of messages in

25   the binary newsgroups violate copyrights. You're in a tough position having

26   to respond to copyright complaints while knowing full well that if it wasn't

27

28

for all that copyrighted data on your servers, no one would be paying

subscription fees to access it."

- **No. 95:** Admit that after receiving the above message referred to in RFA No.
94, Giganews did not remove the Perfect 10 content that subscriber asked
Giganews to remove.

- **No. 96:** Admit that after receiving the above message referred to in RFA No.
94, Giganews continued to make copies of the same infringing Perfect 10
content and provide it to requesting subscribers.

- **No. 97:** Admit that Dkt. 506, Exhibit 19, page 1 of the Related Case, contains
the following text: "I tell you the truth. 100% of the newsgroup posts is
copywriter. Your company is making money off copyright. Maybe the
newsgroups want to be completely closed down because they are nothing but
copyriter [sic]."

- **No. 112:** Admit that Perfect 10's copyrights had clearly been infringed by
Giganews.

- **No. 113:** Admit that Perfect 10's copyrights had clearly been infringed by
Giganews's subscribers who uploaded those images to Giganews's servers.

- **No. 114:** Admit that Perfect 10's copyrights had clearly been infringed by
Giganews's subscribers who downloaded copies of Perfect 10 images from
Giganews's servers.

- **No. 127:** Admit that page 38 of the Ninth Circuit's ruling in the appeal of the
judgment in the Related Case [Dkt. Entry 110-1] contains the following text:
"Indeed, this is not a case where a sole shareholder operated a company with
little or no assets, nor is this a case where a company was stripped of its
assets to shield its sole shareholder from adverse judgments."

- **No. 209:** Admit that Related Case Dkt. 436 at page 8:12-14 states, "In fact,
Perfect 10 has provided significant evidence that Giganews is the direct

cause of infringement on its servers, and therefore is liable for direct infringement…"

- **No. 210:** Admit that Related Case Dkt. 436 at page 8:15-17 states, "Perfect 10's evidence includes the following five situations where Giganews continues to copy and distribute content that infringes upon Perfect 10's copyrighted images:"

- **No. 211:** Admit that in Related Case Dkt. 436, Perfect 10 describes five situations where it contended that Giganews was the direct cause of any further infringement because Giganews refused to remove Perfect 10 images from its servers even though the uploaders of those images 1) asked that they be removed, 2) conceded that everything they uploaded was infringing and cancelled their account, 3) were terminated for repeat infringement, 4) claimed to have not uploaded the allegedly infringing Perfect 10 content, or 5) died.

- **No. 236:** Admit that the Ninth Circuit found on page 19 of its opinion (appeal of Related Case Dkt. Entry 110-1), "Perfect 10 failed to show that the distribution does not happen automatically."

- **No. 237:** Admit that the following text appears on page 20 of the Ninth Circuit's ruling (appeal of Related Case Dkt. Entry 110-1), "Second, we are unpersuaded by Perfect 10's argument that Livewire engaged in volitional conduct because it sold access to Giganews servers, including infringing Perfect 10 images, for a monthly fee. As the district court concluded, "the undisputed evidence affirmatively shows Livewire sells access to all the content available on Giganews' servers. There is no evidence that Livewire sells any of Perfect 10's copyrighted material. Id. (emphasis in original)."

- **No. 241:** Admit that the Copyright Act does not suggest that reproducing copyrighted works without permission is "inactionable" if the reproduction is performed automatically.

- **No. 242:** Admit that the Copyright Act does not suggest that distributing copyrighted works without permission is "inactionable," if the distribution is performed automatically.

- **No. 243:** Admit that Perfect 10's Opposition to Giganews's Motion for Summary Judgment on the issue of direct liability (Related Case Dkt. 436, p. 21:6- 8), stated, "Here as well, the fact that Giganews's infringing activities may involve automated processes does not absolve it from liability for direct infringement."

- **No. 244:** Admit that Perfect 10's Opposition to Giganews's Motion for Summary Judgment on the issue of direct liability (Related Case Dkt. 436, p. 18:1-2) has a heading entitled, "Perfect 10's Evidence Satisfies Any Requirement of 'Volitional Conduct.'"

- **No. 245:** Admit that Perfect 10's Opposition to Giganews's Motion for Summary Judgment on the issue of direct liability (Related Case Dkt. 436 page 18:16-17) stated, "This Court likewise should decline to adopt the volitional conduct requirement advocated by Defendants."

- **No. 246:** Admit that Perfect 10's Opposition to Giganews's Motion for Summary judgment on the issue of direct liability (Related Case Dkt. 436 at page 19:4-6) stated, "First, Defendants are actively engaged in direct infringement when they choose to sell access to infringing Perfect 10 images to their users in exchange for a monthly fee."

- **No. 247:** Admit that Perfect 10's Opposition to Giganews's Motion for Summary judgment on the issue of direct liability (Related Case Dkt. 436 at

page 19:7-9) stated, "Second, Giganews's involvement in the peering process is volitional, involves human activity, and is not automatic…"

- **No. 248:** Admit that Perfect 10's Opposition to Giganews's Motion for Summary judgment on the issue of direct liability (Related Case Dkt. 436 at page 19:16-19) stated, "Third, Giganews is the direct cause of direct infringement when it refuses to remove infringing Perfect 10 images of uploaders who have died, cancelled their accounts, been terminated for repeat infringement, asked that the infringing content be removed; and denied uploading the infringing content at issue."

- **No. 314:** Admit that Judge Birotte, Jr. found in his order, Related Case Dkt. 620 that "To begin with, Perfect 10 does not submit any competent evidence to suggest that infringement of other forms of media is rampant on Giganews' servers."

- **No. 330:** Admit that GIGANEWS provides copies of copyrighted works for which it has no rights, to GIGANEWS' subscribers.

- **No. 331:** Admit that GIGANEWS accepts compensation for making copyrighted works, for which GIGANEWS has no rights, available to users to view or download.

**Giganews and Livewire's Position**

Perfect 10 lost its copyright infringement case; it may not re-litigate the merits of that case here or collaterally attack the Court's judgment against it. All of these requests seek admissions on irrelevant claims and standards and are thus not in proportion to the needs of this case.

A party may serve a written request to admit, "for the purposes of the pending action only," the truth of any matters relating to "facts, the application of law to fact, or opinions about either" and "the genuineness of any described documents." Fed. R. Civ. P. 36(a)(1). Perfect 10 asks Giganews and Livewire

instead to admit facts of the original copyright case.  For example, Perfect 10's first thirty-nine requests fall under the heading "**Admissions related to Perfect 10's [First Amended Complaint]**," most of which ask Giganews and Livewire to admit that Perfect 10 made an allegation (that was ultimately disproved).  The fact that Perfect 10 set forth an allegation in its complaint is not evidence relevant to this case.  It does not tend to suggest that the transfers at issue here were or were not made with fraudulent intent, that Perfect 10 was insolvent, what a reasonable party could or should have expected for an outcome, or whether Perfect 10's failure to pay its judgment caused Giganews and Livewire any harm.

Requiring Giganews and Livewire "to answer these requests for admissions far outweighs any potential benefit given that they are irrelevant to any claims […] in this action." *Knapp v. Cate*, No. 1:08-cv-01779-AWI-BAM PC, 2012 WL 2912254, at *3 (E.D. Cal. Jul. 16, 2012) (granting motion for protective order).  The Court should enter a protective order as to these requests.

**Perfect 10's Position**

As a preliminary matter, RFAs 18-29, 67, 82-83, 86-97, 127, 209-210, 236-237, 243-248, 314 merely ask that Plaintiffs admit that certain language appeared in certain documents at certain pages.  That type of request is not burdensome at all and should be answered in the affirmative.

Plaintiffs continue to misstate the law.  Defendants are not trying to relitigate the case, they are simply seeking to establish in an efficient way that they thought they would win and had a substantial basis for that belief.  If Perfect 10 thought it would win, Plaintiffs would never have been creditors, and so transfers made early on could not have been made to hinder their collection attempts.

### 4.   Requests Regarding Perfect 10's Reason for Filing Suit

- **No. 117:** Admit that Perfect 10 filed its lawsuit against Giganews, in party to obtain compensation for the use of its copyrighted works.

- **No. 118:** Admit that filing a lawsuit to obtain compensation for the unauthorized use of one's works is not an improper reason to file a lawsuit.
- **No. 119:** Admit that most copyright holders who file lawsuits, do so at least in part to obtain compensation for the use of their works.
- **No. 120:** Admit that parties that are robbed do not expect courts to order that they pay the thieves of their property millions of dollars in attorney's fees.
- **No. 121:** Admit that parties whose intellectual property is used without permission, do not expect courts to order them to pay millions in attorney's fees to the misappropriators of their content.
- **No. 122:** Admit that a ruling that allows parties to reproduce and distribute copyrighted works without paying the rights holder for the use of their works, is antithetical to the purposes of the copyright act.
- **No. 123:** Admit that $5.63 million award against Perfect 10 ended Perfect 10's ability to create copyrighted works.
- **No. 124**: Admit that Perfect 10 had been creating copyrighted works from at least 1996 to 2013.
- **No. 125:** Admit Perfect 10 provided to PLAINTIFFS a list of more than 3,000 websites that Perfect 10 claimed have used Perfect 10's content without permission.
- **No. 126:** Admit that the primary reason why Perfect 10 began to spend more and more time on litigation, is because it could not earn enough revenue from the sale of its copyrighted works to survive.

**Giganews and Livewire's Position**

Perfect 10's reasons for filing its copyright action have no connection to the transfers from Perfect 10 to Zada to prevent enforcement of the Court's judgment. These requests do not relate to whether Defendants made the transfers at issue with the intent to "hinder, delay, or defraud." They do not tend to suggest that Zada or

1   Perfect 10 had a reasonable belief that Perfect 10 would not incur a debt Perfect 10
2   would be unable to pay, as an adverse fee award is a risk in any copyright litigation
3   and Zada's subjective beliefs about the likelihood of such an award are irrelevant.

4       **Perfect 10's Position**

5       Giganews and Livewire do not even adequately describe the above RFAs.
6   The purpose of the RFAs is in part to establish that the District Court got the award
7   wrong as well as the copyright issues.  In other words, not only did Perfect 10
8   expect to win the related case, even after the entry of the summary judgment orders,
9   it did not expect to be ordered to pay any fee award, let alone one that was 5,600
10  times the size of the award in the Mattel v. MGA case, when compared to the
11  respective sales of the losing plaintiffs.  (Zada Decl. ¶14.)

12          **5.    Requests Regarding Ineffective DMCA Notifications of**
13              **Claimed Infringement**

14  •   **No. 23:** Admit that paragraph 50 of Perfect 10's FAC in the Related Case
15          states, "Perfect 10 has also sent to the DMCA agent for Giganews and
16          Livewire Services, Ronald Yokubaitis, DMCA notices which identified at
17          least several hundred celebrity fake images consisting of a celebrity's face
18          superimposed on the body of a Perfect 10 copyrighted image (which was
19          typically tasteful). See Exhibit 6 for several such examples of images offered
20          by Defendants, which consist of the faces of Christina Aguilera, Bridget
21          Fonda, Halle Berry, Jennifer Lopez, Kate Beckinsale, Katie Holms, and
22          Natalie Portman, superimposed on portions of images copyrighted by Perfect
23          10."

24  •   **No. 24:** Admit that Perfect 10's FAC in the Related Case provided examples
25          of full size images that Perfect 10 claimed were offered by Giganews which
26          consisted of the faces of celebrities superimposed of the bodies of Perfect 10
27          models. (See Related Case Dkt. 105, FAC Exhibit 6.)

28

- **No. 25:** Admit that Perfect 10's FAC in the Related Case provided an example of Christina Aguilera's face superimposed on a copyrighted Perfect 10 image, that Perfect 10 contended was offered by Giganews. (See Related Case Dkt. 105, FAC Exhibit 6, Pg. 1.)

- **No. 26:** Admit that Perfect 10's FAC in the Related Case provided an example of Halle Berry's face superimposed on a copyrighted Perfect 10 image, that Perfect 10 contended was offered by Giganews. (See Related Case Dkt. 105, FAC Exhibit 6, Pg. 3.)

- **No. 27:** Admit that Perfect 10's FAC in the Related Case provided an example of Jennifer Lopez's face superimposed on the body of a Perfect 10 model that Perfect 10 contended was offered by Giganews. (See Related Case Dkt. 105, FAC Exhibit 6, Pg. 4.)

- **No. 275:** Admit that paragraph 28 of the declaration referred to in RFA No. 274 states, "As an example, for the twelve-month period from November 6, 2012, to November 6, 2013, Defendants received approximately 204,470 DMCA takedown notices, which included a total of approximately 690,865,100 Message- IDs."

- **No. 302:** Admit that a company who received more than 10 notices regarding the same copyrighted work, yet continued to offer unlicensed copies of that work to its subscribers, would normally lose any chance for a DMCA safe harbor.

- **No. 348:** Admit that page 17 of Related Case Dkt. 449-3 contains the heading "OTHER USENET OPERATORS PROCESSED PERFECT 10'S NOTICES."

- **No. 349:** Admit that paragraph 37 of Related Case Dkt. 449-3 states, "Attached as Exhibit 20 is a true and correct copy of a Perfect 10 DMCA notice sent to Astraweb, another Usenet Operator, and their hosting

company, on April 10, 2012, and their reply, less than a day later. The reply shows that they were able to find the relevant Message-IDs just from the seven images attached on page 2 give the file names of those images…"

**Giganews and Livewire's Position**

The contents of Perfect 10's notifications of claimed infringement under the DMCA have no connection to the transfers from Perfect 10 to Zada to prevent enforcement of the Court's judgment.  These requests do not relate to whether Defendants made the transfers at issue with the intent to "hinder, delay, or defraud." They do not tend to suggest that Zada or Perfect 10 had a reasonable belief that Perfect 10 would not incur a debt Perfect 10 would be unable to pay, as an adverse fee award is a risk in any copyright litigation and Zada's subjective beliefs about the likelihood of such an award are irrelevant.

**Perfect 10's Position**

Once again, Plaintiffs completely misstate the fundamental issue in the case. The central issue is not how the court ruled, but how Perfect 10 expected the court to rule.   If Perfect 10 firmly believed it would win, then any transfer from Perfect 10 to Dr. Zada of monies owed, was simply done to pay back some of those monies and not to defraud anyone as there were no creditors other than Dr. Zada, and none were expected to ever exist.

RFAs 23-27 establish that Giganews offered what are known as "celebrity fakes," which consist of a celebrities face placed without permission on the body of someone who is often engaged in sexual acts.  Such images are widely known as being infringing on their face, since no celebrity would ever grant permission to be defamed in that fashion.  Giganews's refusal to block entire newsgroups of clearly defamatory and infringing materials, was yet another reason why Dr. Zada expected to win the case easily.

RFAs 275 and 302 are relevant in establishing that Giganews was likely

ineligible for any DMCA safe harbor, because it admittedly received **690 million
Message-IDs** in a single year, yet continued to offer the same repeatedly identified
infringing movies, TV shows, and songs.

RFAs 348 and 349 are relevant in establishing that other Usenet Operators
processed Perfect 10's notices (which Giganews refused to process).  Given this
undisputed evidence, Dr. Zada did not expect the Court to ignore it and instead find
that there was no issue of triable fact that Perfect 10's notices were too burdensome
to be DMCA compliant.

### 6.   Requests Regarding the Mimo Newsreader

- **No. 30:** Admit that Perfect 10's FAC in the Related Case provided examples
  of how Giganews subscribers could view full-sized Perfect 10 images via the
  Giganews Mimo newsreader.   (See Related Case Dkt. 105, FAC Exhibit 5.)
- **No. 37:** Admit that subscribers to giganews.com are able to download copies
  of copyrighted works owned by Perfect 10 via the Giganews Mimo
  newsreader.
- **No. 272:** Admit that Giganews allows its subscribers to view Perfect 10
  copyrighted images via its Mimo newsreader, by transmitting such images to
  its users upon their request.

**Giganews and Livewire's Position**

*This* is not a copyright action, and Giganews and Livewire's alleged receipt
of DMCA notifications of claimed infringement has no connection to the transfers
from Perfect 10 to Zada to hide assets from judgment.  These requests do not relate
to whether Defendants made the transfers at issue with the intent to "hinder, delay,
or defraud," and they do not tend to suggest that Zada or Perfect 10 had a
reasonable belief that Perfect 10 would not incur a debt Perfect 10 would be unable
to pay.  *See* Plaintiffs' Preliminary Statement, above.  Perfect 10 propounds these
requests for no reason but to harass, embarrass, and improperly extend the scope of

1  this litigation.  Fed. R. Civ. P. 26(c)(1).

2      As discussed above, it is also irrelevant that the requests target alleged facts

3  or allegations that Zada relied on in believing Perfect 10 could not possibly lose.

4  The standard for constructive fraudulent transfer is an objective one, making Zada's

5  subjective misconceptions additionally irrelevant.  The Court should issue a

6  protective order as to these requests as well.

7      **Perfect 10's Position**

8      Plaintiffs are completely wrong on this issue.  The issue before the Court

9  here, is not how the Court ruled, but how Perfect 10 believed the Court would rule.

10  If Perfect 10 believed that it would win, no transfer prior to the entry of the

11  summary judgment orders could have been fraudulent, because Perfect 10 would

12  have no basis to believe that Plaintiffs would be creditors.  Using Plaintiffs

13  arguments, whenever a copyright holder is involved in prosecuting a copyright

14  infringement lawsuit, every transfer to an insider who the company owes money to,

15  is fraudulent, even if the company was absolutely sure it would win.

16      **7.    Requests Regarding Litigation Other than the Underlying**

17          **Action**

18  - **No. 40:** Admit that Perfect 10 was awarded partial summary judgement

19      against GUBA, Inc. in 2002, on the issue of direct copyright infringement.

20      *See Perfect 10, Inc. v. GUBA,* LLC, 2002 WL 34940074 (N.D. Cal., Dec 30,

21      2002)

22  - **No. 41:** Admit that, in its ruling, the GUBA Court stated, "It is also

23      undisputed that GUBA obtained the subject images by using its propriety

24      software to 'retrieve binary files posted by users on the Usenet,' which

25      images GUBA then made available on its site for its customers."

26  - **No. 42:** Admit that Arista records LLC., BMG Music, UMG Records, Inc.,

27      Warner Bros. Records, Inc., and other music plaintiffs received summary

28

judgment against Usenet Operator usenet.com in 2009, on the issues of direct, vicarious, and contributory liability. *See Arista Records LLC v. Usenet.com, Inc.,* 633 F.Supp.2d 124 (S.D.N.Y. 2009).

- **No. 43:** Admit that plaintiff Playboy Enterprises received summary judgment against defendant Webbworld, Inc. d/b/a Neptics.com, on the issue of direct and vicarious liability in 1997. *See Playboy Enters., Inc. v. Webbworld, Inc.,* 991 F.Supp. 543 (N.D. Tex. 1997).

- **No. 44:** Admit that Webbworld, Inc. d/b/a/ Neptics was found to be directly liable for storing copies of unlicensed Playboy images on its servers, and then providing copies of those images to requesting subscribers.

- **No. 45**: Admit that the Webbworld court found that "Where Netcom gets paid for providing Internet access for its customers, Neptics com gets paid for selling the images it stores on its computers."

- **No. 46:** Admit that attached to Dr. Zada's declaration, Related Case Dkt. 508-3, filed on 10/06/2014, as Exhibit 33, is a document entitled "CONSENT JUDGMENT AND PERMANENT INJUNCTION."

- **No. 47:** Admit that the Plaintiffs listed on the document referred to in RFA No. 46 include Disney Enterprises, Inc. and Twentieth Century Fox Film Corporation.

- **No. 48:** Admit that the Defendants listed on the document referred to in RFA No. 46 included Joseph Morganelli, and Binnews, LLC.

- **No. 49:** Admit that that the document referred to in RFA No. 46 states, "Defendants shall pay damages to Plaintiffs in the amount of Fifteen Million U.S. Dollars (US $15,000,000).

- **No. 50:** Admit that the second page of the document referred to in RFA No. 46 states, "shall cease and desist from indexing or otherwise providing

identification of or access to Copyrighted Works available on Usenet in any form." (See Related Case Docket 508-3, Exh. 33 Pg. 2.)

- **No. 54:** Admit that in his order, Related Case Dkt. 619, Judge Birotte stated, "Once Giganews has established a peering agreement with another Usenet provider, it exercises a certain amount of control over the articles it copies from other servers." (See Related Case Dkt. 619, p. 4.)

- **No. 55:** Admit that in 2011, a press release was issued by the office of the then United States Attorney for the Central District of California, Andre Birotte, Jr.

- **No. 57:** Admit that in the press release referred to in RFA No. 55, then U.S. attorney Birotte, was quoted as saying, "The Justice Department will pursue and prosecute persons who seek to steal the intellectual property of this nation."

- **No. 84:** Admit that page 2 of Dkt. 536 in the Related Case states, "Nowhere in the Memo, however, does Giganews establish that it has any rights to even ONE copyrighted work on its massive servers. Giganews's excuse – that it 'provides access to Usenet' – is no justification for its theft of more than 25,000 terabytes of the intellectual property of this nation."

- **No. 107:** Admit that MGA, which received the award of approximately $137 million in the case of Mattel, Inc. v. MGA Entertainment, Inc., was a creator of copyrighted works.

- **No. 108:** Admit that John Fogerty, who received an award of $1.348 million in the case Fantasy, Inc. v. Fogerty, was a creator of copyrighted songs.

- **No. 111:** Admit that page 7 of the Supreme Court opinion in *Kirstsaeng v. John Wiley & Sons, Inc.*, No. 15-375, 579 U.S. (June 16, 2016) ("Kirstsaeng") states, "The holder of a copyright that has obviously been

infringed has good reason to bring and maintain a suit even if the damages at stake are small."

- **No. 115:** Admit that page 2 the Supreme Court in Kirstsaeng, referred to in RFA No. 111, states, "By contrast, Kirtsaeng's [sic] proposal—to give special consideration to whether a suit meaningfully clarified copyright law by resolving an important and close legal issue—would produce no sure benefits."

- **No. 116:** Admit that the Supreme Court in Kirstsaeng, referred to in RFA No. 111 in effect, rejected the District's Court basis for awarding attorney's fees, namely that the defendants successful defense helped clarify the boundaries of the copyright act.

- **No. 254:** Admit that Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, and Warner Bros. Entertainment, Inc. filed an Amicus brief in the case of *Spanski v. Polska*, U.S. District Court for the District of Columbia Case No. 17-7051 (hereinafter the "Movie Studio Spanski Brief") before the United States Court of Appeals for the District of Columbia Circuit on October 4, 2017.

- **No. 255:** Admit page 14 of the Movie Studio Spanski Brief contains the following text: "First, nothing in the Copyright Act requires proof that a defendant acted 'volitionally' to be liable for direct infringement.  Second, the Supreme Court has rejected the very same arguments … .Third, a defendant's automation of infringing activities does not excuse it from direct-infringement liability."

- **No. 256:** Admit that page 15 of the Movie Studio Spanski Brief contains the following text: "Copyright is a strict liability statute.  'To establish infringement,' only 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original.' *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.* 499 U.S. 340, 361 (1991). … Neither this traditional test, nor anything in the text or legislative history of the Copyright Act, requires 'volitional conduct' or any other additional element to establish direct copyright infringement."

- **No. 257:** Admit page 25 of the Movie Studio Spanski Brief contains the heading: "A Defendant's Automation of Infringing Conduct is No Defense to Direct Infringement."

- **No. 258:** Admit that the Justice Department filed an Amicus brief in the case of Spanski v. Polska, U.S. District Court for the District of Columbia Case No. 17-7051 (hereinafter the "Justice Department Spanski Brief") which was also signed by representatives of the U.S. copyright office, before the United States Court of Appeals for the District of Columbia Circuit on October 4, 2017.

- **No. 259:** Admit that page 2 of the Justice Department Spanski Brief contains the following text: "The United States further urges the Court to clarify that copyright infringement is a strict liability offense."

- **No. 260:** Admit that page 19 of the Justice Department Spanski Brief contains the heading: "COPYRIGHT INFRINGEMENT IS A STRICT LIABILITY OFFENSE THAT DOES NOT REQUIRE PROOF OF WRONGFUL INTENT."

- **No. 261:** Admit that pages 9-10 of the Justice Department Spanski Brief contains the following text: "If TVP had streamed SEI's copyrighted works from servers within the United States to the American public, it would be liable for infringement."

- **No. 262:** Admit that page 13 of the Justice Department Spanski Brief contains the following text: "Nothing in the Copyright Act, furthermore,

turns on the particular technological mechanism by which the performance to the public is effected [sic]."

- **No. 263:** Admit that page 18 of the Justice Department Spanski Brief contains the following text: "It held that 'both the broadcaster and the viewer of a television program 'perform' because they both show the program's images and make audible the program's sounds." Aereo, 134 S. Ct. at 2506 (citing 17 U.S.C. §101)."

- **No. 264:** Admit that page 20 of the Justice Department Spanski Brief contains the following text: "It is well established that '[c]opyright infringement is a strict liability offense in the sense that a plaintiff is not require to prove unlawful intent or culpability.'"

- **No. 265:** Admit that page 20 of the Justice Department Spanski Brief contains the following text: "A bit of reflection suffices to realize that such innocence should no more constitute a defense in an infringement action that it would to a charge of conversion of tangible property."

- **No. 266:** Admit that page 20 of the Justice Department Spanski Brief contains the following text: The district court erred to the extent it suggested that intent is necessary predicate to infringement liability."

- **No. 267:** Admit that page 21 of the Justice Department Spanski Brief contained a section entitled "TVP's 'Volitional Conduct' Argument Is Foreclosed By Aereo."

- **No. 268:** Admit that the United States Court of Appeals for the District of Columbia Circuit issued a ruling in Spanski Enterprises, Inc. v. Telewizja Polska, S.A. in March of 2018.

- **No. 269:** Admit that page 8 of the DC Appellate Court's ruling rejected Defendant TV Polska's argument that because it maintained a fully

automated video-on-demand service, its end users were solely liable for any infringement.

- **No. 270:** Admit that page 10 of the DC Appellate Court's ruling states, "Aereo thus forecloses TV Polska's argument that the automated nature of its video-on-demand system or the end user's role in selecting which content to access insulates it from Copyright Act liability."

- **No. 271:** Admit that page 13 of the DC Appellate Court's ruling states, "TV Polska's conduct, -- 'us[ing] its own equipment' to 'allow[] [users] to watch television programs, many of which are copyrighted,' by transmitting content upon a user's request, Aereo, 134 S. Ct. at 2506—constitutes infringement under Aereo's binding authority, whatever the scope of any such requirement might otherwise be."

**Giganews and Livewire's Position**

The outcomes of other cases in different jurisdictions, involving other parties, and with unique facts have no connection to the transfers from Perfect 10 to Zada to hide assets from judgment. They arguably have no connection even to the underlying copyright case. These requests do not relate to whether Defendants made the transfers at issue with the intent to "hinder, delay, or defraud," and they do not tend to suggest that Zada or Perfect 10 had a reasonable belief that Perfect 10 would not incur a debt Perfect 10 would be unable to pay. *See* Plaintiffs' Preliminary Statement, above. Perfect 10 propounds these requests for no reason but to harass, embarrass, and improperly extend the scope of this litigation. Fed. R. Civ. P. 26(c)(1).

It is also irrelevant that the requests target alleged facts or allegations that Zada relied on in believing Perfect 10 could not possibly lose. The standard for constructive fraudulent transfer is an objective one, making Zada's subjective misconceptions additionally irrelevant.

Perfect 10 argues that the requests target alleged facts that convinced Zada of a Perfect 10 victory.  The argument is tantamount to suggesting that because other copyright suits—involving different parties, allegations, and jurisdictions—were successful, Zada could not reasonably have foreseen losing.  If that were how *stare decisis* worked, there would be no place for a legal defense or even litigation because the earliest case would control.  The requests are therefore irrelevant and burdensome, demanding effort well beyond any appropriate needs of this case.  The Court should issue a protective order as to these requests as well.

**Perfect 10's Position**

These RFAs are easy to answer because most simply ask Plaintiffs to confirm the language in certain documents.  Plaintiffs continue to misstate the law and ignore their own allegations.  They have alleged in paragraphs 38 and 40 of their FAC that Perfect 10 knew it would lose early on.  Dr. Zada is entitled to demonstrate that not only did he think Perfect 10 would win, but extremely respectable and completely unbiased entities such as the RIAA, MPAA, Justice Department and Copyright Office thought Perfect 10 would win as well.  The fact that the Supreme Court in *Kirtsaeng* basically sided with Perfect 10 that an award should not have been made, is extremely important as well.  Admitting to these RFAs should destroy Plaintiffs case, which is why Plaintiffs attempt to avoid them.

### 8.    Requests Regarding Criminal Investigations

- **No. 51:** Admit that Perfect 10 filed a document in the Related Case on 07/11/11 (See Related Case Dkt. 26-3, Exh. 21, Pg. 6)), which displayed insignias from several agencies, including the Department of Justice, which stated, "This domain name has been seized by the U.S. Immigration and Customs Enforcement… It is unlawful to reproduce or distribute copyrighted materials, such as movies, music, software or games, without authorization."

- **No. 76:** Admit that Perfect 10 filed a document in the Related Case on 07/11/11 (See Related Case Dkt. 26-3, Exh. 21, Pg. 1), entitled "HATCH, INTERNATIONAL ANTI-PIRACY CAUCUS UNVEILS '2010 INTERNATIONAL PIRACY WATCH LIST'" dated May 19th, 2010.
- **No. 77:** Admit that document referred to in RFA No. 76 contained the following text: "To assure the continued creation and distribution of music, movies, software and books, from which we all benefit, we must ensure that our artists, creators, and producers are paid for their work."
- **No. 78:** Admit that there were news reports on March 24, 2016, that the operator of a Usenet provider "Newsoo" was arrested in France. (See Dkt. 34-6 from this case.)
- **No. 79:** Admit that one news report stated that Newsoo was "small by Giganews standards." (See Dkt. 34-6, page 2, from this case.)
- **No. 80:** Admit that there were news reports in November of 2017, which stated that German police shut down multiple Usenet sites overseas. (See Dkt. 34- 7 from this case.)
- **No. 81:** Admit that a number of Usenet Operators in Europe were arrested in 2016 and 2017.

**Giganews and Livewire's Position**

The requests concern law enforcement investigations, criminal activities, and criminal punishments in cases that occurred in other jurisdictions, and in some cases, other countries. These requests also do not relate to whether Defendants made the transfers at issue with the intent to "hinder, delay, or defraud," and they do not tend to suggest that Zada or Perfect 10 had a reasonable belief that Perfect 10 would not incur a debt Perfect 10 would be unable to pay. *See* Plaintiffs' Preliminary Statement, above. Perfect 10 propounds these requests for no reason but to harass, embarrass, and improperly extend the scope of this litigation. Fed. R.

Civ. P. 26(c)(1).

It is also irrelevant that the requests target alleged facts or allegations that Zada relied on in believing Perfect 10 could not possibly lose.  The standard for constructive fraudulent transfer is an objective one, making Zada's subjective misconceptions additionally irrelevant.

**Perfect 10's Position**

Once again the RFAs are easy to admit because most simply ask that Plaintiffs confirm that certain documents contained certain language.  The fact that other Usenet Operators were arrested in Europe is extraordinarily significant, because it supports Dr. Zada's testimony that he was certain that Perfect 10 would win in part because Plaintiffs were committing blatant criminal copyright infringement.

### 9.    Requests Regarding Usenet

- **No. 207:** Admit that Related Case Dkt. 436 [Perfect 10's opposition to Giganews's motion for summary judgment on the issue of direct copyright infringement] at page 7:5-8 states, "As a result of the peering process, Giganews has offered approximately 61,000 copies of Perfect 10's copyrighted images to other Usenet providers with which it has peering agreements, and to users who pay Giganews its monthly fee, even though Perfect 10 has never authorized Giganews to do so."
- **No. 208:** Admit that Related Case Dkt. 436 at page 7:9-11 states, "In addition, during the peering process, Giganews has copied at least 9,604 Perfect 10 images onto its Usenet servers from other Usenet providers with which it has peering agreements."

**Giganews and Livewire's Position**

Usenet is "an international collection of organizations and individuals (known as 'peers') whose computers connect to one another and [by which the

58

peers] exchange messages posted by USENET users.'" *Ellison v. Robertson*, 357 F.3d 1072, 1074 n.1 (9th Cir. 2004) (citation omitted).  Giganews's provision of Usenet access has no conceivable connection to the transfers from Perfect 10 to Zada to evade enforcement of the Court's judgment.  The requests do not relate to whether Defendants made the transfers at issue with the intent to "hinder, delay, or defraud," and they do not tend to suggest that an adverse fee award is not a reasonably foreseeable risk of Perfect 10's copyright litigation.

### Perfect 10's Position

The RFAs are easy to answer and Plaintiffs are once again misstating the law and ignoring their own allegations in paragraphs 38 and 40 of their FAC.  Defendants certainly have the right to refute those allegations, which is exactly what the above RFAs attempt to do.  Both RFA 207 and 208 establish that Giganews satisfied the normal standard for direct copyright infringement.

### 10.   Requests Regarding Megaupload

- **No. 56:** Admit that the press release referred to in RFA No. 55 stated that one Gilberto Sanchez was sentenced to jail for a year for uploading a copy of the movie "X-Men Origins: Wolverine" to the website Megaupload.com.

- **No. 65:** Admit that Related Case Dkt. 506, a declaration signed by Dr. Zada on September 29, 2014, states in paragraph 31: "Attached as page 1 of Exhibit 15 is a true and correct copy of a spreadsheet I created in 2013 which compared the number of movie files offered by Giganews as compared to Megaupload, a website whose operators are currently being prosecuted for criminal copyright infringement by the U.S. Justice Department."

- **No. 66:** Admit that in that same paragraph referred to in RFA No. 65, Dr. Zada stated, "Giganews offered a total of 7,968 files that were 4 GB or more, as opposed to 33 for Megaupload; or a ratio of 242 to 1."

- **No. 71:** Admit that Exhibit 10 to Perfect 10's FAC in the Related Case contains the text: "Justice Department Charges Leaders of Megaupload with Widespread Online Copyright Infringement."
- **No. 72:** Admit that same exhibit referred to in RFA No. 71 contains the text: "Seven individuals and two corporations have been charged in the United States with running an international organized criminal enterprise allegedly responsible for massive worldwide online piracy of numerous types of copyrighted works, through Megaupload.com and other related sites, generating more than $175 million in criminal proceeds…"
- **No. 73:** Admit that Exhibit 10 to Perfect 10's FAC in the Related Case indicated that the operators of Megaupload.com were being prosecuted for criminal copyright infringement.
- **No. 74:** Admit that Exhibit 10 to Perfect 10's FAC in the Related Case contains the text: "According to the indictment, for more than five years the conspiracy has operated websites that unlawfully reproduce and distribute infringing copies of copyrighted works, including movies…"
- **No. 75:** Admit that Related Case Dkt. 436, at page 1:9-11 states, "Defendants offer more than 240 times as many full-length movies as the website megaupload.com, whose operators are facing 25 years in prison for criminal copyright infringement."

**Giganews and Livewire's Position**

Megaupload was a controversial "digital storage locker" company with a vastly different technology, business model, and set of business practices from those of Giganews and Livewire.  Perfect 10's wild assertions in the Related Case trying to compare Giganews and Livewire to Megaupload have no bearing on this case.  Perfect 10 got past a motion to dismiss in the Related Case by pleading a similarity between Megaupload and Giganews that Perfect 10 could never establish

as a fact, which is why the Court granted summary judgment to Giganews on Perfect 10's direct infringement claim. These requests are wholly irrelevant and improper.

### Perfect 10's Position

Megaupload and Giganews do exactly the same thing. They both sell access to pirated materials stored on their servers for a monthly fee.  The exact technology used to steal is irrelevant.  If one is copying movies and songs without permission for commercial gain, one satisfies the standard for criminal copyright infringement. For that reason, as well as the undisputable fact that Usenet Operators have recently been arrested in Europe, Perfect 10 was completely justified in believing it would win the case, which means that it could not have expected that Plaintiffs would ever be creditors.

### 11.    Requests Regarding Movies, Television Shows, and Music

- **No. 58:** Admit that Dkt. 506 in the related case, a declaration signed by Dr. Zada on September 29, 2014, states in paragraph 27, "Attached as Exhibit 11 are true and correct copies of six pages of results I obtained by doing a search using the Mimo newsreader on 'X-Men Origins,' the name of a well-known movie. The first four pages were printed on August 12, 2014. I sorted the results by 'Size' before print-screening this Exhibit.  The size of the first message is 43 GB, which is the size of at least 8 DVDs."

- **No. 59:** Admit that Dkt. 506 in the related case, a declaration signed by Dr. Zada on September 29, 2014, states in paragraph 28 of that declaration, "Attached as Exhibit 12 is a true and correct copy of pages from Defendants production. I have circled in red on page 1 where the document indicates that Defendants have received at least one DMCA notice regarding the same movie, X-Men Origins, shown in Exhibit 11."

- **No. 60:** Admit that YOU have received at least one notice regarding the movie, X-Men Origins: Wolverine.
- **No. 61:** Admit that YOU have received at least ten notices regarding the movie, X-Men Origins: Wolverine.
- **No. 62:** Admit that examples of the search results on "X-Men Origins" using the Giganews Mimo newsreader were attached to Dr. Zada's declaration (See Related Case Dkt. 506) as Exhibit 11.
- **No. 63:** Admit that listed in those results referred to in RFA No. 62 were multiple files that were over 40 GB in Size.
- **No. 64:** Admit that GIGANEWS has reproduced copies of the movie "X-Men Origins: Wolverine" without authorization.
- **No. 68:** Admit that Dr. Zada attached to his declaration (Related Case Dkt. 506), as Exhibit 14, a six page list of major movies and TV shows entitled "POPULAR WORKS OFFERED BY DEFENDANTS DESPITE NOTICE."
- **No. 69:** Admit that six page list referred to in RFA No. 68 contained the movies "The Hunger Games," "Casino," "Fast and Furious," "Jaws," "Jurassic Park," "Liar Liar," The Scorpion King," "Eagle Eye," "Transformers," "Tropic Thunder," "Harry Potter and the Half Blood Prince," and "The Dark Knight."
- **No. 70:** Admit that six page list referred to in RFA No. 68 contained the TV series, "Boardwalk Empire," "Curb Your Enthusiasm," "Entourage," "Everybody Loves Raymond," "Real Time With Bill Maher," "Sex and the City," "The Sopranos," "True Blood," "Law and Order," and "Miami Vice," among others.
- **No. 85:** Admit that page 5 of Dkt. 536 in the Related Case states, "Giganews offers tens of thousands of messages with 'bootleg' in their Message Titles, which contain works by most major artists, such as Beyonce, Bob Dylan,

Bob Marley, Bruce Springsteen, Chicago, Michael Jackson, The Beatles, and The Eagles.  Zada Decl. ¶ 31, Exh. 15."

- **No. 273:** Admit that page 5 of Dkt. 536 in the Related Case states, "By its own admission, Giganews has received hundreds of thousands of DMCA notices, which identify infringing movies, songs, and other copyrighted works on Giganews's Usenet servers. Zada Decl. ¶ 30, Exh. 14. For example, Giganews has received DMCA notices regarding thousands of popular movies, such as 'X-Men Origins: Wolverine,' 'The Dark Knight,' and 'Fast and Furious,' and numerous popular television series, such as 'True Blood,' 'Boardwalk Empire,' 'Entourage,' and 'Curb Your Enthusiasm.' Nevertheless, Giganews is still offering hundreds of copies of these same works to its users. Id. ¶¶ 27-31, Exhs. 11-15.  In fact, in the last three weeks, Giganews has copied large numbers of episodes of 'The Sopranos,' 'Boardwalk Empire,' 'Miami Vice,' and copies of 'Michael Jackson's Thriller,' and 'The Dark Knight' onto its Usenet servers.  Id., ¶ 29, Exh. 13, pp. 21-26. Giganews has received countless DMCA notices regarding these works.  Id. ¶ 30, Exh. 14. In other words, Giganews is not an innocent host; rather it is a copyright pirate."

- **No. 274:** Admit that paragraph 30 of declaration of Philip Molter (Related Case Dkt. 523-1 filed 10/13/14), an employee of Giganews, states, "Giganews has received DMCA-compliant notices from a wide range of copyright claimants, including Warner Bros, HBO, Lionsgate Films, the Entertainment Software Association, the Recording Industry Association of America ("RIAA"), Microsoft, and NBC Universal."

- **No. 276:** Admit that YOU have received notices from HBO, advising YOU that YOU were offering HBO content without permission.

- **No. 277:** Admit that YOU received a notice from HBO, dated December 23, 2009, which stated, "I am writing this letter on behalf of HOME BOX OFFICE, INC. ("HBO"). It has come to our attention that your website is hosting and facilitating the streaming and downloading of the television program, in which HBO is the owner in copyright and/or owner of exclusive rights (the "HBO Properties.")  These properties (listed below) are currently available on your website located at Giganews (the "Website"). No one is authorized to exhibit, reproduce, transmit, or otherwise distribute the HBO Properties without the express written permission of HBO, which permission HBO has not granted to you."  See GIGANEWS00022281-83

- **No. 278:** Admit that that same notice went on to state, "Accordingly HBO demands that you immediately cease and desist distribution of the HBO Properties in connection with the Website…"

- **No. 279:** Admit that YOU received a notice from HBO, dated December 24, 2009, which stated, "I am writing this letter on behalf of HOME BOX OFFICE, INC. ("HBO"). It has come to our attention that your website is hosting and facilitating the streaming and downloading of the television program, in which HBO is the owner in copyright and/or owner of exclusive rights (the "HBO Properties.") These properties (listed below) are currently available on your website located at Giganews (the "Website"). No one is authorized to exhibit, reproduce, transmit, or otherwise distribute the HBO Properties without the express written permission of HBO, which permission HBO has not granted to you."  See GIGANEWS00026228-30.

- **No. 280:** Admit that the above notice referred to in RFA No. 279 listed True Blood as one of the HBO properties allegedly infringed.

- **No. 281:** Admit that in the past, Giganews has stored on its servers, unlicensed copies of episodes of the HBO series, "True Blood."

- **No. 282:** Admit that YOU received a notice from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that on January 28, 2009, your company was providing unauthorized copies of the following HBO Properties to your subscribers: "Sex and the City," [GIGANEWS00087337]; "Everybody Loves Raymond," [GIGANEWS00087332]; "The Wire," [GIGANEWS00087361]; "The Sopranos," [GIGANEWS00087367], GIGANEWS00090809]; "True Blood," [GIGANEWS00087378]; "Entourage" and "Real Time with Bill Maher," [GIGANEWS00087397].

- **No. 283:** Admit that in the past, Giganews has stored on its servers, unlicensed copies of episodes of the HBO series, "Sex and the City."

- **No. 284:** Admit that in the past, Giganews has stored on its servers, unlicensed copies of episodes of the HBO series, "Everybody Loves Raymond."

- **No. 285:** Admit that in the past, Giganews has stored on its servers, unlicensed copies of episodes of the HBO series, "The Sopranos."

- **No. 286:** Admit that YOU received a notice from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that on January 28, 2009, your company was providing unauthorized copies of the following HBO Properties to your subscribers: "HBO Boxing (All Fights) [GIGANEWS00090817]; "Flight of the Conchords," [GIGANEWS00090831]; "Curb Your Enthusiasm," [GIGANEWS00090874].

- **No. 287:** Admit that in the past, Giganews has stored on its servers, unlicensed copies of episodes of the HBO series, "Curb Your Enthusiasm."

- **No. 288:** Admit that YOU received a notice on November 20, 2009, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box

Office, advising YOU that your company was hosting and facilitating the streaming and downloading of the HBO series Curb Your Enthusiasm, without HBO's permission. GIGANEWS00018983-84.

- **No. 289:** Admit that YOU received a notice on November 20, 2009, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that your company was hosting and facilitating the streaming and downloading of the HBO series True Blood, without HBO's permission. GIGANEWS00013918-19.

- **No. 290:** Admit that YOU received a notice on November 20, 2009, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that your company was hosting and facilitating the streaming and downloading of the HBO series True Blood, without HBO's permission. GIGANEWS00020287-88.

- **No. 291:** Admit that YOU received a notice from HBO, dated December 28, 2009, which stated, "I am writing this letter on behalf of HOME BOX OFFICE, INC. ("HBO"). It has come to our attention that your website is hosting and facilitating the streaming and downloading of the television program, in which HBO is the owner in copyright and/or owner of exclusive rights (the "HBO Properties.") These properties (listed below) are currently available on your website located at Giganews (the "Website"). No one is authorized to exhibit, reproduce, transmit, or otherwise distribute the HBO Properties without the express written permission of HBO, which permission HBO has not granted to you."  See GIGANEWS00026232-34.

- **No. 292:** Admit that the above notice listed True Blood as one of the HBO properties allegedly infringed.

- **No. 293:** Admit that YOU received a notice on June 7, 2010, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office,

advising YOU that your company was hosting and facilitating the streaming and downloading of the HBO series True Blood, without HBO's permission. GIGANEWS00013918-19.

- **No. 294:** Admit that YOU received a notice on June 8, 2010, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that your company was hosting and facilitating the streaming and downloading of the HBO series True Blood, without HBO's permission. GIGANEWS00012751-53.

- **No. 295:** Admit that YOU received a notice on June 27, 2010, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that your company was hosting and facilitating the streaming and downloading of the HBO series True Blood, without HBO's permission. GIGANEWS00012138-39.

- **No. 296:** Admit that YOU received a notice on July 8, 2010, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that your company was hosting and facilitating the streaming and downloading of the HBO series True Blood, without HBO's permission. GIGANEWS00018997-98.

- **No. 297:** Admit that YOU received a notice on July 22, 2010, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that your company was hosting and facilitating the streaming and downloading of the HBO series True Blood, without HBO's permission. GIGANEWS00015184-85.

- **No. 298:** Admit that YOU received a notice on July 31, 2010, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising YOU that your company was hosting and facilitating the streaming

and downloading of the HBO series True Blood, without HBO's permission. GIGANEWS00015188-89.

- **No. 299:** Admit that members of giganews.com have been able to download copies of episodes of the HBO series "True Blood," from Giganews's servers.

- **No. 300:** Admit that YOU received a notice which stated, "No one is authorized to exhibit, reproduce, transmit, or otherwise distribute HBO Properties without the express written permission of HBO, and the unauthorized distribution of HBO Properties constitutes copyright infringement", related to the series "Banshee." See GIGANEWS00079936-79941

- **No. 301:** Admit that YOU received a notice which stated, "No one is authorized to exhibit, reproduce, transmit, or otherwise distribute HBO Properties without the express written permission of HBO, and the unauthorized distribution of HBO Properties constitutes copyright infringement", related to the series "True Detective." See GIGANEWS00079990-80000.

- **No. 303:** Admit that YOU received a notice on July 30, 2010, from Steven S. Rosenthal, Manager, Anti-Piracy, Legal Department, Home Box Office, advising you that your company was hosting and facilitating the streaming and downloading of the HBO series Entourage, without HBO's permission. GIGANEWS00012271-72.

- **No. 304:** Admit that subscribers to Giganews have been able to download unlicensed episodes of the TV series "Entourage."

- **No. 305:** Admit that YOU have received notices from NBC Universal, advising YOU that YOU were offering NBC Universal content including movies, without permission.

- **No. 306:** Admit that YOU have received notices from Paramount Studios, advising YOU that YOU were offering Paramount content, including movies, without permission.

- **No. 307:** Admit that YOU have received notices from Sony Pictures, advising YOU that YOU were offering Sony content, including movies, without permission.

- **No. 308:** Admit that YOU have received notices from Disney, advising YOU that YOU were offering Disney content, including movies, without permission.

- **No. 309:** Admit that YOU have received notices from Microsoft, advising YOU that YOU were offering Microsoft software without permission.

- **No. 310:** Admit that subscribers to giganews.com are able to obtain unlicensed copies of movies owned by NBC Universal which are stored on Giganews's servers.

- **No. 311:** Admit that subscribers to giganews.com are able to obtain unlicensed copies of movies owned by Paramount Studios which are stored on Giganews's servers.

- **No. 312:** Admit that subscribers to giganews.com are able to obtain unlicensed copies of movies owned by Disney which are stored on Giganews's servers.

- **No. 313:** Admit that subscribers to giganews.com are able to obtain unlicensed copies of movies owned by Twentieth Century Fox which are stored on Giganews's servers.

**Giganews and Livewire's Position**

Perfect 10 seeks admissions regarding Hollywood movies, various hit television shows, popular music, and production companies with no relation to any Perfect 10 copyrights. These requests bear no connection to the original copyright

1   action let alone the claims in this case.  They are a baseless attempt to paint

2   Plaintiffs as bad actors, collaterally attack the district court's judgment, and distract

3   from Defendants' financial fraud.

4           **Perfect 10's Position**

5           In order to establish fraudulent transfers, Plaintiffs must show that Dr. Zada

6   continued to litigate a case he expected to lose.   That allegation by itself, defies

7   logic and common sense.  Anyone who has gone to the movies has seen the

8   disclaimer on the screen which states that it is unlawful to make a copy of the

9   movie and provide it to someone else.   Plaintiffs do just that en masse, for

10  commercial gain, which is, plain and simple, criminal copyright infringement.

11  There is a reason why Apple, Netflix, Amazon, and Hulu pay for the rights to the

12  materials they copy and distribute to their subscribers.  To do otherwise is unlawful.

13  No copyright holder expects to lose to criminal copyright infringers, let alone be

14  bankrupted by filing suit against them.

15          The above RFAs establish that Giganews received numerous notices

16  regarding its unauthorized commercial exploitation of the same TV shows and

17  movies, and yet continued to offer those same infringing materials.  That evidence

18  would disqualify Giganews from a DMCA safe harbor and well as subject it to

19  prosecution for criminal copyright infringement.

20          **12.     Requests Regarding Amicus Briefs in the Underlying Case**

21  • **No. 212:** Admit that on 12/23/2015, the Recording Industry Association of

22      America ("RIAA") filed an Amicus brief before the Ninth Circuit in the

23      appeal of the judgment in the Related Case (hereinafter the "RIAA Amicus

24      brief").

25  • **No. 213:** Admit that the first page of the RIAA Amicus brief contains the

26      following language "Recording Industry Association of America, Inc.

27

28

("RIAA") respectfully submits this brief urging reversal of the district court rulings addressed herein."

- **No. 214:** Admit that the first page of the RIAA Amicus brief contains the following language: "The business of defendants-appellees ("defendants") is built on unlawfully exploiting the works of RIAA members and others, by engaging in and facilitating for profit the unauthorized copying and distribution of these works on a massive scale. The RIAA's members are harmed by the type of large-scale Internet piracy at issue in this case."

- **No. 215:** Admit that pages 2-3 of the RIAA Amicus brief includes the following language: "The district court believed that the rulings now under review 'helped demarcate the boundaries of copyright law." *Perfect 10, Inc. v. Giganews, Inc.* 2015 WL 1746484, at *7 (C.D. Cal. Mar. 24, 2015) (Birotte, J.) (quotation omitted). On a number of important issues regarding liability for direct and secondary copyright infringement, the district court indeed staked out new law in a sense – by disregarding and misapplying existing law, including controlling Supreme Court and Ninth Circuit precedent. In doing so, the district court provided legal immunity to a business that profits from mass piracy by selling access to unauthorized copies of copyrighted works that it chooses to copy, store, and make available on its servers. This is the very same type of business that the Southern District of New York in an earlier case held liable for direct, contributory, and vicarious infringement, and intentional inducement of infringement.. [sic]  See Arista Records LLC v. Usenet.com, Inc. 633 F.Supp. 2d 124, 159 (S.D.N.Y. 2009) ("Arista II"). The district court's analysis of important copyright law questions was wrong in at least the following ways:"

- **No. 216:** Admit that page 4 of the RIAA Amicus brief contains the following text: "In rulings entered on motions to dismiss, … the district court misstated and misapplied the law of direct infringement in three important and related respects."

- **No. 217:** Admit that page 5 of the RIAA Amicus brief contains the following text: "The district court misstated the test for intentional inducement of copyright infringement by confusing it with the test for contributory infringement by material contribution."

- **No. 218:** Admit that page 6 of the RIAA Amicus brief contains the following text: "The district court also misapplied the law governing the knowledge element of contributory infringement by material contribution."

- **No. 219:** Admit that page 7 of the RIAA Amicus brief contains the following text: "Finally, the district court misstated the law of vicarious infringement liability."

- **No. 220:** Admit that page 7 of the RIAA Amicus brief contains the following text: "Citing no legal authority, the district court added an extra element to the vicarious liability test. The court held that a plaintiff also must prove that its own works, or its category of works, acted as a specific draw to defendants' service. … This ruling is contrary to decades of vicarious infringement jurisprudence…"

- **No. 221:** Admit page 8 of the RIAA Amicus brief described Plaintiff's business as a "Modern Piracy Service."

- **No. 222:** Admit that the RIAA is not known for filing Amicus briefs in support of frivolous or meritless cases.

- **No. 223:** Admit that page 10 of the RIAA Amicus brief included the following language: "This case simply involves defendants who utilize the Usenet to profit from piracy by selling access to infringing content from

private servers that they control. Unlike legitimate service providers involved in the early Usenet cases, the defendants here are committing blatant copyright infringement."

- **No. 224:** Admit that page 11 of the RIAA Amicus brief contains the heading "The District Court Misstated the Test for Direct Copyright Infringement."

- **No. 225:** Admit that page 12 of the RIAA Amicus brief contains the language: "This Court Should Reject a 'Volitional Conduct' Test for Direct Infringement."

- **No. 226:** Admit that page 17 of the RIAA Amicus brief contains the heading "Automation Does Not Negate a Defendant's Direct Infringement."

- **No. 227:** Admit that the RIAA filed a second Amicus Brief in support of Perfect 10's petition for panel rehearing and rehearing en banc (hereinafter the RIAA Second Amicus brief.")

- **No. 228:** Admit that page 4 of the RIAA Second Amicus brief contains the heading: "THE PANEL'S VICARIOUS COPYRIGHT INFRINGEMENT RULING IS INCORRECT AND, IF LEFT UNDISTURBED, WILL HAVE HARMFUL CONSEQUENCES"

- **No. 229:** Admit that page 13 of the RIAA Second Amicus brief contains the heading: "If Allowed To Stand, The Panel's Decision Will Harm Copyright Holders, Especially Individuals And Small Businesses."

- **No. 230:** Admit that page 16 of the RIAA Second Amicus brief contains the following heading: "THE PANEL IGNORED THIS COURT'S ESTABLISHED 'SITE AND FACILITIES' TEST FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT."

- **No. 231:** Admit that page 18 of the RIAA Second Amicus brief contains the following heading: "THE MERE FACT OF AUTOMATION DOES NOT NEGATE A DEFENDANT'S DIRECT INFRINGEMENT."

- **No. 232:** Admit that page 18 of the RIAA Second Amicus brief contains the following language: "Finally, the panel also erred by accepting the district court's determination that defendants could not be liable for direct infringement because they had automated much of their conduct, and by rejecting key evidence of defendants' direct infringement. Opinion 18. That included evidence that defendants had targeted for copying and distribution news-groups and servers known to feature pirated content, programming their servers to copy such content and store it long enough to make defendants' service a preferred destination for users looking for pirated music, movies, software, and images. See D. Ct. 508-2, Ex. 16, at 1 (news-group titles including 'alt.binaries.music.beatles,' alt.binaries.music.springsteen,' and alt.binaries.playboy')."

- **No. 249:** Admit that the Motion Picture Association of America ("MPAA"), filed an Amicus brief on 3/3/2017, in support of Perfect 10's Petition for Rehearing or Rehearing en Banc (hereinafter "MPAA Amicus brief.")

- **No. 250:** Admit that Judge Birotte, Jr. in his Order dated 11/14/2014, found that, to establish direct financial benefit, "Perfect 10 must prove with competent evidence that at least some of Giganews' customers were 'drawn' to Giganews' services, in part, to obtain access to infringing Perfect 10 material."

- **No. 251:** Admit that page 3 of the MPAA Amicus brief states, "Prior to the district court and panel decisions in this case, neither this court nor any other the MPAA is aware of had held that a copyright holder was required to make a further showing that users were drawn to a defendant's site or service by the availability of 'the plaintiffs copyrighted material' specifically. … Interpreting the direct financial benefit prong to require a plaintiff to make that showing conflicts with decades of precedent."

- **No. 252:** Admit that page 5 of the MPAA Amicus brief contains the following heading: "THE PANEL'S INTERPRETATION OF THE DIRECT FINANCIAL BENEFIT TEST IS INCONSISTENT WITH DECADES OF PRECEDENT."

- **No. 253:** Admit that page 7 of the MPAA Amicus brief contains the following heading: "Courts Have Never Required A Plaintiff To Show That Its Specific Works Were The Draw For Third-Party Infringers."

**Giganews and Livewire's Position**

Like those in other categories, these requests attempt to relitigate the merits of the copyright case Perfect 10 lost. They are irrelevant. The requests target information with no possible bearing on the transfers from Perfect 10 to Zada to hide assets from judgment. These requests do not relate to whether Defendants made the transfers at issue with the intent to "hinder, delay, or defraud," and they do not tend to suggest that Zada or Perfect 10 had a reasonable belief that Perfect 10 would not incur a debt Perfect 10 would be unable to pay. It is also irrelevant that the requests target alleged facts that Zada relied on in believing Perfect 10 would not lose its copyright case. The standard for constructive fraudulent transfer is an objective one, making Zada's subjective misconceptions about the likelihood of an adverse fee award irrelevant.

**Perfect 10's Position**

Plaintiffs are not only completely wrong in their interpretation of the law, but their claims are contrary to the key allegations in their FAC. Paragraph 38 of their FAC states, "Beginning in early 2014, Perfect 10, through Zada and in conspiracy with him, began unlawfully transferring Perfect 10's corporate assets to Zada as it became reasonably apparent that Perfect 10 would be ultimately be held liable for Plaintiff's attorney's fees and costs in defeating Perfect 10's unmeritorious suit." Paragraph 40 of their FAC alleges, "(3) the transfers happened when it became

reasonably apparent that a large judgment would be entered against Perfect 10 as a result of its unmeritorious and unsuccessful suit for copyright infringement." Defendants have the right to propound RFAs which, if admitted, destroy allegations made in the FAC.  The above RFAs do just that.   The RIAA's Amicus brief makes clear that it believed that the District Court got direct, vicarious, and contributory infringement wrong.  The MPAA and the Justice Department and the Copyright Office filed Amicus briefs which sought to reverse portions of the District Court's rulings.  Those are facts critical to the proper resolution of this case.

### 13.   Requests Regarding Hypotheticals Regarding the Concept of Theft

- **No. 233:** Admit that copyright holders who file cases against parties who they believe are engaged in blatant copyright infringement, do not expect to lose, let alone be ordered to pay millions in attorney's fees.

- **No. 234:** Admit that awarding millions in fees to parties engaged in "blatant copyright infringement" and against copyright holders whose works they use without permission, does not further the purposes of the copyright act.

- **No. 235:** Admit that the fact that a theft of tangible property was "automated," would not be a viable defense.

- **No. 238:** Admit that if one steals a car using a robot, the fact that the theft was accomplished in some automated fashion would not be a viable defense.

- **No. 239:** Admit that if someone wrote a program which was able to automatically remove money from other people's bank accounts, the fact that the theft was automated would not be viable defense.

- **No. 240:** Admit that if someone has a car lot which contains stolen cars and legally owned cars, the fact that one sells all of the cars on the lot does not protect them from being prosecuted for selling the stolen cars.

**Giganews and Livewire's Position**

These requests target information with no bearing on the transfers from Perfect 10 to Zada made to frustrate enforcement of the judgment.  They pose vague and unanswerable hypotheticals about "blatant" copyright infringement, bank robbery software, and a robotic car thief.  As hypotheticals, they are improper: "[s]ince requests to admit must be connected to the facts of the case, courts do not permit 'hypothetical' questions within requests for admission." *Buchanan v. Chi. Transit Auth.*, No. 16-cv-4577, 2016 WL 7116591, at *5 (N.D. Ill. Dec. 7, 2016) (internal quotes omitted).

### Perfect 10's Position

Plaintiffs' case rests on the following allegation from paragraphs 38 and 40 of their FAC.  "Beginning in early 2014, Perfect 10, through Zada and in conspiracy with him, began unlawfully transferring Perfect 10's corporate assets to Zada as it became reasonably apparent that Perfect 10 would ultimately be held liable for Plaintiff's attorney's fees and costs in defeating Perfect 10's unmeritorious suit."

The above RFAs seek to establish in a common sense way, that it was not reasonably apparent that Perfect 10 would ultimately be held liable for its thief's attorney's fees.

### 14.    Requests Regarding Message-IDs

- **No. 332:** Admit that Giganews's DMCA instructions ask for "Message-IDs for all articles the DMCA notice is requesting Giganews take down." (See Related Case Dkt. 508-1 Exh. 3, Pg. 11.)
- **No. 333:** Admit that the DMCA instructions referred to in RFA No. 332 do not explain how to find Message-IDs.
- **No. 334:** Admit that the DMCA instructions referred to in RFA No. 332 do not advise copyright holders how the Giganews Mimo newsreader can be used to rapidly obtain thousands of Message-IDs.

- **No. 335:** Admit that the DMCA instructions referred to in RFA No. 332 do not specifically require that the Message-IDs provided be machine readable.

- **No. 336:** Admit that Message-IDs are character strings providing no message comprehensible in any human language.

- **No. 337:** Admit that there is no requirement in the DMCA that a compliant notice must contain Message-IDs.

- **No. 338:** Admit that prior to Perfect 10 v. Giganews, no Court had ever required that a compliant DMCA notice contain Message-IDs, yet alone machine- readable Message-IDs.

- **No. 339:** Admit that other Usenet operators processed Perfect 10's DMCA notices that did not contain message-IDs, but that Giganews refused to do so.

- **No. 340:** Admit that in paragraph 14 of Related Case Dkt. 550-7, Perfect 10's expert, Professor Douglas Tygar, states, "Message-IDs are certainly one way of referring to messages.  But they are by no means the only way."

- **No. 341:** Admit that paragraph 15 of Related Case Dkt. 550-7 states, "While Message-IDs do allow particular Usenet messages to be identified, they most certainly are not the only way to identify messages. Such a claim is akin to asserting that ISBNs are the only unique way to identify a book. It is true that one can identify a book by ISBN, but in ordinary discourse, an ISBN has no meaning. Few people are likely to understand a person who says she has just read 978- 0316055437; but if she says she has just read the American hardcover edition of Donna Tartt's The Goldfinch, one can immediately understand. Information in a header, such as the account posting the message, the message title, and date, also identifies a message or a group of messages…"

- **No. 342:** Admit that in paragraph 16 of Related Case Dkt. 550-7 states, "Specifying a search is a convenient way to specify a set of messages when

they all contain the same distinctive search term in their message titles.  For example, I have been informed by Perfect 10 that a Mimo search in the newsgroup alt.binaries.pictures.erotica.scanmaster for the term 'perfecttengallery' yields a single .zip file containing exclusively Perfect 10 copyrighted content (approximately 4,951 Perfect 10 images). In this instance, specifying the search term 'perfecttengallery' is a far more efficient way of identifying and locating all of the infringing content contained in that .zip file than providing the associated list of approximately 4,951 Message-IDs."

- **No. 343:** Admit that paragraph 17 of Related Case Dkt. 550-7 states, "However, even if Giganews needs Message-IDs to remove files, those Message- IDs can be extracted from a search in seconds using a mechanism that exists in the Mimo newsreader distributed by Giganews."

- **No. 344:** Admit that page 4 of Related Case Dkt. 550-7 contains the heading "Single Message-IDs are Inadequate for Identifying Files Stored on USENET."

- **No. 345:** Admit that page 8 of Related Case Dkt. 449-3 contains a heading " RAPID EXTRACTION OF THOUSANDS OF MESSAGE-IDS IN SECONDS"

- **No. 346:** Admit that paragraph 18 of Related Case Dkt. 449-3 states, "In Exhibit 1, the disk, in a folder labelled 'Video Demonstrations,' I have included a number of videos demonstrations which I created that show how I was able to extract thousands of Message-IDs/Message Headers into text files using the Mimo or Newsrover newsreaders in anywhere from 15 seconds to at most a few minutes."

- **No. 347:** Admit that paragraph 19 of Related Case Dkt. 449-3 states, "In Video 2, I perform a search on the term 'perfecttengallery' in the newsgroup,

1    alt.binaries.pictures.erotica, scanmaster. One result, a 639MB .zip file

2    appears, containing exclusively Perfect 10 images. I use the Mimo

3    newsreader's 'copy NZB to clipboard' option to extract the approximately

4    4,951 Message-IDs corresponding to the infringing messages containing the

5    infringing images into a text file.  It took about ten seconds in total to extract

6    the 4,951 Message-IDs."

7    • **No. 350:** Admit that paragraph 11 of Related Case Dkt. 650-8 states, "On or

8    about May 21, 2014, Perfect 10 learned for the first time that the Mimo

9    newsreader created by Giganews included an automatic Message-ID

10   extraction feature…Thereafter, Perfect 10 used this feature to provide

11   Defendants, on June 26, 2014, with approximately 54,000 machine readable,

12   full Message-Headers (which contained machine readable Message-IDs).

13   Those 54, 000 full Message- Headers were contained in a folder labeled 'Full

14   Message Headers extracted using Automatic Message-ID Extraction Feature'

15   which Perfect 10 produced to Defendants on that day. As of today,

16   Defendants have still not processed the Message-IDs in those Message

17   Headers or removed the corresponding messages associated with the

18   Message-IDs in those Message Headers."

19   • **No. 351:** Admit that paragraph 12 of Related Case Dkt. 650-8 states,

20   "Attached hereto as Exhibit 1 is a sample of what Perfect 10 provided

21   Defendants with respect to the full Message-Headers described in the

22   previous paragraph. … Page 1 shows a portion of the production of the

23   54,000 machine readable, full Message-Headers/Message-IDs which Perfect

24   10 provided to Defendants on June 26, 2014…"

25   • **No. 352:** Admit that Perfect 10 stated in its third brief on cross appeal of the

26   judgment in the Related Case before the Ninth Circuit, filed on 6/21/2016 on

27   page 54, "Although P10 used this feature almost immediately thereafter to

28

provide Defendants with 54,000 machine-readable Message-IDs in June 2014, Giganews did not remove most of P10's images from its servers until late 2015. 2ER0413- 14(¶¶11-12);2ER0418-19."

- **No. 353:** Admit that Giganews did not immediately process all of the 54,000 machine-readable Message-IDs provided by Perfect 10 on June 26, 2014.

- **No. 354:** Admit that Giganews did not immediately process any of the 54,000 machine-readable Message-IDs provided by Perfect 10 on June 26, 2014.

- **No. 355:** Admit that the Ninth Circuit stated on page 24 of its 1/23/2017 ruling in the appeal of the Related Case, "Moreover, the record is clear that when Giganews did receive machine-readable Message-IDs, it immediately processed them and subsequently removed the messages from its servers."

- **No. 356:** Admit that GIGANEWS continued to make Perfect 10 images available to its subscribers upon request, even after receiving machine readable Message-IDs which identified the messages containing those images.

- **No. 357:** Admit that in his order, Related Case Dkt. 620, on page 12, Judge Birotte Jr. found "the evidence before the Court is undisputed that the only method for consistently identifying a specific Usenet message that Giganews could promptly remove is the post's Message-ID."

- **No. 358:** Admit that this finding was not consistent with the declaration submitted by Professor Tygar as Related Case Dkt. 550-7.

- **No. 359:** Admit that in his order, Related Case Dkt. 620, on page 12, Judge Birotte, Jr. found "While some of Perfect 10's takedown notices have included the relevant Message-ID (undisputedly conferring knowledge on Giganews), the evidence shows that Giganews promptly disabled access to the offending messages.  (Dkt. No. 442, ¶39.)"

- **No. 360:** Admit that Related Case Dkt. No. 442 ¶39 states, "To the extent that Perfect 10 has provided Giganews with legible Message-IDs for allegedly infringing messages, Giganews has disabled access to those Usenet messages if they were on Giganews's servers. For instance, at one point I received what I understood to be a copy of an August 23, 2014 letter from Perfect 10's counsel, Lynell Davis, to Defendant's counsel. (That letter is Exhibit 25 of the Declaration of Todd R. Gregorian, filed concurrently herewith.) The letter includes 'sample notices' containing attachments that list Message-IDs. Giganews has disabled access to the associated messages."
- **No. 361:** Admit that Related Case Dkt. No. 442 ¶39 does not state that Giganews promptly disabled access to any identified messages.
- **No. 362:** Admit that Related Case Dkt. 442 was a declaration by Philip Molter that was signed on September 15, 2014.
- **No. 363:** Admit that Giganews received approximately 54,000 machine readable Message-IDs from Perfect 10 in June 2014.
- **No. 364:** Admit that in fact Giganews did not promptly disable any of the 54,000 machine readable Message-IDs received from Perfect 10 in June 2014.
- **No. 365:** Admit that in his declaration (Related Case Dkt. 506), in paragraph 47, Dr. Zada states, "Giganews has also failed to process a number of Message-IDs contained in DMCA notices which Perfect 10 emailed to Defendants."

**Giganews and Livewire's Position**

These requests attempt to re-litigate the merits of the copyright case Perfect 10 lost.  "Message-IDs" are the only reasonable means by which a Usenet service can uniquely identify a particular Usenet message.  In the original case, the Court noted that Perfect 10 could have—in a matter of *minutes*—provided the Message-

IDs for thousands of Usenet messages for which it claimed copyright infringement, thus allowing Giganews to remove the messages and resolve the dispute. Related Case Dkt. No. 620 at 12-13. Perfect 10 elected not to do so. *Id.*

Perfect 10's requests ask Defendants to confirm, in excruciating detail, the contents of the summary judgment record and the Court's orders on this subject. The requests thus bear no connection to the fraudulent transfer claims in this case. As discussed above, an adverse fee award is a reasonably foreseeable risk of copyright litigation. The requests are irrelevant to show otherwise.

**Perfect 10's Position**

The RFAs are mostly easy to answer in the affirmative because they ask Plaintiffs merely to admit that certain language appears in certain documents. As noted above, Plaintiffs case rests on their allegations in paragraphs 38 and 40 of their FAC, that Perfect 10 expected to lose early on. The RIAA's Amicus brief makes clear that in the RIAA's opinion, Perfect 10 should have won. The above RFAs relate to yet another reason why Perfect 10 believed it would win, which was not covered by the RIAA in its Amicus briefs.

### 15.    Requests Regarding Giganews Deposition Responses

- **No. 366:** Admit that Jonah Yokubaitis was deposed on April 30, 2014.
- **No. 367:** Admit that at the time he was deposed, Jonah Yokubaitis was a co-owner of Giganews, Inc.
- **No. 368:** Admit that Jonah Yokubaitis had served as CEO of Giganews, Inc. at the time of his deposition on April 30, 2014.
- **No. 369:** Admit that in response to the deposition question: "Can you give me an estimate as to how many years you worked for Texas Networking, Inc?" asked to him during his 4/30/2014 deposition, Jonah Yokubaitis responded, "Over one and under 100."

- **No. 370:** Admit that in response to the deposition question: "Who are the other shareholders in Giganews, Inc., to your understanding as of today other than you," asked to him during his 4/30/2014 deposition, Jonah Yokubaitis responded, "I am not sure."

- **No. 371:** Admit that the following sequence of questions and answers occurred during the 4/30/2014 deposition of Jonah Yokubaitis: "Q. The servers that Giganews owned during your tenure as CEO, what was stored on those servers? A. I am not sure.  Q. Where were those servers located? A. I am not sure. Q. Who would know the answers to where the servers were located? A. I am not sure. That was a long time ago. Q. Who would know what was stored on those servers? A. I don't know."

- **No. 372:** Admit that in response to the deposition question: "And my – and my question was different. It is simply, does Giganews maintain messages on its servers?" asked to him during his 4/30/2014 deposition, Jonah Yokubaitis responded, "I don't know."

- **No. 373:** Admit that in response to the deposition question: "During the time that you were CEO, did Giganews maintain messages on its servers as part of its Usenet subscription service?" asked to him during his 4/30/2014 deposition, Jonah Yokubaitis responded, "I don't know."

- **No. 374:** Admit that in response to the deposition question asked to him during his 4/30/2014 deposition: "The servers that Giganews owned during your tenure as CEO, what was stored on those servers?" Jonah Yokubaitis responded, "I am not sure."

- **No. 375:** Admit that in response to the deposition question: "During your tenure as CEO of the Company, could Giganews' customers download songs from Giganews's Usenet servers using their Giganews' membership?" asked

to him during his 4/30/2014 deposition, Jonah Yokubaitis responded, "I just
don't know."

- **No. 376:** Admit that in response to the deposition question: "In other words,
  why did people pay for a membership from Giganews?" asked to him during
  his 4/30/2014 deposition, Jonah Yokubaitis responded, "I don't – I don't
  know why."

- **No. 377:** Admit that in response to the deposition question: "During your
  tenure, sir, did the Company, Giganews, have any policy that prohibited the
  copying and displaying of copyrighted material?" asked to him during his
  4/30/2014 deposition, Jonah Yokubaitis responded, "I don't know."

- **No. 378:** Admit that, in response to the deposition question: "Has any movie
  studio ever asked Giganews to stop reproducing and distributing its movies?"
  Ronald Yokubaitis responded in his 1/23/2014 deposition, "No ma'am." See
  page 35 of the transcript.

- **No. 379:** Admit that Mr. Yokubaitis' response referred to in RFA No. 378
  was not correct.

- **No. 380:** Admit that in response to the deposition question: "Has any
  recording studio ever asked Giganews to stop reproducing or distributing its
  songs?" Mr. Yokubaitis responded, "We don't reproduce songs." (See
  Transcript, page 38.)

- **No. 381:** Admit that in response to the deposition question: "Has any
  uploader of a full length movie to the Giganews' Usenet servers ever
  demonstrated that they were authorized by the copyright holder to upload
  that movie?" Mr. Yokubaitis responded, "I don't know ma'am."  (See
  Transcript page 95.)

- **No. 382:** Admit that when asked the follow-up deposition question, "Who at Giganews would know?" Mr. Yokubaitis responded, "I don't know who at Giganews, if any, would know."

- **No. 383:** Admit that, when asked the deposition question, "How many employees did Giganews have at the end of 2013?" Mr. Yokubaitis responded, "I don't know, we could – I don't know."

- **No. 384:** Admit that, when asked the follow up deposition question, "Were there more than 20 employees at the end of 2013?" Mr. Yokubaitis answered, "I don't know."

- **No. 385:** Admit that Giganews actually had over 200 employees at the end of 2013.

- **No. 386:** Admit that when asked the deposition question, "What was the total Giganews payroll in 2012?" Mr. Yokubaitis responded, "I don't know, ma'am."  (See Transcript page 101.)

- **No. 387:** Admit that asked the follow-up deposition question, "Was it over $10 million?" Mr. Yokubaitis responded, "The – I don't know the payroll, ma'am."

- **No. 388:** Admit that when asked the follow-up deposition question, "Do you know if the payroll for Giganews in 2012 was over $1 million?" Mr. Yokubaitis responded, "No, I don't know."

- **No. 389:** Admit that during his deposition, Mr. Yokubaitis could not identify any of the programmers who ever worked for Giganews.  (See Transcript pages 103- 104.)

- **No. 390:** Admit that in response to the deposition question, "Giganews's Usenet servers offer content to Giganews's subscribers, exclusively, correct?" Mr. Yokubaitis responded, "We don't offer content, ma'am." (See Transcript page 107.)

1  • **No. 391:** Admit that in response to the deposition question, "Can a Giganews
2  customer download a message containing a song from the Giganews Usenet
3  servers?" Mr. Yokubaitis responded, "Again, ma'am, I don't know." (See
4  Transcript page 122.)

5  • **No. 392:** Admit that in response to the follow-up deposition question: Who
6  would know?" Mr. Yokubaitis responded, "I don't know who would know."
7  (See Transcript page 122.)

8  • **No. 393:** Admit that Shane Menking was deposed on March 22, 2014.

9  • **No. 394:** Admit that Shane Menking testified in his deposition, "I am the
10  Chief Financial Officer of Giganews."  (See Transcript Page 9:18-19.)

11  • **No. 395:** Admit that Mr. Menking testified at his deposition that he had
12  worked for Giganews "Approximately six years."  (See transcript Page 14:3-
13  5.)

14  • **No. 396:** Admit that in response to the deposition question, "Why do you
15  believe people – subscribers pay Giganews their monthly fee? Mr. Menking
16  answered, "I don't know."  (See Transcript Page 121:6-11.)

17  • **No. 397:** Admit that in response to the deposition question: "Is there an
18  individual at Giganews who would have some insight regarding the reasons
19  subscribers subscribe to its services?" Mr. Menking answered, "I don't know
20  who that individual would be, I don't have any insight." (See Transcript Page
21  121:20-122:2.)

22  • **No. 398:** Admit that in response to the deposition question, "And to the best
23  of your knowledge, what's contained in Usenet messages?" Mr. Menking
24  answered, "I don't know."  (See Transcript Page 82:3-8.)

25  • **No. 399:** Admit that in response to the follow-up deposition question, "And
26  who would know?" Mr. Menking responded, "I don't know if anyone could
27  answer that question."  (See Transcript Page 38:10-13.)

28

- **No. 400:** Admit that in response to the deposition question, "Do you have any reason to believe that Giganews has ever stored messages on its server that contain movies or portions of movies? Mr. Menking answered: "I don't have a reason to believe that."

- **No. 401:** Admit that in response to the deposition question, "Do you have any reason to believe that Giganews has ever stored messages on its servers that contain songs or portions of songs?" Mr. Menking answered, "No." (See Transcript Page 120:13-18.)

- **No. 402:** Admit that in response to the deposition question, "Is there anyone at Giganews whose duties include reducing the amount of infringement on Giganews's Usenet servers?" Mr. Menking answered, "I am not aware of – of infringement on Giganews's Usenet servers."  (See Transcript Page 130:4-11.)

- **No. 403:** Admit that in response to the deposition question, "How many employees did Giganews have at the end of 2013?" Mr. Menking responded, "I don't know."  (See Transcript Page 26:18-20.)

- **No. 404:** Admit that in response to the follow-up deposition question, "And who would know that?" Mr. Menking responded, "I don't know." (See Transcript Page 26:21-22.)

- **No. 405:** Admit that in response to the deposition question, "What was the total Giganews' payroll at the end of 2013?" Mr. Menking responded, "I don't know." (See Transcript Page 27:1-3.)

- **No. 406:** Admit that in response to the follow-up deposition question, "And who would know that?" Mr. Menking responded, "I don't know." (See Transcript Page 27, 4-5.)

- **No. 407:** Admit that in response to the deposition question, "Are there documents that provide the total payroll of Giganews by year?" Mr. Menking responded, "I don't know."

- **No. 408:** Admit that in response to the deposition question, "Does somebody keep track of how much money or compensation is paid to Giganews' employees?" Mr. Menking answered, "I don't know." (See Transcript Page 30:6-7.)

- **No. 409:** Admit that in response to the follow-up deposition question, "And who would know?" Mr. Menking responded, "I don't know." (See Transcript Page 30:9-10.)

- **No. 410:** Admit that in response to the deposition question, "And what is your annual pay from Powerhouse Management?" Mr. Menking answered, "I don't know my annual pay specifically."

### Giganews and Livewire's Position

Confirming individual questions and answers in deposition testimony from the original case would be a pointless and burdensome exercise in and of itself.  But as in the other categories discussed above, these requests attempt to re-litigate the merits of the copyright case Perfect 10 lost, and they have no relevance to the claims in *this* case.  The requests ask Giganews to confirm Mr. Yokubaitis's and Mr. Menking's testimony about the number of employees at Giganews, Mr. Menking's salary information, and similar subjects.  Given their lack of connection to any relevant or non-burdensome discovery purpose, the Court should issue a protective order as to these requests.

### Perfect 10's Position

As noted above, Plaintiffs case rests on their allegations in paragraphs 38 and 40 of their FAC, that Perfect 10 expected to lose early on.  The above RFAs are easy to answer because they simply ask Plaintiffs to admit as to what their

deponents stated in their depositions.  The RFAs will minimize the effort needed for Defendants to establish that Plaintiffs were clearly lying in their depositions, yet another reason why Defendants expected to easily win the related case.

## IV.    CONCLUSIONS

### Giganews and Livewire's Conclusion

Perfect 10 and Mr. Zada have continued the discovery abuse that subjected them to a sanctions order in the original case.  Accused of financial fraud, they nonetheless seek to hide from the Court key information regarding their assets, liabilities, and transfers between one another.  At the same time, they have sought to use the case to harass and drive up expense by dragging Giganews's CEO to a deposition and propounding hundreds of discovery requests on irrelevant and offensive topics.  For the reasons set forth above, Giganews and Livewire respectfully request that the Court grant the motion enter an order in the form they have submitted.

### Perfect 10's Conclusion

Plaintiffs, who the RIAA described as "shady companies" engaged in "blatant copyright infringement," and whose peering partners have been arrested in Europe, are once again attempting to smear the victims of their thievery.   There is a reason why the RIAA, MPAA, Justice Department, and the Copyright Office, have filed Amicus briefs urging reversal of the District Court's rulings.   The District Court simply got the case wrong, in part because of Plaintiffs orchestrated smear campaign, and their never ending false and misleading allegations.  Defendants could not possibly have imagined that as a result of getting robbed and fighting back, they would be bankrupted.  Plaintiffs improperly rely on a vacated sanctions order.  There was no discovery abuse by Defendants.  In fact, it is Defendants contention that Plaintiffs created discovery disputes that did not actually exist, just like they are attempting to do now.

Defendants are producing all relevant documents responsive to the RFP 6, even extremely private and confidential documents that they did not have to provide, such as Dr. Zada's loan application for the loan on his home, in order to once again cooperate fully in the discovery process. The fact that Plaintiffs do not like the facts that emerge from those documents – because they disprove their contentions – does not give Plaintiffs license to rummage around in Dr. Zada's private financial affairs as they stand now.

Mr. Yokubaitis is not an "apex" deponent. He is a former attorney from Texas who makes extraordinary sums of money by copying and selling access to other people's intellectual property without permission or payment. Defendants are completely justified in seeking to depose him, particularly since Plaintiffs are pretty much attempting to obstruct any other type of discovery, as they have produced no documents, answered few interrogatories, and are attempting to improperly select the RFAs that they must answer, very late in the game.

Finally, the RFAs are relevant to key contentions in this case, and will simplify fact questions significantly before trial. Plaintiffs should be required to answer them in a succinct fashion.

Dated: July 2, 2018                FENWICK & WEST LLP


By:   /s/Todd R. Gregorian
         Todd R. Gregorian

Attorneys for Plaintiffs,
GIGANEWS, INC. and LIVEWIRE, INC.

Dated: July 2, 2018                LAW OFFICES OF MATTHEW C. MICKELSON

By:   /s/Matthew C. Mickelson
         Matthew C. Mickelson

Attorneys for Defendants,
PERFECT 10, INC. and NORMAN ZADA

1

2

## __ATTESTATION OF SIGNATURES__

3

I hereby attest that the concurrence in the filing of this document has been

4

obtained from the signatory indicated by a "conformed" signature (/s/) within this

5

e-filed document.

6

7

By:    _/s/Todd R. Gregorian_

8

Todd R. Gregorian

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28