1  Matthew C. Mickelson (S.B.N. 203867)
2  **LAW OFFICES OF MATTHEW C. MICKELSON**
   16055 Ventura Boulevard, Ste. 1230
3  Encino, CA 91436
   818-382-3360

4  Attorney for Defendants PERFECT 10, INC.
5  and NORMAN ZADA

6

7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10 | GIGANEWS, INC., a Texas corporation;    | Case No.: 2:17-cv-05075-AB (JPR)
11 | LIVEWIRE SERVICES, INC., a Nevada       |
   | corporation,                            | ***Before Honorable André Birotte, Jr.***
12 |                                         |
   |            Plaintiffs,                  | **REPLY DECLARATION OF DR.**
13 |                                         | **NORMAN ZADA IN SUPPORT OF**
   |      v.                                 | **DEFENDANTS' MOTION FOR**
14 |                                         | **SUMMARY JUDGMENT OR**
   | PERFECT 10, INC., a California          | **PARTIAL SUMMARY JUDGMENT**
15 | corporation, NORMAN ZADA, an            |
   | individual, and DOES 1-50, inclusive,   | Date:        December 14, 2018
16 |                                         | Time:        10:00 a.m.
   |            Defendants.                  | Courtroom: 7B,  350 West First Street,
17 |                                         |             Los Angeles, CA  90012

18

19

20

21

22

23

24

25

26

27

28

1

### DECLARATION OF DR. NORMAN ZADA

2        I, Norman Zada, declare as follows:

3        1.      I make this declaration in support of Defendants' motion for summary

4  judgment.  Except where otherwise stated, I have direct and personal knowledge of the

5  facts set forth herein and, if called as a witness, could and would competently testify

6  thereto.  I have downloaded or otherwise created the documents that are attached to this

7  declaration, which are in all cases true and correct copies, except that in some cases, I

8  may have circled or highlighted portions of those documents for the convenience of the

9  court, or redacted portions for privacy reasons.  Any documents marked "confidential"

10  have been intentionally filed publicly to allow the entire reply to be filed in open court.

11        2.      I am the President of Perfect 10, Inc. ("Perfect 10").  After receiving a

12  Ph.D. in Operations Research from the University of California at Berkeley, I worked as

13  a research staff member in the main computer science department at IBM, and

14  subsequently taught as a visiting professor in the area of applied mathematics at Stanford

15  University, UCLA, Columbia University, and UC Irvine.

16        The $454,002 that I added to the Perfect 10 bank account was a short-term loan

17        3.      Plaintiffs incorrectly contend that the $454,002 that I added to the Perfect

18  10 bank account was a capital contribution.  It was not.  Eric Benink had asked me to

19  wire his custodial account $454,002 to protect himself and his law firm in the event a

20  substantial sanctions award was entered against them.  He told me to wire the money to

21  the Perfect 10 bank account and then have Perfect 10 wire the money to him.  I wasn't

22  wiring the money to make an additional investment in Perfect 10, I was wiring the

23  money as a short-term loan to allow Perfect 10 to then wire the money to Eric Benink

24  per his instructions.

25        4.      I know that Plaintiffs are claiming that all of the money that I wired to the

26  Perfect 10 bank account was a capital contribution.  That was not my view.  My view

27  was that everything I advanced to Perfect 10 was a loan.  That view is supported by the

28  fact that there are no minutes showing that any of my advances to Perfect 10 were

capital contributions, and the signed promissory notes that I have from Perfect 10,
totaling at least $1.655 million.  Those notes are attached to a signed letter from the
attorney overseeing Perfect 10 corporate matters at that time, Gregory L. Larson.  (See
Zada Decl. Dkt. 77, page 20 of 130, filed 9/14/18).  Exhibit 35 page 276 states, "The
Chairman presented to the meeting that he had made loans to the corporation pursuant to
previous board action and that said loans were made for corporate business.'  I also
recall seeing a financial report in or around 2009 which stated that Perfect 10 owed me
approximately $54 million.  I know I would never have advanced monies to Perfect 10 if
I believed I could never get those monies back.  I did not discover that Bruce Hersh was
treating my loans to Perfect 10 as capital contributions on Perfect 10's tax returns until a
few weeks ago.  I never imagined this would be an issue.  I apologize to the Court for
not reviewing Perfect 10's tax returns more carefully.

5.      If I was not able to legally receive monies from Perfect 10, I would have
stopped providing it with monies and would have stopped working for the company.
That would have led to its immediate demise.  Over the course of the 18 years I worked
for Perfect 10 without receiving a salary, I estimate that I worked at least 40 hours a
week, which would be around 37,440 hours.

<u>I have been contacted by the Criminal Division of the Justice Department</u>

6.      On July 23, 2018, I was contacted by a Jason Gull from the Criminal
Division of the Justice Department.  Mr. Gull spoke to me for about ninety minutes on
the phone.  For part of that conversation, there were other persons from the department
listening in.  Mr. Gull made clear that the department had already studied the publicly
filed materials regarding Perfect 10's case against Giganews.  He asked me to send him
whatever materials I had that might help the department make a criminal prosecution of
Giganews.  Attached as Exhibit 42 is a true and correct copy of the textual portion of the
first email that I sent him on July 23 in response to his request.  I did not bring up this
matter in Perfect 10's opening brief because I wanted to give the Justice department
some time before Giganews was made aware of this conversation.  Defendants did make

1   Giganews aware of this conversation when Defendants filed their opposition to

2   Plaintiffs' second request to extend the discovery schedule.  See Dkt. 82-3.

3   <u>Plaintiffs Are Continuing their Disinformation Campaign</u>

4        7.    Plaintiffs have twisted my words repeatedly in statements they have made

5   to the Court.  On page one of their Opposition, they claim I admitted that I removed the

6   $850,000 because of the summary judgment orders.  They have basically taken a snippet

7   of the testimony and left out other testimony which conveys a much different picture.  I

8   also testified I removed the money because I was owed or otherwise entitled to it.   At

9   Opp. p. 1:13-14, I never testified that I "made the transfers to avoid enforcement of the

10  Court's judgement."  In fact, I testified exactly the opposite.  Perfect 10 does not control

11  anything.  It is completely moribund at this point.

12       8.    At Opp. p. 1:20-24, the notes are unsigned and were never used.  They

13  were recreated after a massive flood in October of 2014 destroyed all of Perfect 10's

14  paper files that were stored in the basement.  Attached as Exhibit 43 is a true and correct

15  copy of an email exchange between Melanie Poblete, myself, dated October 18, 2014,

16  regarding that serious flood.  I have highlighted where it states that the repairs would

17  cost around $50,000.  The actual cost was over $80,000.  I only produced those draft

18  documents to satisfy my discovery obligations.  I never edited anything to the best of my

19  knowledge.  I never "covered anything up" because I never did anything wrong.  At

20  most I may have opened the unsigned documents on my computer to review them at

21  some point.  Moreover, the documents were not "false" in any way.  I always considered

22  my injections of money into Perfect 10 to be loans, and Perfect 10's repayments to me to

23  be repayments of those loans.  I believe my accountant has explained this matter in his

24  declaration.  The documents simply memorialize transfers that are reflected in Perfect

25  10's bank statements.

26       9.    At Opp. p. 2:2-5, Bruce Hersh incorrectly left Perfect 10's physical assets on

27  Perfect 10's tax returns because I forgot to tell him about that transaction.  I have asked

28  Mr. Hersh to file amended returns where necessary.  I know that an amended 2017

1  return has already been filed.  It is my fault and I apologize to the Court.  But at that

2  time, Perfect 10 was in complete crisis and I had many other problems to deal with,

3  including an appeal to the Ninth Circuit.  The transaction was no sham.  I wired $70,000

4  from my personal account to Perfect 10's account.

5        10.    At Opp. p. 2:10, Perfect 10 does not have a "Bad-Faith Litigation History."

6  The company has never been sanctioned, and prior to this case, had never been ordered

7  to pay attorney fees.  Perfect 10 has filed a number of important cases, including its

8  cases against Visa, Google, and this case.  In all of those cases, the MPAA and RIAA

9  filed Amicus briefs in Perfect 10's support.  In my experience, those organizations do

10  not support meritless cases.  When Perfect 10 asked for Supreme Court certification for

11  its case against Visa, Perfect 10 was represented by Donald Verrilli, who later became

12  solicitor general under President Barack Obama.

13        11.    Perfect 10 has, over the years, had the expensive pleasure of working with

14  some of the top copyright lawyers in the country.  For example, we had the pleasure of

15  being represented by Douglas Eakeley, Bill Clinton's former roommate, who won a case

16  for us in New Jersey against Magna Publications.  Other well-known attorneys who

17  represented Perfect 10 include Ron Johnson of Arnold and Porter, Russ Frackman of

18  Michell Silverberg, and Ken Doroshow of Jenner and Block.  These attorneys do not

19  typically take on meritless cases.  Mr. Bridges knows better than to make such

20  outlandish claims.   He was the attorney representing Google when Perfect 10 received

21  its preliminary injunction against Google in 2006.

22        12.    At Opp. at p. 2:20-21, Perfect 10 always believed in settling cases out of

23  respect for Court's limited resources, and because we do not enjoy with litigation and

24  view it as a horrific waste of time.  For that reason, we never sought large amounts as

25  Plaintiffs claim.  We couldn't settle with Giganews because it was completely

26  intransigent.  For example, most recently, Giganews asked for $23.1 million to settle this

27  case, which is much more than I have.  The mediator conveyed to me and Mr.

28  Mickelson, that Plaintiffs told him in essence, that they were willing to throw good

money after bad to ruin me.

13.    At Opp. at p. 3:13-17, Plaintiffs make the false statement that Perfect 10 did not provide them with machine readable Message-IDs.  In fact, Plaintiffs know that Perfect 10 provided them with 54,000 machine readable Message-IDs before the end of June 2014.  Related case, Dkt. 650-8, ¶¶ 11-12. Ex. 1.  They did not process any of those message-IDs to the best of my knowledge for at least a year, if ever.

14.    At Opp. at p. 8:6-8, Plaintiffs make the outright lie that I directed Melanie to turn over any monies coming into the Perfect 10 account to me.  That is not her testimony and I never did that.  They added the words "to him" to what she actually said to completely change the meaning of her testimony.  At Opp. p. 13:6-9, Plaintiffs make the outrageous claim that I concealed assets.  I never concealed anything.  They cite to SUF285, which is basically a sequence of questions where they ask me about the refrigerators, pool chairs, and televisions at the house.  I tell them that I don't believe that any of that stuff was purchased by Perfect 10.  They claim I did not provide a complete identification when I did the best I could.  No court has the resources to check all of their non-responsive cites.  To me it's an abuse of the legal system.

15.    On or about August 15, I provided the receiver with 1,000 back issues of Perfect 10.  I am not aware that he has sold any of them.  Attached as Exhibit 44 is a true and correct copy of an email between me and the receiver's assistant Zachary Lake.

16.    Perfect 10's experience with selling back issues is that the cost of the employee needed to sell them substantially exceeded the revenues we obtained by doing so.  It cost Perfect 10 roughly $1 to print each magazine.  Plaintiffs' suggestion that 4,000 back issues were "worth" $46,000 is preposterous.  4,000 back issues are only worth what someone will pay for them all at one time, and my experience is that number is around ten cents a copy.

17.    I believe that the receiver made next to no effort to sell Perfect 10's intellectual property.  Not a single person who I know that is in the business, who would be interested in that extensive library contacted me.  I did not see the content or auction

advertised anywhere.  Even with the fee award and decision against Perfect 10, the content is still worth multiple millions.  I just saw no use in bidding against Giganews and my financial situation has substantially deteriorated.

18.     At Opp. p. 24:9-11, Plaintiffs incorrectly contend that even if there had been no fee award, the $1.75 million in transfers would have left Perfect 10 unable to carry on its existing business.  That is completely untrue.  In the last two years, I had been able to cut down dramatically on costs to the point where Perfect 10 was actually able to make money.  If there had been no fee award or even a modest award, Perfect 10 would have paid it and continued on with its claims against OVH and appealed the ruling.  Perfect 10 did not become insolvent as a result of the transfers, in part because the money was transferred to me, and I have historically put that money back into the company.  That company was my life and I intended to fund it to the end.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed this 30th day of November 2018 in Los Angeles County, California.

_____

NORMAN ZADA

# Exhibit 42

**Subject:** Thank you so much for your time
**From:** Norman Zada <normanz@earthlink.net>
**Date:** 7/23/2018 11:05 PM
**To:** Jason.Gull@usdoj.gov


Dear Mr. Gull,

Thank you for spending so much time with me.  Regardless of what happens, you made my day.

I've gone through our filings and have pulled what I hope will be of interest to you.  You most likely are aware of some of the attached materials but possibly not others.  The first exhibit is from our third brief on cross appeal before the Ninth Circuit and shows that Giganews decided on October 29, 2014, to offer various versions of the movie X-Men Origins that were uploaded to someone's Usenet servers months earlier, which Giganews had not offered on September 16, 2014, even though it could have done so.  In other words, Giganews selects what content it offers, the process is not automatic.  This makes total sense because the totality of all Usenet messages exceeds the capacity of Giganews's servers, so it has to decide which messages to offer.  It is obviously better to make sure to offer at least one full length copy of each movie than to offer ten copies of one movie and none of the next.

I created the second exhibit today.   To obtain those printouts, I did a search using the Giganews Mimo newsreader on "Batman v. Superman," "Microsoft Windows," and "Bootleg Beatles."  I then clicked on the first two files shown and then the fifth file shown.  What the first printout shows is that Giganews elected to copy (without copyright holder permission) a 21 Gigabyte file containing the movie Batman v. Superman Dawn of Justice, originally uploaded to the Usenet Operator Astraweb.com, onto Giganews's servers 649 days ago.  What the second printout shows is that Giganews elected to copy (without copyright holder permission) a 9 gigabyte version of Microsoft Windows 10 from a different Usenet Operator (it looks like Highwinds Media, which is the same as UNS Holdings), 254 days ago, and place it on Giganews's servers.   This file was also available from the newsgroup alt.binaries.warez.  "Warez" is a term which typically is understood to mean that the content is pirated.  What the third printout shows, is that Giganews copied "I saw her standing there by the Beatles" from what appears to be the Usenet Operator xs4all.nl (I can explain how I know that if you want) about 607 days ago.  That file is associated with the newsgroup alt.binaries.beatles, which I would argue strongly suggests infringement on its face, along with the "Bootleg Recordings" in the file title.

I would argue that these actions by Giganews demonstrate intent and knowledge in multiple ways.  First, Giganews elected to copy the above obviously infringing materials from other sources, without seeking permission of copyright holders.  Second, because those items are

now being offered by Giganews, Giganews also elected to make copies of those infringing materials available to its requesting subscribers without permission of copyright holders.

Pages 1-3 of the third exhibit are admissions from Giganews that it has no licenses but has received hundreds of thousands of notices from movie and recording studios in a single year.   In total, Giganews only "terminated" 46 repeat infringers in 8 years, suggesting that it did not satisfactorily implement a repeat infringer policy, considering that it received over a million notices over that time period.  In pages 4-5 of Exhibit 3, Giganews advertises that it does not track the downloads of its users.  On page 6, Giganews offers a VPN service which it created to help its users hide their downloads.  On page 8, Giganews advertises that it encrypts all its users downloads.  Pages 9-10 show that Giganews increased the amount of content it offered from 9 petabytes (roughly 9,000 terabytes) in 2011, to 25 Petabytes in 2014.  On page 11, Giganews brags that it builds 100% of its server code, "Own the servers" "Write the code," "Build the network."  I would suggest that shows quite a bit of volition right there.  Giganews also advertises that it stores the content for 2213 days.  That is more than six years, and certainly not temporary storage as the Ninth Circuit erroneously ruled.  It is also obvious that they are not storing the content at the direction of any user.  They are storing the content as long as they want, independent of any user.  The next two pages are admissions that Giganews offered music and movies.  The next page is from the website galacticgroups.com, which was a website run by Giganews's sister company, Livewire.  Giganews is basically admitting there that it knows that its subscribers favorite hierarchies include alt.binaries.movies.  The last two pages of Exhibit 3 show that Giganews employed the metatags "usenet movies" and "warez" among others.

The first page of Exhibit 4 shows that there are only 6 or 7 major infringers who make up the "Usenet."  Giganews owns supernews.  Highwinds-media.com is the same as UNS Holdings, which I am pretty sure either owns easynews, newshosting, and newscene, or supplies them with their infringing content.  The second page of Exhibit 4 shows the contract that youtube requires its subscribers to sign, which gives Youtube the right to copy and distribute their content and indemnifies Youtube.  Giganews basically has no meaningful agreement.  The primary difference between Giganews and Youtube is that a) Giganews copies obviously infringing content from other infringers whereas Youtube relies solely on user "generated" uploaded content; Giganews sells access to all the unlicensed movies, songs, etc on its servers whereas Youtube does not; Youtube only streams relatively low resolution materials whereas Giganews has written software which allows it to provide copies of ultra high resolution movies to its subscribers, Youtube removes all the content uploaded by an identified repeat infringer whereas Giganews keeps commercially exploiting that content, and Youtube is truly storing the content at the direction of the users whereas Giganews doesn't even keep track of what the user has uploaded and does not obey the uploader's instructions.  I can go on.  The last two pages are statements made by our expert, Professor Tygar of U.C. Berkeley Computer science.  His testimony that Perfect 10's DMCA notices were

better than providing lists of incomprehensible Message-IDs was completely ignored by both the District Court and by the Ninth Circuit.

This is part of what I am sending.  I am getting tired and will send you the rest tomorrow. That will include their deponents' testimony, emails from their users, evidence that Giganews offers much more infringing content than did Megaupload, and other evidence of Giganews's knowledge.

I can't thank you enough for taking the time to talk to me about this.

Please confirm receipt.

Sincerely,

Norm Zada, Ph.D.

310-476-0700 after 10:30 AM

310-409-7193 anytime

─Attachments:────────────────────────────────────────

   Exhibits 1 to 4 more coming.pdf                                         3.2 MB

Exhibit 43

**CONFIDENTIAL**

---

| | |
|---|---|
| **From:** | Melanie P <melanie@perfect10.com> |
| **Sent:** | Saturday, October 18, 2014 1:34 PM |
| **To:** | normanz@earthlink.net |
| **Cc:** | melanie@perfect10.com |
| **Subject:** | FW: Emergency Restoration Services |

This is what I sent to the association.

**Melanie Poblete** | **Perfect 10, Inc**. | melanie@perfect10.com

This e-mail may be confidential or may contain information which is protected by the attorney-client privilege and work product doctrine, as well as other privileges. If you are not the intended recipient of this e-mail, any dissemination or copying of this message is strictly prohibited. Anyone who mistakenly receives this e-mail should notify the sender immediately by telephone or return e-mail and delete it from his or her computer.

---

**From:** Melanie P [mailto:melanie@perfect10.com]
**Sent:** Friday, October 17, 2014 9:35 PM
**To:** erin@belaircrest.net
**Cc:** melanie@perfect10.com
**Subject:** Emergency Restoration Services

Hey Erin,

We had a flood in our basement this week, unfortunately.  Yesterday, I referred to my vendor list and was able to get Emergency Service Restoration out here the quickest.  They spent 10 minutes assessing the situation, while name-dropping our celebrity neighbors they have as clients, and, upon urging that we needed to take immediate action, recommended that we have the basement vacuemed dry (because they failed to locate the drain that had been obstructed), and urged us to rent from them dehumidifiers and an air purifier for the cost of about $3,000, which, in the wake of seeing our basement flooded, seemed necessary.  They also proceeded to inform me that I would need to hire 3 of their "affiliates" to task out separate jobs without really explaining what each one would do, and told me the job would cost roughly $50,000.  I told him we would need to look around.

Today (Friday), I called another company that happened to be close by in Sherman Oaks for another bid, TipTop Restoration.  He came out almost immediately after I called and took 20 minutes or so assessing the situation.  He explained his credentials and went over his licensing and insurance information – made sure I was clear that I was dealing with an expert.  He was very knowledgeable, friendly and genuine.  He explained that Emergency Service Restoration did exactly the opposite of what they should have done given the circumstances.  They had left the temperature in the basement at about 70 degrees and didn't remove the drenched insulation from the ceiling.  Without raising the temperature and removing the drenched material, it would be impossible to properly dehumidify the space given the amount of equipment we were given.  He said it was akin to trying to dry a bucket of water with a desk fan.  He took charge of the situation, and is dealing directly with my insurance, but explained that the equipment we rented, and the vacuuming of the water should have been closer to the $900-1200 range, not the $3,000 range.  That is exorbitant.  He also explained in very clear detail  the steps being taken, provided a detailed quote on the spot, and was able to begin on remediating the damage.

PN-SUPPORT-0003

**CONFIDENTIAL**

I want to also say that TipTop's company policy is to honor whatever payment the insurance adjustor decides as a final payout.  If the quote for the job is $10,000, and the insurance will only pay $3,000, they will honor the insurance's payment and consider the matter settled with the customer and they will dispute any disagreements about payment directly with the insurance.  Its amazing.

Given my experience with Emergency Service Restoration, I would really hate it if one of our neighbors had something like this happen in their basement and they end up also having to deal with such an unprofessional company.  Would you consider removing them?

Regardless of if you think its unreasonable to remove Emergency Service Restoration, I really highly recommend that we add TipTop Restoration to the list of preferred vendors.  I'm providing their contact information so you can check them out.

TipTop Restoration
Dan Reichman
danreichman@tiptoprestoration.com
www.tiptoprestoration.com
Cell: 818-486-1148
Office: 800-788-1196

See you Sunday at the BBQ!

Melanie

**Melanie Poblete** | **Perfect 10, Inc.** |  11803 Norfield Court, Los Angeles, CA 90077 | best: 310.476.9869  |  alternate: 323.313.6446 | office: 310.476.0700 | fax: 310.476.8138 |  melanie@perfect10.com

This e-mail may be confidential or may contain information which is protected by the attorney-client privilege and work product doctrine, as well as other privileges. If you are not the intended recipient of this e-mail, any dissemination or copying of this message is strictly prohibited. Anyone who mistakenly receives this e-mail should notify the sender immediately by telephone or return e-mail and delete it from his or her computer.

PN-SUPPORT-0004

# Exhibit 44

**Subject:** Re: 1000 magazines
**From:** Norman Zada <normanz@earthlink.net>
**Date:** 8/10/2018, 4:28 PM
**To:** Zachary Lake <ZLake@PasLaw.com>

11803 Norfield Court, 90077.  Any time after 11 AM works.  Just give me some notice.  The
magazines are in the basement.


On 8/10/2018 4:18 PM, Zachary Lake wrote:

> Norman,
>
> What's the address again? I'm shooting for next week. What days and times are good for
> you?
>
>
>
> -----Original Message-----
> From: David Pasternak
> Sent: Friday, August 10, 2018 2:27 PM
> To: Norman Zada
> Cc: Zachary Lake
> Subject: RE: 1000 magazines
>
> Zach will contact you to pick them up.
>
> -----Original Message-----
> From: Norman Zada [mailto:normanz@earthlink.net]
> Sent: Friday, August 10, 2018 2:25 PM
> To: David Pasternak
> Subject: 1000 magazines
>
> Dear Mr. Pasternak,
>
> I've pretty much given up on ever selling any of the magazines. If you
> want to pick up 40 boxes of back issues, which is 1000 copies,
>
> please let me know.
>
> Thanks,
>
> Norm Zada, Ph.D.