# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIGANEWS, INC. a Texas corporation; and LIVEWIRE SERVICES, INC., a Nevada corporation<br><br>Plaintiffs,<br><br>v.<br><br>PERFECT 10, INC., a California corporation; NORMAN ZADA, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. CV-05075-AB (JPRx)<br><br>**PROPOSED FINAL PRE-TRIAL CONFERENCE ORDER**<br><br>Pretrial Conf.: March 1, 2019<br>Time: 11:00 a.m.<br>Courtroom: 7B<br>Trial Date: March 26, 2019<br>Judge: Hon. André Birotte, Jr. |

1

# TABLE OF CONTENTS

1.    THE PARTIES AND PLEADINGS ............................................................ 3

2.    JURISDICTION ......................................................................................... 3

3.    TRIAL DURATION ................................................................................... 3

4.    JURY TRIAL .............................................................................................. 3

5.    ADMITTED FACTS ................................................................................... 3

6.    STIPULATED FACTS ............................................................................... 4

7.    PARTIES' CLAIMS AND DEFENSES ..................................................... 8

8.    REMAINING TRIABLE ISSUES ........................................................... 23

9.    DISCOVERY ........................................................................................... 24

10.   DISCLOSURES AND EXHIBIT LIST .................................................... 24

11.   WITNESS LISTS ..................................................................................... 24

12.   MOTIONS IN LIMINE ............................................................................ 24

13.   BIFURCATION ....................................................................................... 26

14.   ADMISSIONS .......................................................................................... 28

2

Following pre-trial proceedings, pursuant to Federal Rule of Civil Procedure 16 and Local Rule 16, IT IS ORDERED:

**1.      THE PARTIES AND PLEADINGS**

The parties to this matter are Plaintiffs Giganews, Inc. and Livewire Services, Inc. ("Plaintiffs") and Defendants Norman Zada and Perfect 10, Inc. ("Defendants"). Both Defendants have been served and have appeared.  Plaintiffs' First Amended Complaint (Dkt. 26) and Defendants' Answer (Dkt. 27) are the operative pleadings.

**2.      JURISDICTION**

It is stipulated that subject matter jurisdiction over this action exists under 28 U.S.C. § 1332, and venue is proper in this District and this Division pursuant to 28 U.S.C. § 1391(b)(1).

**3.      TRIAL DURATION**

The parties estimate that the trial will take ten days.

**4.      JURY TRIAL**

The trial is to be a jury.

Plaintiffs and Defendants shall serve and file "Joint Proposed Jury Instructions" and "Joint Proposed Verdict Forms" as well as any disputed jury instructions by no later than February 8, 2019.

**5.      ADMITTED FACTS**

The following facts are admitted and require no proof:

- Perfect 10 transferred the following amounts from Perfect 10's bank account to Norman Zada's bank account:
  - ○ $200,000 on January 13, 2014;
  - ○ $50,000 on March 10, 2014;
  - ○ $100,000 on March 19, 2014;

3

1      o        $100,000 on May 14, 2014;

2      o        $100,000 on May 28, 2014;

3      o        $150,000 on July 8, 2014;

4      o        $100,000 on September 4, 2014;

5      o        $100,000 on October 7, 2014;

6      o        $850,000 on November 20, 2014; and

7      o        $454,002.05 on May 13, 2015.

8   **6.**    <u>STIPULATED FACTS</u>

9          The following facts, though stipulated, shall be without prejudice to any

10   evidentiary objection:

11      •    Perfect 10 filed a First Amended Complaint ("FAC") in the Related

12          Case on March 26, 2013.

13      •    Perfect 10's FAC ¶ 26, alleged that Giganews "stores on its own

14          servers, and makes available movies, songs, images, computer software,

15          and other materials for 1,677 days, its 'retention period.'"

16      •    Perfect 10's FAC ¶ 34 alleged that Giganews infringed Perfect 10

17          copyrighted works by reproduction in at least four different ways.

18      •    Perfect 10's FAC ¶ 66, alleges that all Perfect 10 images copied and

19          distributed by Giganews and Livewire were done so without Perfect

20          10's permission.

21      •    On March 8, 2013, the Court dismissed Perfect 10's claims against

22          Giganews and Livewire for (1) direct copyright infringement, (2) direct,

23          contributory, and vicarious trademark infringement, (3) trademark

24          dilution, (4) violation of California's Unfair Competition Law, and (5)

25          violation of the right of publicity with leave to amend, but allowed

4

26

27   PROPOSED FINAL PRE-TRIAL                    Case No. 2:17-cv-05075(AB)(JPRx)
     CONFERENCE ORDER

28

1    Perfect 10's claims for contributory and vicarious liability to move

2    forward.  [Related Dkt. 97]

3    • On July 10, 2013, the Court dismissed Perfect 10's claims for

4    contributory and vicarious infringement against Livewire without leave

5    to amend, but added back in certain direct infringement claims against

6    Giganews and Livewire, so Perfect 10's case was allowed to proceed on

7    its claims for contributory, vicarious, and certain direct liability claims

8    against Giganews, and for certain direct liability claims against

9    Livewire. [Related Dkt. 129]

10    • On January 29, 2014, the Court denied Perfect 10's early motion for

11    summary judgment on the issue of DMCA compliance as to Perfect

12    10's notices of infringement.  The Court held that Perfect 10 had not

13    established that its notices complied with section 512(c)(3)(A) of the

14    Act.  [Related Dkt. 180]

15    • On February 13, 2014, the Court compelled Giganews to answer

16    interrogatories and produce documents as described in its order [Related

17    Case Dkt. 205]

18    • On February 26, 2014, the Court compelled Giganews to answer

19    interrogatories and produce documents as described in its order [Related

20    Dkt. 216]

21    •  On March 17, 2014, the Court compelled Perfect 10 to answer

22    interrogatories and produce documents as described in its order

23    [Related Dkt. 223]

24

25

26

27

28

5

- On April 24, 2014, the Court compelled Perfect to 10 to answer interrogatories and produce documents as described in its order. [Related Dkt. 254]

- On May 21, 2014, Perfect 10 filed a motion for sanctions against Giganews.  [Related Dkt. 293].

- On June 2, 2014, the Court entered an Order denying Perfect 10's motion for discovery sanctions.  [Related Dkt. 295]

- On June 5, 2014, the Court compelled Perfect to 10 to answer interrogatories and produce documents as described in its order. [Related Dkt. 311]

- On June 5, 2014, the Court compelled discovery from third-party witnesses.  [Related Dkt. 312]

- On June 23, 2014, the Court compelled interrogatory responses from Perfect 10 as described in its order.  [Related Dkt. 326]

- On August 18, 2014, Giganews filed a motion seeking sanctions against Perfect 10.  [Related Dkts. 355 & 356]

- On November 14, 2014, the Court issued two orders granting summary judgment in favor of Giganews and Livewire on the issues of direct and indirect copyright infringement, respectively.  [Related Dkts. 619 & 620.]  In those orders, the Court held that:

  o "[Perfect 10] failed to show that [Giganews or Livewire] 'himself uploaded or downloaded the files, or directly caused such uploading or downloading to occur . . .'" *Id.*

  o "After considerable discovery [the Court found] no evidence to bear out" Perfect 10's allegations of direct infringement. *Id.*

6

PROPOSED FINAL PRE-TRIAL CONFERENCE ORDER

Case No. 2:17-cv-05075(AB)(JPRx)

- o "[T]here is no evidence that Giganews received a direct financial benefit from third-party infringement of Perfect 10's copyrights to support a claim for vicarious liability.  Additionally, the record is devoid of any evidence that Giganews had the necessary knowledge of specific third-party infringements to support a claim for contributory infringement."  [Related Dkt. 620]

- On November 26, 2014, the Court entered final judgment in Giganews and Livewire's favor and against Perfect 10. [Related Dkt. 628]

- On December 1, 2014, Perfect 10 filed a motion for reconsideration of the Court's order regarding no indirect infringement.  [Related Dkt. 627].

- On February 4, 2015, the Court entered "further interim findings" on the motion for sanctions.  [Related Dkt. 676]

- On March 3, 2015, the Court denied Perfect 10's motion for reconsideration.  [Related Dkt. 682].

- On March 24, 2015, the Court awarded attorneys' fees and nontaxable costs in Giganews and Livewire's favor and against Perfect 10 in the amount of $5,637,352.53. [Related Dkt. 684].

- On or about April 4, 2015, Perfect 10 and Dr. Zada made an offer to satisfy the judgment which included $2 million in cash plus a first trust deed on Dr. Zada's home of $3.819 million.

7

**7.**    PARTIES' CLAIMS AND DEFENSES

**Plaintiffs' Claims:**

(a)    Plaintiffs plan to pursue the following claims against Defendant:

**Claim 1:**    Violation of Uniform Fraudulent Transfer Act for Actual Fraudulent Transfer Pursuant to California Civil Code § 3439.04(a)(1);

**Claim 2:**    Violation of Uniform Fraudulent Transfer Act for Constructive Fraudulent Transfer Pursuant to California Civil Code § 3439.04(a)(2)(B);

**Claim 3:**    Fraudulent Conveyance of Personal Property Without Delivery in Violation of California Civil Code § 3440.

**Attorneys' Fees and Costs:**    Plaintiffs currently intend to seek their reasonable attorneys' fees against all Defendants jointly and severally.

**Punitive Damages:**    Plaintiffs seek punitive and exemplary damages from all Defendants jointly and severally in the amount of $20,000,000, or in such other amount that the Court determines to bear a reasonable relationship to Plaintiffs' actual damages and does not otherwise violate the requirements of due process.

(b)    The elements required to establish Plaintiffs' claims are:

**Claim 1 (Actual Fraudulent Transfer):**    (1) That Giganews and Livewire have a right to payment from Perfect 10 for the amount of the underlying judgment; (2) that Defendants caused Perfect 10 to transfer funds or property to Norman Zada; (3) that Defendants transferred the funds or property with the intent to hinder, delay, or defraud one or more of Perfect 10's creditors; (4) that Giganews and Livewire were harmed; and (5) that Defendants' conduct was a substantial factor in causing Giganews and Livewire's harm.[1]

---

[1] The parties note that, notwithstanding the description of the elements of the claims here, the jury instructions and special verdict form should account for the facts that

8

**Claim 2 (Constructive Fraudulent Transfer):**     (1) That Giganews and Livewire have a right to payment from Perfect 10; (2) that Defendants caused Perfect 10 to transfer funds or property to Norman Zada; (3) that Perfect 10 did not receive a reasonably equivalent value in exchange for the transfer; (4) that Perfect 10 intended to incur debts beyond its ability to pay as they became due **or** that Perfect 10 believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due; (5) that Giganews and Livewire were harmed; and (6) that Defendants' conduct was a substantial factor in causing Giganews and Livewire's harm.[2]

The parties dispute whether Plaintiffs may alternatively prove element (4), above, by showing: that Perfect 10 was in business or about to enter a transaction when its remaining assets were unreasonably small for the business or transaction. *See* Cal. Civ. Code § 3439.04(a)(2)(A).  They have set forth their respective positions in their briefing regarding disputed jury instructions.

**Claim 3 (Conveyance Without Delivery:**   (1) Defendants caused Perfect 10 transfer personal property to Norman Zada; (2) at the time of the transfer, Perfect 10 had possession of the property; and (3) The transfer was not accompanied by an immediate delivery to Norman Zada, followed by an actual and continued change of possession of the property.

---

multiple transfers are at issue, and that Plaintiffs assert their claims against multiple Defendants.   The parties have submitted competing proposals on these topics.

[2] The parties note that, notwithstanding the description of the elements of the claims here, the jury instructions and special verdict form should account for the facts that multiple transfers are at issue, and that Plaintiffs assert their claims against multiple Defendants.   The parties have submitted competing proposals on these topics.

9

The parties dispute whether Plaintiffs must additionally prove the following elements: (4) That Norman Zada was not a buyer of the personal property in good faith; and (5) That Norman Zada did not buy the personal property for reasonably equivalent value.  They have set forth their respective positions in their briefing regarding disputed jury instructions.

    (c)    The Key Evidence Plaintiffs Rely on for Each Claim

**Claim 1 (Actual Fraudulent Transfer):**

- Norman Zada is the President and CEO of Perfect 10.  Perfect 10 is a litigation business.

- When Perfect 10 received settlement proceeds from litigation targets, Mr. Zada typically took the money out of the company within two months, even if Perfect 10 also anticipated significant expenses. When Perfect 10's bank balance decreased beyond its ability to pay, Zada would make equity contributions back to the company from his personal accounts to cover them.

- Perfect 10 sued Giganews and Livewire in 2011.  Over the course of that case, Perfect 10 lost (or mostly lost) two motions to dismiss, an early summary judgment motion, a motion for sanctions, four motions to compel, lost or had mooted seven motions for summary judgment, the Court issued discovery sanctions and attorneys' fees issued against it, and lost a motion for reconsideration.

- Between January 2014 and May 2015, Zada made ten separate transfers of money, totaling $2,204,002, from Perfect 10 to himself.

- Those transfers included an $850,000 transfer just six days after the Court granted summary judgment on November 14, 2014.  Zada

10

PROPOSED FINAL PRE-TRIAL
CONFERENCE ORDER

Case No. 2:17-cv-05075(AB)(JPRx)

confessed that he made this transfer due to the "summary judgment orders" because, after those "orders were issued, I did not see any point in keeping more cash than we needed in the account."

- Also on November 14, 2014, Mr. Zada sought a $3.5 million mortgage on the Norfield Court mansion that serves as both his residence and Perfect 10's offices.

- On December 8 and 9, 2014, with the sanctions issue pending and Giganews's motion for attorney's fees imminent, Melanie Poblete drafted a series of backdated "demand notes" that falsely portrayed those investments as "loans."

- Those notes contradicted Perfect 10's tax returns, which Zada signed under penalty of perjury. For many years the tax returns had consistently identified Zada's financial contributions to the company as equity investments, not interest-bearing loans as the notes suggest. Perfect 10's financials reflect no interest expense. The metadata in the electronic files reveals that Poblete created them, and Zada admitted that "we" created them.

- On February 4, 2015, the Court entered a 55-page order of "further interim findings" on the motion for sanctions. It stated: "Defendants have presented this Court with extensive evidence showing unjustified discovery noncompliance, numerous violations of this Court's orders, and pervasive failures by Perfect 10, its attorneys, and the Perfect 10-affiliated witnesses.

- That month, Zada renewed his inquiry regarding a substantial mortgage on Norfield Court.

11

- On March 24, 2015, the district court issued the attorney's fee award to Giganews. Mere hours after the award issued, Mr. Zada created and modified "repayment" certificates that falsely showed Perfect 10 as having repaid "loans" in the amounts Plaintiffs now allege Defendants fraudulently transferred.  Those notes include the $850,000 transfer as well as all other transfers from Perfect 10 to Mr. Zada since January 2014.

- On March 24, 2015, Mr. Zada drafted corporate minutes purporting to document the transfer of some of Perfect 10's physical assets to himself for $20,000. A week later, on April 1, 2015, he did the same for all Perfect 10's remaining physical assets, ostensibly reflecting a transfer of them to himself for $50,000.

- Mr. Zada admitted that he caused Perfect 10 to make these transfers of Perfect 10's physical assets because "it would have been totally disruptive to have those [assets] seized" in satisfaction of the judgment. Mr. Zada admitted that he needed to "save" the Perfect 10 business from "the judgment." The minutes themselves also state that Zada made the transfer "in light of the recent attorneys [sic] fees award, to avoid complete disruption" of Perfect 10's legal business.

- Perfect 10's records show Zada's transfer of $70,000 as additional paid-in capital, not as revenue from an asset sale.

- The physical assets Mr. Zada purported to buy remained on Perfect 10's books, and Perfect 10 reported a depreciation expense for them on its federal taxes for 2015, 2016, and 2017.

12

PROPOSED FINAL PRE-TRIAL
CONFERENCE ORDER

Case No. 2:17-cv-05075(AB)(JPRx)

- The assets Mr. Zada claimed to have purchased included a Lexus automobile, 4000 back issues of the Perfect 10 magazine, computers, office equipment, and furniture. The value of the magazines standing alone was between $46,000 and $120,000. The Lexus was worth around $30,000. Perfect 10's tax returns show that the original value of its office furniture and equipment was $555,464, and their value at the time of transfer was approximately $55,000.

- Mr. Zada did not know what assets he was purchasing; the Perfect 10 board minutes include a Lexus that Mr. Zada now claims he had owned all along, showing that he recognized no practical distinction between Perfect 10's assets and his own assets.  Also, the Norfield Court address contains additional personal property that Zada failed to identify in the list of asset transfers the Court ordered Defendants to provide.

- On March 26 and 27, 2015, while Giganews and Livewire's sanctions motion was pending, Zada also contributed an additional $454,002.05 to Perfect 10.  Perfect 10 immediately forwarded that exact amount to its lawyers for the potential sanctions award that was hanging over them personally. The Court later decided that sanctions were moot because of the attorney's fees award. The lawyers then transferred about $436,000 back to Perfect 10.  Shortly thereafter, Perfect 10 immediately returned the full $454,002.05 to Zada, all while a live judgment was pending against the company.

- On April 4, 2015, with the mortgage closing imminent, Mr. Zada offered to settle the underlying case on April 4, 2015 for $2 million in cash plus a $3.819 million deed of trust on the mansion.

13

- Zada represented to the Court that he did not have sufficient cash to pay the judgment. But on April 21, 2015, he closed the mortgage to take out $3.5 million of equity in the mansion.

- Melanie Poblete contacted Perfect 10's accountant to discuss "how we pay things" in light of the "$5M judgment" against Perfect 10.

- During his judgment debtor's examination on January 28, 2016, Zada confessed that he caused the transfer of $850,000 from Perfect 10 to his personal bank account due to "the summary judgment orders."

"Q: There's a withdrawal on November 20, 2014. It's an online banking transfer CHK 0277 in the amount of $850,000. Do you see that?

A:   Yes.

Q:   Is that to your personal account?

A:   Yes.

Q:   Do you share that account with anyone else?

A:   No.

Q:   That's a personal account you have at Bank of America?

A:   Correct.

Q:   At the same branch as your Perfect 10 account?

A:   I think it's the same branch.

Q:   What did that – what prompted that transfer of $850,000?

A:   Well, I had been – you know, we had gotten a significant amount of settlements in 2014. We had a settlement of $1.1 million in, I believe, June. I was entitled to that money. And after the summary judgment orders were issued, I did not see any point in keeping more cash than we needed in the account."

14

- On July 16, 2015, Melanie Poblete sent an email, copying Mr. Zada, inquiring about paying Perfect 10's bills because "Perfect 10 has a $5M judgement [sic] against it now and so we probably need to reallocate how we pay things."

- In her debtor's examination, Ms. Poblete admitted that "Norm[an Zada] was worried that Perfect 10 shouldn't be paying anything because there was a judgment against it and any money that came in should be given over. So he didn't want to be improper and pay something out of the Perfect 10 account that would have been entitled to—you know, as a judgment payment."

**Claim 2 (Constructive Fraudulent Transfer):**

- Perfect 10 classified the $70,000 "payment" for its remaining physical assets as an additional equity investment by Zada, not as proceeds from a sale of the assets.

- The assets Mr. Zada claimed to have purchased included a Lexus automobile, 4000 back issues of the Perfect 10 magazine, computers, office equipment, and furniture. The value of the magazines standing alone was between $46,000 and $120,000. The Lexus was worth around $30,000. Perfect 10's tax returns show that the original value of its office furniture and equipment was $555,464, and their value at the time of transfer was approximately $55,000.

- Perfect 10 paid no payroll taxes on the amounts it transferred to Zada in 2014 and 2015.

15

- Transfers of cash from Perfect 10 to Mr. Zada were irregular and do not resemble a typical salary; and Zada used some portion of the transferred funds to pay Perfect 10's expenses.

- Years of Perfect 10 accounting records and tax filings show that Zada held an equity investment in Perfect 10.

- Zada and Perfect 10 have represented to the Court that as of the April 4, 2015 settlement offer to Giganews and Livewire: "Dr. Zada and Perfect 10 did not have the funds to pay the full amount [of the judgment] in cash," and "Dr. Zada and Perfect 10 did the best they could do given the limited amount of cash they had available."

- The transfers out of Perfect 10's accounts left the company unable to pay operating costs and legal fees, debts that Zada paid personally.

- The 2015 asset transfer and transfer of $454,000 both occurred after the Court had entered a $5.6 million judgment against Perfect 10.

- After the transfers to Mr. Zada in 2014 and 2015, Perfect 10 had to lay off its employees, including its paralegal and bookkeeper Melanie Poblete (who continued to be Zada's close personal assistant and housemate), stop work by its accountant, definitively cease photoshoots and film purchases, and dismiss other pending litigation.

- Perfect 10 also could not pay its legal fees in the litigation against Giganews: Zada paid them personally out of his own accounts.

- Perfect 10 had four pending U.S. cases in 2014, all of which carried a risk of a fee award. It lost at every stage of its lawsuit against Giganews. Starting in 2014, it suffered adverse court orders nearly every month, and Giganews requested a substantial sanctions award in August 2014.

16

- Perfect 10 has filed over 20 copyright litigation lawsuits.
- The Copyright Act allows a court to award attorneys' fees to a defendant prevailing party, creating the chance of an award against the plaintiff in any copyright litigation.

**Claim 3 (Conveyance Without Delivery):**

- Ms. Poblete admitted that the only change to the Perfect 10 offices after Zada purportedly purchased Perfect 10's physical assets is that she "set up a sowing [sic] desk in that room for me to do my personal sowing [sic]."
- Ms. Poblete admitted that she still has access to a computer that she used before July 5, 2015, for her work at Perfect 10.
- Ms. Poblete also admitted that "nothing" had changed at Perfect 10's office after Perfect 10 transferred substantially all of its physical assets to Zada.
- The office furniture and computers remain in the same room as when Perfect 10 owned them, and Perfect 10 still uses them for its business.
- Perfect 10 continued for years to claim depreciation on its taxes for assets it purportedly transferred to Zada.

(d)   The Key Evidence Defendants Rely on for Each Claim

**Claim 1 (Actual Fraudulent Transfer):**

- Dr. Zada's testimony that he did not make any transfers with the intent to hinder, delay or defraud any creditors of Perfect 10.

17

- Dr. Zada's testimony as to why Perfect 10 sued Giganews and why Perfect 10 expected to win the case, including the exhibits supporting such testimony.

- Dr. Zada's testimony as to why Perfect 10 did not expect to be ordered to pay a fee award and the exhibits supporting such testimony.

- At least 61,000 copies of Perfect 10 images were stored on Giganews's servers and offered to Giganews subscribers, to Livewire subscribers, and to other Usenet Operators without Perfect 10's permission or payment.

- Giganews had copied at least 9,600 unlicensed Perfect 10 images from other Usenet Operators and placed them on Giganews's servers.

- Giganews charged its subscribers a monthly fee of between $5 and $30 a month to access its servers and download selected content, which included 61,000 unlicensed Perfect 10 images.

- Giganews admittedly received hundreds of thousands of notices from movie and recording studios, establishing that it was offering unlicensed movies and songs to its subscribers.

- Giganews had 25,000 trillion bytes of content on its servers with no licenses for any of that content.

- the operators of Megaupload.com had been criminally prosecuted for doing essentially what Giganews does, offering movies and songs to its subscribers without permission from copyright holders.

- No Usenet Operator had previously won, let alone received attorneys fees.

18

PROPOSED FINAL PRE-TRIAL
CONFERENCE ORDER

Case No. 2:17-cv-05075(AB)(JPRx)

- Perfect 10 had won a similar case against Usenet Operator GUBA on summary judgment.

- Perfect 10 had successfully prosecuted at least ten similar cases against paysites that had offered unlicensed copies of Perfect 10 content to their subscribers without Perfect 10's permission.

- the Supreme Court had twice found direct infringement liability under facts and circumstances similar to those in the Related Case (see *Aereo* and *Tasini)*

- Other Usenet Operators processed notices that Giganews refused to process.

- Giganews processed a number of Perfect 10 DMCA notices but waited almost 75 days to do so.

- The Ninth Circuit found that Giganews owned a few servers (Ruling p. 3) and made temporary copies (Ruling p. 8), suggesting that it had been misled by Giganews or otherwise did not understand Giganews's operation.

- The Ninth Circuit made other findings showing that it had not read Perfect 10's briefs.

- Perfect 10 had never been sanctioned or ordered to pay attorneys fees.

- no business that commercially exploited copyrighted works without permission had ever been awarded fees.

- no fee award against a copyright holder had previously exceeded that copyright holder's yearly sales.

19

- Dr. Zada is a member of the Copyright Society and had frequent discussions with recording and movie studio attorneys and knew that they largely agreed with his views.
  - Dr. Zada and Perfect 10 offered to satisfy the award by paying million $5.819 million - $4 miliom more than the transferred $1.75 million.
- Inconsistencies between the testimony of Giganews's deponents and their declarations, which show that Giganews won the Related Case at least in part by substantially misleading the Court
- Amicus briefs filed by the RIAA, MPAA, and DOJ after the District Court's ruling that contain largely the same arguments made by Perfect 10 before the District Court.
- 42 persons associated with Usenet Operators were arrested in 2016 and 2017 for offering copyrighted works without payment to copyright holders, which is essentially what Giganews does.
- Jason Gull, a senior counsel for the Department of Justice, contacted Dr. Zada on July 23, 2018, and spoke to him for at least 90 minutes while other DOJ staff listened in.  Mr. Gull asked Dr. Zada to provide Mr. Gull with whatever evidence Dr. Zada had that would assist the justice department in filing criminal charges against Giganews.
- Dr. Zada's testimony in all of his depositions from 2014 onward, as well as his declarations and his upcoming testimony at trial; and the exhibits and testimony listed on Defendants' exhibit and witness lists.

**Claim 2 (Constructive Fraudulent Transfer):**

- The $1.75 million that Dr. Zada paid himself in 2014 was a tiny fraction of the money that he had lent to Perfect 10 over the years.  Perfect 10

20

received equivalent value for the $1.75 million that was transferred to Dr. Zada because it was simply returning the same money that had been previously provided to it by Dr. Zada.  Perfect 10 also received equivalent value because that money could be viewed as partial payment to Dr. Zada for his 18 years of unpaid efforts on behalf of Perfect 10, and for his recent efforts in obtaining $4 million in settlements.  In addition, Dr. Zada was entitled to receive the $1.75 million because Perfect 10 was an S-Corporation.   In addition, with respect to the $850,000 transfer, Dr. Zada put more than 50% of that money back into the Perfect 10 bank account and paid additional Perfect 10 expenses from his personal account, to ultimately provide Perfect 10 with more than the $850,000 that was transferred.

- Perfect 10 had paid all of its bills over an 18 year period.
- Dr. Zada had managed to substantially reduce Perfect 10's expenses to the point where it had actually made money in 2013 and 2014.
- The Ninth Circuit had many of the disputed transfers before it and found that Dr. Zada did not transfer money from Perfect 10 in bad faith or strip its assets.
- The testimony of Perfect 10's accountant, Bruce Hersh, and Defendants' expert, John Cooper, supports Defendants' contention that Perfect 10 received reasonably equivalent value for the assets it transferred to Dr. Zada.  Stated simply, when Dr. Zada provided Perfect 10 with $1.75 million, and then Perfect 10 provided that $1.75 million back to Dr. Zada, both sides received equivalent value.

21

- Defendants' will also rely on Perfect 10's bank statements, which show that when each of the earlier transfers totaling $900,000 were made, Perfect 10's bank account was left with at least $1 million, which was substantially more than Perfect 10's historical bank balance of around $380,000.  In addition, Perfect 10 had all of its copyrights and trademarks, which would cost at least $11.5 million to recreate.

- Dr. Zada and Perfect 10 offered the $1.75 million that had been transferred as part of an offer of full payment.  Thus the reason the $5.63 million was not paid had nothing to do with the $1.75 million in transfers.  It was because Dr. Zada's financial situation had substantially deteriorated, and he and Perfect 10 together didn't have enough cash and had to offer part of the payment in the form of a first trust deed on Dr. Zada's home, and because Plaintiffs refused that full priced offer.

- The exhibits and testimony listed on Defendants' exhibit and witness lists.

**Claim 3 (Conveyance Without Delivery):**

- Dr. Zada has produced bank records which show that when he paid Perfect 10 $30,000 for the Lexus, he actually owned it already.  (See Defendant's Motion for Summary Judgment, Statement of Undisputed Facts ("SOF") ¶¶ 5-6.  The remaining Perfect 10 physical assets, 4,000 Perfect 10 back issues (which were previously sold for ten cents a copy in bulk), a few computers, printers, and a fifteen year old couch, desk, scanner, and a few beds, were worth at most $11,900.  (SOF ¶¶ 12, 173) Plaintiffs cannot establish fraud because the amount paid was more than five times the value of the assets.

22

- The exhibits and testimony listed on Defendants' exhibit and witness lists.

**Defendants' Affirmative Defenses:**

(a)     Defendants plan to assert the following affirmative defenses:

**Defense 1:** Failure to mitigate damages.

(b)     The elements required to establish Defendant's affirmative defenses are:

**Defense 1 (Failure to Mitigate):** (1) Plaintiffs failed to use reasonable efforts to mitigate damages; and (2) the amount by which damages would have been mitigated.[3]

Defendants' Evidence In Support of This Claim

- Defendants offered Plaintiffs the full amount of the judgment soon after Plaintiffs were granted the fee award; Plaintiffs refused to accept it.
- Plaintiffs waited months to enforce their judgment, waiting until long after Perfect 10 had exhausted its cash resources paying for ordinary expenses.

**8.     REMAINING TRIABLE ISSUES**

All of the claims and defenses identified above remain to be tried.  Giganews and Livewire also seek punitive damages and intend to seek attorneys' fees for amounts spent litigating this dispute.[4]  Should there be a defense verdict, Defendants will seek their attorney's fees.

---

[3] Plaintiffs contend that failure to mitigate is not a defense to fraudulent transfer claims.  Plaintiffs are not aware of any case or other authority that has applied the defense to claims under California Civil Code Section 3439.04.  Plaintiffs object to any instruction to the jury regarding this defense.

[4] Attorneys' fees incurred in enforcing a creditor's suit judgment are included as "reasonable necessary costs" where the underlying judgment provides for an award of attorneys' fees, as the judgment does in the underlying case.  *See* Cal. Code Civ.

23

PROPOSED FINAL PRE-TRIAL                              Case No. 2:17-cv-05075(AB)(JPRx)
CONFERENCE ORDER

**9.**    DISCOVERY

Plaintiffs assert that Defendants have not complied with all of their discovery obligations; Defendants assert that they have so complied.[5]

**10.**    DISCLOSURES AND EXHIBIT LIST

All disclosures under Fed. R. Civ. P. 26(a)(3) have been made.

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6.1 ("Joint Exhibit List").  In view of the volume of exhibits marked by each party, the parties have incorporated in the attached "Joint Exhibit List" all agreements regarding admitted exhibits, and all objections, including the grounds therefor.

**11.**    WITNESS LISTS

The parties have already filed witness lists.

Only the witnesses identified on the lists will be permitted to testify (other than solely for impeachment).

**12.**    MOTIONS IN LIMINE

The parties have already filed Motions *in Limine.*  The parties have met and conferred on the motions *in limine.*  The following motions *in limine*, and no others, are pending or contemplated:

///

///

---

Proc. §§ 685.040, 685.070; Related Case Dkt. 628 (allowing fees under 15 U.S.C. § 1117, 17 U.S.C. § 50, and Cal. Civ. Code. § 3344).

[5] Defendants would not agree to specify the outstanding discovery disputes in this document.  In the interest of complying with the Court's request for a joint filing, Plaintiffs have agreed to Defendants' proposed language.  Plaintiffs will file a supplement regarding discovery.

24

PROPOSED FINAL PRE-TRIAL CONFERENCE ORDER

Case No. 2:17-cv-05075(AB)(JPRx)

**Plaintiffs' Motions *in Limine***

1.    Plaintiffs' Motion *in Limine* No. 1 to exclude the putative expert testimony of Douglas Lichtman;

2.    Plaintiffs' Motion *in Limine* No. 2 to exclude expert opinion testimony from Robert C. Lind;

3.    Plaintiffs' Motion *in Limine* No. 3 to exclude evidence relating to settlement and mediation communications;

4.    Plaintiffs' Motion *in Limine* No. 4 to exclude improper behavior, testimony, and argument of Norman Zada;

5.    Plaintiffs' Motion *in Limine* No. 5 to exclude in part expert testimony from John R. Cooper;

6.    Plaintiffs' Motion *in Limine* No. 6 to exclude evidence relating to Professor Douglas Tygar;

7.    Plaintiffs' Motion *in Limine* No. 7 to exclude inflammatory topics the Court has already deemed irrelevant;

8.    Plaintiffs' Motion *in Limine* No. 8 to exclude evidence and argument aiming to relitigate the underlying copyright case; and

9.    Plaintiffs' Motion in *Limine* No. 9 to exclude reference to Zada's subjective belief in the likelihood of success of Perfect 10's copyright case.

**Defendants' Motions *in Limine***

1.    Defendants' Motion *in Limine* No. 1 to exclude testimony of Steven Boyles;

2.    Defendants' Motion *in Limine* No. 2 to exclude testimony of Mark Eskridge;

25

3.      Defendants' Motion *in Limine* No. 3 to exclude irrelevant and inflammatory exhibits;

4.      Defendants' Motion *in Limine* No. 4 to exclude evidence and documents related to vacated and denied sanctions order;

5.      Defendants' Motion *in Limine* No. 5 to exclude testimony of Plaintiffs' re chances of likelihood of prevailing;

6.      Defendants' Motion *in Limine* No. 6 to exclude evidence of Dr. Zada's wealth and strike punitive damages claims;

7.      Defendants' Motion *in Limine* No. 7 to exclude video testimony and/or live witness testimony; and

8.      Defendants' Motion *in Limine* No. 8 to exclude selected portions of fee order.

**13.     <u>BIFURCATION</u>**

**Defendants' Position:**

To the extent Plaintiffs are allowed to continue with their punitive damages claims, Defendants request that this issue be bifurcated, and that the jury determine liability before it is provided with any additional evidence related to punitive damages.  As discussed in Defendants' Motion in Limine No. 6 regarding Defendants' wealth, the vast majority, if not all, of the documents that Plaintiffs seek to introduce regarding Dr. Zada's wealth are irrelevant and violative of his privacy.  As such, in the context of this case, it makes sense to bifurcate the issues of liability and punitive damages in order to prevent prejudice to Dr. Zada in the liability phase of trial by placing undue and irrelevant focus on his wealth.  If the Court grants Motion in Limine No. 6, it should also provide for bifurcation.

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' Position:**

Defendants' request to bifurcate is untimely.  Defendants have been aware of Plaintiffs' claim for punitive damages since Plaintiffs filed the Complaint on July 10, 2017 (Dkt. 1), and have never previously raised the issue of bifurcation.   A motion under Rule 42(b) should be fully noticed, not included as an aside in a final pretrial conference order.  *See, e.g.,  Hirst v. Gertzen,* 676 F.2d 1252, 1261 (9th Cir. 1982)(describing factors); *see also* The Rutter Group Prac. Guide Fed. Civ. Trials & Evid Ch. 4-G A § 4:488 (2019).

Bifurcation is also unnecessary and would waste judicial and party resources. "Bifurcation is the exception rather than the rule."  *Baker v. Colonial Life & Acc. Ins. Co.*, No. C14-0319JLR, 2014 WL 3850848, at *2 (W.D. Wash. Aug. 5, 2014) (citing *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (citation omitted)).  "[T]he normal procedure is to try compensatory and punitive damage claims together with appropriate instructions to make clear to the jury the difference in the clear and convincing evidence required for the award of punitive damages."  *Willard v. Foremost Ins. Co.*, No. EDCV 13-0262 JGB (DTBx), 2014 WL 12589331, at *3 (C.D. Cal. May 9, 2014) (citing *Hangarter*, 373 F.3d at 1021)).

The party seeking bifurcation "has the burden of proving that bifurcation is justified given the facts in [the] case."  *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 102 (N.D. Cal. 1992).  Here, Defendants have offered no reason to deviate from normal practice.  A second trial on punitive damages would consider substantially the same evidence and be a wasteful exercise.  *See, e.g., Datel Holdings LTD. v. Microsoft Corp.*, No. C-09-05535 EDL, 2010 WL 3910344, at *2-5 (N.D. Cal. Oct. 4, 2010).

27

**14.** <u>ADMISSIONS</u>

The parties have made the foregoing admissions, and the parties having specified the foregoing issues remaining to be litigated, this Final Pre-Trial Order shall supersede the pleadings, and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

DATED:

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

Approved as to form and content:


Dated:  February 8, 2019          FENWICK & WEST LLP


                                  By: */s/ Todd Gregorian*
                                      Todd Gregorian

                                  Attorneys for Plaintiffs/Judgment Creditors,
                                  GIGANEWS, INC., and LIVEWIRE
                                  SERVICES, INC.


Dated:  February 8, 2019          LAW OFFICES OF MATTHEW C.

                                  MICKELSON


                                  By: */s/ Matthew C. Mickelson*
                                      Matthew C. Mickelson

                                  Attorneys for Defendants,
                                  PERFECT 10, INC. and NORMAN ZADA


28